**EXECUTION COPY**

AGREEMENT AND PLAN OF MERGER BY AND AMONG

MERCURY COMPUTER SYSTEMS, INC.,

KING MERGER INC.,

KOR ELECTRONICS,

AND

THE SECURITYHOLDERS' REPRESENTATIVE NAMED HEREIN

Dated as of December 22, 2011

A/74600477.20

**Mercury Proprietary Information**

## TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS; CERTAIN RULES OF CONSTRUCTION.......................... 2

    Section 1.01.        Definitions.................................................................. 2
    Section 1.02.        Certain Matters of Construction....................................... 16

ARTICLE II       THE MERGER ................................................................. 17

    Section 2.01.        The Merger................................................................. 17
    Section 2.02.        Closing; Effective Time ................................................ 17
    Section 2.03.        Articles of Incorporation and Bylaws of the Surviving
                             Corporation ................................................................ 18
    Section 2.04.        Directors and Officers of the Surviving Corporation ....................... 18
    Section 2.05.        Effects of the Merger ................................................... 18

ARTICLE III      MERGER CONSIDERATION; CONVERSION OF SHARES ................. 18

    Section 3.01.        Conversion of Stock.................................................... 18
    Section 3.02.        Total Merger Consideration............................................ 19
    Section 3.03.        Surrender of Certificates .............................................. 20
    Section 3.04.        Treatment of Options .................................................. 21
    Section 3.05.        Working Capital Adjustment ......................................... 21
    Section 3.06.        Withholding ............................................................. 24
    Section 3.07.        Dissenting Shares...................................................... 25
    Section 3.08.        Changes in Shares ..................................................... 25
    Section 3.09.        Further Assurances..................................................... 25

ARTICLE IV       REPRESENTATIONS AND WARRANTIES REGARDING THE
                      COMPANY................................................................. 26

    Section 4.01.        Organization............................................................. 26
    Section 4.02.        Power and Authorization ............................................. 26
    Section 4.03.        Authorization of Governmental Authorities ....................... 27
    Section 4.04.        Noncontravention....................................................... 27
    Section 4.05.        Capitalization of the Company ...................................... 27
    Section 4.06.        Financial Matters....................................................... 28
    Section 4.07.        Absence of Certain Developments................................... 30
    Section 4.08.        Debt; Guarantees....................................................... 30
    Section 4.09.        Assets .................................................................... 30
    Section 4.10.        Real Property ........................................................... 31
    Section 4.11.        Intellectual Property.................................................... 32
    Section 4.12.        Legal Compliance; Illegal Payments; Permits.................... 35
    Section 4.13.        Tax Matters ............................................................. 36
    Section 4.14.        Employee Benefit Plans............................................... 39
    Section 4.15.        Environmental Matters................................................. 41
    Section 4.16.        Contracts ................................................................ 42

i

**Mercury Proprietary Information**

TABLE OF CONTENTS

(continued)

Page

Section 4.17.    Government Contracts ........................................................................... 44
Section 4.18.    Related Party Transactions ................................................................... 47
Section 4.19.    Customers and Suppliers....................................................................... 47
Section 4.20.    Labor Matters ......................................................................................... 48
Section 4.21.    Litigation; Governmental Orders ......................................................... 48
Section 4.22.    Insurance ................................................................................................. 48
Section 4.23.    Books and Records ................................................................................. 49
Section 4.24.    No Brokers ............................................................................................... 49

ARTICLE V       REPRESENTATIONS AND WARRANTIES  OF PARENT AND
                MERGER SUB ........................................................................................ 50

Section 5.01.    Organization............................................................................................ 50
Section 5.02.    Power and Authorization ....................................................................... 50
Section 5.03.    Authorization of Governmental Authorities ...................................... 50
Section 5.04.    Noncontravention.................................................................................... 50
Section 5.05.    No Brokers ............................................................................................... 51
Section 5.06.    Merger Sub Capitalization .................................................................... 51
Section 5.07.    Litigation ................................................................................................. 51
Section 5.08.    Financing.................................................................................................. 51

ARTICLE VI      COVENANTS OF THE PARTIES ............................................................ 51

Section 6.01.    Conduct of the Business of the Company and its Subsidiaries.......... 51
Section 6.02.    Access to Information ............................................................................. 54
Section 6.03.    Commercially Reasonable Efforts; Notices and Consents ............... 54
Section 6.04.    Expenses .................................................................................................. 54
Section 6.05.    Notification of Certain Matters ............................................................ 54
Section 6.06.    Publicity .................................................................................................. 54
Section 6.07.    Conditions to the Contemplated Transactions; Further
                Assurances ............................................................................................. 55
Section 6.08.    Certain Employment and Employee Benefits Matters....................... 55
Section 6.09.    Directors' and Officers' Indemnification and Insurance ................... 57
Section 6.10.    Merger Sub and Surviving Corporation............................................... 58
Section 6.11.    Section 280G Approval........................................................................... 58
Section 6.12.    Shareholder Merger Approval ............................................................... 58

ARTICLE VII     CONDITIONS TO THE OBLIGATIONS OF PARENT AND
                MERGER SUB AT THE CLOSING............................................................ 59

Section 7.01.    Representations and Warranties............................................................ 59
Section 7.02.    Agreements and Covenants................................................................... 59
Section 7.03.    Delivery of Closing Certificates ........................................................... 59
Section 7.04.    Qualifications........................................................................................... 60

ii

**Mercury Proprietary Information**

TABLE OF CONTENTS
(continued)

Page

Section 7.05.    Absence of Litigation..................................................................... 60
Section 7.06.    Consents, etc ................................................................................. 60
Section 7.07.    Proceedings and Documents ......................................................... 60
Section 7.08.    Ancillary Agreements ................................................................... 60
Section 7.09.    Resignations ................................................................................. 60
Section 7.10.    No Material Adverse Change......................................................... 60
Section 7.11.    Payoff Letters and Lien Releases, etc ........................................... 60
Section 7.12.    DLA Opinion ................................................................................ 61
Section 7.13.    Non-Competition Agreements ...................................................... 61
Section 7.14.    Principal Shareholders Agreements .............................................. 61

ARTICLE VIII    CONDITIONS TO THE COMPANY'S  OBLIGATIONS AT THE
                CLOSING ....................................................................................... 61

Section 8.01.    Representations and Warranties.................................................... 61
Section 8.02.    Agreements and Covenants........................................................... 61
Section 8.03.    Officers Certificate....................................................................... 61
Section 8.04.    Qualifications ............................................................................... 61
Section 8.05.    Absence of Litigation ................................................................... 61
Section 8.06.    Ancillary Agreements ................................................................... 61

ARTICLE IX    INDEMNIFICATION ...................................................................... 62

Section 9.01.    Indemnification by the Securityholders ........................................ 62
Section 9.02.    Indemnification by the Parent....................................................... 64
Section 9.03.    Time for Claims; Notice of Claims............................................... 65
Section 9.04.    Third Party Claims........................................................................ 66
Section 9.05.    Indemnity Escrow ........................................................................ 68
Section 9.06.    Knowledge and Investigation ....................................................... 69
Section 9.07.    Remedies Cumulative ................................................................... 69
Section 9.08.    Sole Remedy ................................................................................. 69
Section 9.09.    Merger Consideration Adjustment................................................ 69
Section 9.10.    Insurance ...................................................................................... 69

ARTICLE X    TAX MATTERS.................................................................................. 70

Section 10.01.    Tax Indemnification..................................................................... 70
Section 10.02.    Tax Return Preparation ................................................................ 70
Section 10.03.    Computation of Taxes for Straddle Periods.................................. 72
Section 10.04.    Section 338(g)............................................................................. 72
Section 10.05.    Allocation of Certain Expenses ................................................... 72
Section 10.06.    Tax Sharing Agreements............................................................... 72
Section 10.07.    Certain Taxes and Fees ................................................................ 73
Section 10.08.    Cooperation on Tax Matters ........................................................ 73

**Mercury Proprietary Information**

<u>TABLE OF CONTENTS</u>
(continued)

<u>Page</u>

Section 10.09.    Control ....................................................................................... 73
Section 10.10.    Section 280G Vote Solicitation ........................................ 74
Section 10.11.    Tax Treatment of Escrow ................................................. 75

ARTICLE XI        TERMINATION ........................................................................ 75

Section 11.01.    Termination of Agreement ............................................... 75
Section 11.02.    Effect of Termination ...................................................... 76

ARTICLE XII       MISCELLANEOUS .................................................................. 76

Section 12.01.    Notices ............................................................................. 76
Section 12.02.    Succession and Assignment; No Third-Party Beneficiaries ............. 78
Section 12.03.    Amendments and Waivers ................................................ 78
Section 12.04.    Provisions Concerning the Securityholders' Representative ............ 79
Section 12.05.    Entire Agreement ............................................................ 81
Section 12.06.    Counterparts; Facsimile Signature .................................. 81
Section 12.07.    Severability ...................................................................... 81
Section 12.08.    Governing Law ................................................................ 81
Section 12.09.    Jurisdiction; Venue; Service of Process ......................... 82
Section 12.10.    Specific Performance ...................................................... 83
Section 12.11.    Waiver of Jury Trial ........................................................ 83

iv

**Mercury Proprietary Information**

## EXHIBITS

EXHIBIT

| | |
|---|---|
| A | Form of Escrow Agreement |
| B | Agreement of Merger |
| C | Letter of Transmittal |
| D | Form of Option Cancellation Acknowledgement |
| E | Form of FIRPTA Certificate |
| F | Form of DLA Opinion |
| G-1 | Form of Non-Competition Agreement (California) |
| G-2 | Form of Non-Competition Agreement (Colorado) |
| H | Form of Principal Shareholders Agreement |

## ANNEXES

ANNEX

| | |
|---|---|
| I | List of Principal Shareholders |
| II | Net Working Capital Calculation Schedule |
| III | Securityholders Subject to Non-Compete |
| IV | Directors and Officers of Surviving Corporation; Resignations |

A/74600477.20

**Mercury Proprietary Information**

AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (as amended, modified or supplemented from time to time, this "<u>Agreement</u>") is made and entered into as of December 22, 2011 by and among MERCURY COMPUTER SYSTEMS, INC., a Massachusetts corporation ("<u>Parent</u>"), King Merger Inc., a California corporation and a wholly-owned subsidiary of Parent ("<u>Merger Sub</u>"), KOR ELECTRONICS, a California corporation (the "<u>Company</u>"), and Shareholder Representative Services LLC, a Colorado limited liability company, solely in its capacity as the Securityholders' Representative (as defined below).

<u>RECITALS</u>

WHEREAS, the Board of Directors of the Company (the "<u>Company Board</u>") has determined that this Agreement and the transactions contemplated hereby, including the merger of Merger Sub with and into the Company (the "<u>Merger</u>") in accordance with the California General Corporation Law (the "<u>CGCL</u>"), with the Company continuing as the surviving corporation in the Merger and a wholly-owned subsidiary of Parent, are advisable, fair to and in the best interests of the shareholders of the Company (the "<u>Shareholders</u>"), and has approved this Agreement and the transactions contemplated hereby, including the Merger, and recommended that the Shareholders adopt this Agreement and approve the Merger, all upon the terms and subject to the conditions set forth herein;

WHEREAS, concurrently with the execution of this Agreement, the holders of outstanding shares of capital stock of the Company listed on <u>Annex I</u> hereto (the "<u>Principal Shareholders</u>"), holding shares of common stock, par value $0.0001 per share, of the Company (the "<u>Common Stock</u>" with such outstanding common shares being referred to herein as the "<u>Common Shares</u>"), and all of the issued and outstanding shares of Series F convertible preferred stock, par value $0.0001 per share, of the Company (the "<u>Preferred Stock</u>" and, together with the Common Shares, referred to herein as the "<u>Shares</u>"), in the aggregate representing more than 50% of the outstanding Common Stock, more than 50% of the outstanding Preferred Stock and more than 50% of the total voting power of the capital stock of the Company, have executed and delivered a written consent adopting this Agreement and approving the Merger upon the terms and subject to the terms set forth herein;

WHEREAS, the Boards of Directors of Parent and Merger Sub have each determined that this Agreement and the transactions contemplated hereby, including the Merger, are advisable and in the best interests of their respective shareholders, and have approved this Agreement and the transactions contemplated hereby, including the Merger, and Parent, as the sole stockholder of Merger Sub, has adopted this Agreement and approved the Merger, all upon the terms and subject to the conditions set forth herein;

WHEREAS, by virtue of the Merger, all Shares will be converted into the right to receive cash, as described herein;

WHEREAS, in connection with the Merger, all of the issued and outstanding options to acquire Common Stock (the "<u>Options</u>") will be terminated, with holders of Vested Options (defined herein) receiving a cash payment as provided herein; and

WHEREAS, contemporaneously with the Closing (as defined herein), Parent and Merger Sub shall enter into an Indemnity Escrow Agreement with Wells Fargo Bank, N.A., as escrow agent (the "Escrow Agent"), and the Securityholders' Representative, as the representative of the Shareholders and the holders of the Vested Options (collectively, the "Securityholders"), substantially in the form of Exhibit A hereto (the "Escrow Agreement").

AGREEMENT

NOW THEREFORE, in consideration of the premises and mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the parties to this Agreement hereby agree as follows:

ARTICLE I
DEFINITIONS; CERTAIN RULES OF CONSTRUCTION.

Section 1.01.   Definitions.

(a)      In addition to the other terms defined throughout this Agreement, the following terms shall have the following meanings when used in this Agreement:

"8(a) Business Development Concern" means a firm that the SBA has certified as eligible for participation in the 8(a) Business Development Program as described in 48 C.F.R. § 19.800 and 15 U.S.C. § 637(a).

"1933 Act" means the Securities Act of 1933, as amended.

"Accounting Principles" means GAAP as in effect on the Most Recent Balance Sheet Date applied on a basis consistent with the methodology used to prepare the Net Working Capital Calculation Schedule.

"Action" means any claim, controversy, action, cause of action, suit, litigation, arbitration, investigation, opposition, interference, audit, assessment, hearing, complaint, demand or other legal proceeding (whether sounding in contract, tort or otherwise, whether civil or criminal and whether brought at law or in equity) that is commenced, brought, conducted, tried or heard by or before, or otherwise involving, any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such specified Person.  For purposes of the foregoing, (a) a Person shall be deemed to control a specified Person if such Person (or a Family Member of such Person) possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such specified Person or (b) if such other Person is at such time a direct or indirect beneficial holder of at least 10% of any class of the Equity Interests of such specified Person.

2

"Ancillary Agreements" means the Escrow Agreement, the Option Cancellation Acknowledgements, the Letter of Transmittal, the Non-Competition Agreements, the Principal Shareholder Agreements and each of the other agreements, certificates, instruments and documents to be executed and delivered by the parties in connection with the Contemplated Transactions.

"Appraisal Costs" means any costs incurred by the Company before or after the Effective Time in connection with any Dissenting Shares pursuant to Section 3.07 (Dissenting Shares), including payments required to be made to holders of Dissenting Shares and legal fees, but only to the extent that (i) such payments exceed the Merger Consideration that would otherwise have been payable to such holders in the Merger had their Shares not been Dissenting Shares and (ii) such fees and expenses are not paid by the Company prior to the Effective Time.

"Business" means the businesses conducted by the Company and its Subsidiaries as of the date hereof.

"Business Day" means any day other than a Saturday or a Sunday or a weekday on which banks in Boston, Massachusetts are authorized or required to be closed.

"Change of Control Payment" means (a) any bonus, severance or other payment or other form of Compensation that is created, accelerated, accrues or becomes payable by the Company to any present or former director, stockholder, employee or consultant thereof, including pursuant to any employment agreement, benefit plan or any other Contractual Obligation, including any Taxes payable on or triggered by any such payment (other than payments in respect of the Shares and Options under or as described in Article III of this Agreement, including payments in respect of Vested Options that have been accelerated in connection with the Contemplated Transactions in accordance with Section 3.04), to the extent the Company or any Subsidiary is responsible for the payment or reimbursement of any such Taxes and (b) without duplication of any other amounts included within the definition of Company Transaction Expenses, any other payment, expense or fee that accrues or becomes payable by the Company to any Governmental Authority or other Person under any Legal Requirement or Contractual Obligation, including in connection with the making of any filings, the giving of any notices or the obtaining of any consents, authorizations or approvals, in the case of each of (a) and (b), as a result of, or in connection with, the execution and delivery of this Agreement or any Ancillary Agreement or the consummation of the Contemplated Transactions.

"Classified Government Contract" means any Government Contract where any portion of the agreement or performance of the agreement is classified pursuant to Executive Order 13292.

"Closing Cash Amount" means the amount of cash and cash equivalents held by the Company and the Company's Subsidiaries, net of outstanding checks, as of the close of business on the day immediately preceding the Closing Date.

3

"Closing Date" means the date on which the Closing actually occurs.

"Closing Debt Amount" means the amount of Debt of the Company as of the Closing Date immediately prior to the Closing.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Company Disclosure Schedule" means the separate set of schedules relating to this Agreement and prepared by the Company and delivered by the Company to Parent immediately prior to the execution and delivery of this Agreement.

"Company Intellectual Property Rights" means all Licensed Intellectual Property Rights and Owned Intellectual Property Rights.

"Company's Knowledge," "Knowledge of the Company" and similar formulations mean that one or more of Kevin Carnino, Thomas O'Hara, Wayne Girard, Brett Keating, Peter Reese, Theodore Batch, Richard Halvas and Matthew Hughes (a) has actual knowledge of the fact or other matter at issue or (b) should have had actual knowledge of such fact or other matter assuming the diligent exercise of such individual's duties as an officer or employee of the Company or a Subsidiary of the Company and after reasonable inquiry of all employees of the Company/or such Subsidiary reasonably expected to have actual knowledge of such fact or matter.

"Company Products" means any products being sold, manufactured or developed, and any services being provided, by the Company and its Subsidiaries in connection with and/or related to the Business as currently conducted.

"Company Transaction Expenses" means all costs, fees and expenses incurred in connection with or in anticipation of the negotiation, execution and delivery of this Agreement and the Ancillary Agreements or the consummation of the Contemplated Transactions to the extent such costs, fees and expenses are payable or reimbursable by the Company, including, (i) all fees and expenses of Pagemill Partners and all other brokerage fees, commissions, finders' fees or financial advisory fees, (ii) the fees and expenses of DLA Piper LLP (US) and Mayer Hoffman McCann P.C. and all other fees and expenses of legal counsel, accountants, consultants and other experts and advisors so incurred, (iii) all Change of Control Payments, (iv) the cost of any D&O coverage obtained pursuant to Section 6.09; (v) all Appraisal Costs, (vi) without duplication of any Appraisal Costs, to the extent not covered by the insurance referred to in Section 6.09(b), all other costs and expenses incurred by the Company or any Subsidiary in connection with any claim asserted by any Securityholders in connection with the Contemplated Transactions (other than a claim for payment of amounts due under Article III or the Escrow Agreement) and (vii) all costs and expenses of the Securityholders' Representative not funded by the SR Escrow Amount. Company Transaction Expenses will not include the fees of the Escrow Agent pursuant to the Escrow Agreement or the Paying Agent pursuant to the Paying Agent Agreement.

4

"Compensation" means, with respect to any Person, all salaries, compensation, remuneration, bonuses or benefits of any kind or character whatsoever (including issuances or grants of Equity Interests), made directly or indirectly by the Company or any of its Subsidiaries to or for the benefit of such Person or any Family Member of such Person.

"Contemplated Transactions" means the transactions contemplated by this Agreement, including (a) the Merger, (b) the cancellation of the Options and the making of the Option Payments, (c) the execution, delivery and performance of the Ancillary Agreements, and (d) the payment of fees and expenses relating to such transactions.

"Contractual Obligation" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, sublease, license, sublicense or other commitment, promise, undertaking, obligation, arrangement, instrument or understanding, whether written or oral, to which or by which such Person is a party or otherwise subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Debt" means, with respect to any Person, and without duplication, all Liabilities of such Person (a) for borrowed money (including amounts outstanding under overdraft facilities, and all principal, accrued interest, penalties, fees and premiums), (b) evidenced by notes, bonds, debentures or other similar Contractual Obligations, (c) in respect of "earn-out" obligations and other obligations for the deferred purchase price of property, goods or services (other than trade payables or accruals incurred in the Ordinary Course of Business), (d) for the capitalized liability under all capital leases of such Person (determined in accordance with GAAP), (e) in respect of letters of credit and bankers' acceptances, (f) for Contractual Obligations relating to interest rate protection, swap agreements and collar agreements, in each case, to the extent payable if such Contractual Obligation is terminated at the Closing, and (g) in the nature of Guarantees of the obligations described in clauses (a) through (f) above of any other Person.

"Deferred Merger Consideration" means any additional consideration payable with respect to the Shares and Vested Options pursuant to Section 3.05 (*Working Capital Adjustment*) or pursuant to the Escrow Agreement.

"Distribution" means a declaration, setting aside or payment by the Company or any of its Subsidiaries of any dividend or other distribution (whether in cash, equity or property) on or with respect to, or redemption, purchase or other acquisition by the Company or any of its Subsidiaries of, any Equity Interest of the Company or any Subsidiaries.

"Employee Plan" means any plan, program, policy, arrangement or Contractual Obligation, whether formal or informal, whether or not reduced to writing, and whether covering a single individual or a group of individuals, that is (a) a welfare plan within the meaning of Section 3(1) of ERISA, (b) a pension benefit plan within the meaning of Section 3(2) of ERISA, (c) a stock bonus, stock purchase, stock option, restricted stock,

stock appreciation right or similar equity-based plan or (d) any other deferred-compensation, retirement, severance, welfare-benefit, reimbursement, bonus, profit-sharing, incentive or fringe-benefit plan, program or arrangement.

"Encumbrance" means any charge, claim, community or other marital property interest, equitable or ownership interest, lien, license, option, pledge, security interest, mortgage, deed of trust, right of way, easement, encroachment, servitude, right of first offer or first refusal, buy/sell agreement and any other restriction or covenant with respect to, or condition governing the use, construction, voting (in the case of any security or Equity Interest), transfer, receipt of income or exercise of any other attribute of ownership (other than, in the case of a security, any restriction on the transfer of such security arising solely under federal and state securities laws).  "Encumbered" has a meaning correlative with the foregoing,

"Enforceable" means, with respect to any Contractual Obligation stated to be Enforceable by or against any Person, that such Contractual Obligation is a legal, valid and binding obligation of such Person enforceable by or against such Person in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"Environmental Laws" means any Legal Requirement relating to (a) releases or threatened releases of Hazardous Substances, (b) pollution or protection of public health or the environment or worker safety or health or (c) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances.

"Equity Interest" means, with respect to any Person, (a) any capital stock, partnership or membership interest, unit of participation or other similar interest (however designated) in such Person and (b) any option, warrant, purchase right, conversion right, exchange right or other Contractual Obligation which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974.

"Escrow Amount" means $10,500,000.

"Facilities" means any buildings, plants, improvements or structures located on the Real Property.

"Family Member" means, with respect to any individual, (a) such Person's spouse, (b) each parent, brother, sister or child of such Person or such Person's spouse, (c) the spouse of any Person described in clause (b) above, (d) each child of any Person described in clauses (a), (b) or (c) above, (e) each trust created for the benefit of one or

6

more of the Persons described in clauses (a) through (d) above and (f) each custodian or guardian of any property of one or more of the Persons described in clauses (a) through (e) above in his or her capacity as such custodian or guardian.

"Fully-Diluted Common Share Number" means the total number of issued and outstanding shares of Common Stock immediately prior to the Effective Time calculated on a fully-diluted basis assuming the exercise in full of all Vested Options that are outstanding at such time, but without giving effect to any potential conversion of the Preferred Stock.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time.

"Government Contract" means any Contractual Obligation between the Company or any of its Subsidiaries in its capacity as a prime contractor and any United States Government department or agency or an agency of a foreign sovereign.  A task, purchase or delivery order under a Government Contract shall not constitute a separate Government Contract, but shall be part of the Government Contract to which it relates.

"Government Order" means any order, writ, judgment, injunction, decree, stipulation, ruling, decision, verdict, determination or award made, issued or entered by or with any Governmental Authority.

"Government Subcontract" means any Contractual Obligation between the Company or any of its Subsidiaries and any prime contractor or upper-tier subcontractor relating to a Contractual Obligation between such Person and any United States Government department or agency or an agency of a foreign sovereign, and any subcontract under a Government Contract awarded by the Company or any of its Subsidiaries to another party in each case including any task orders or delivery orders issued under such Contractual Obligation or subcontract.

"Governmental Authority" means any United States federal, state, local, municipal or any foreign government, or political subdivision thereof, regulatory, self-regulatory, or any multinational organization or authority, or any other authority, agency, bureau, board, court, department, tribunal, instrumentality or commission thereof entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal, or any arbitrator or arbitral body.

"Guarantee" means, with respect to any Person, (a) any guarantee of the payment or performance of, or any contingent obligation in respect of, any Debt or other Liability of any other Person, (b) any other arrangement whereby credit is extended to any obligor (other than such Person) on the basis of any promise or undertaking of such Person (i) to pay the Debt or other Liability of such obligor, (ii) to purchase any obligation owed by such obligor, (iii) to purchase or lease assets under circumstances that are designed to enable such obligor to discharge one or more of its obligations or (iv) to maintain the capital, working capital, solvency or general financial condition of such obligor and

A/74600477.20

(c) any liability as a general partner of a partnership or as a venturer in a joint venture in respect of Debt or other Liabilities of such partnership or venture.

"Hazardous Substance" means any pollutant, petroleum, or any fraction thereof, contaminant or toxic or hazardous material (including toxic mold), substance or waste.

"HUBZone Small Business Concern" means a Small Business Concern that appears on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration (13 CFR § 126.103).

"Indemnified Person" means, with respect to any Indemnity Claim, each Parent Indemnified Person or Securityholder Indemnified Person asserting the Indemnity Claim (or on whose behalf the Indemnity Claim is asserted) under Section 9.01 or 9.02, as the case may be (it being understood that, as contemplated by Section 9.04 or Article X, the Securityholders' Representative will be the sole and exclusive agent, representative and attorney-in-fact for each of the Securityholders for all purposes of asserting Indemnity Claims, receiving and giving notices and service of process in respect thereof, making filings with any court or other Governmental Authority in respect thereof and controlling and otherwise making all decisions in connection with each Indemnity Claim brought on behalf of any Securityholder Indemnified Person under Section 9.02, and the term "Indemnified Person" shall mean the Securityholders' Representative to the extent that it is acting in such capacity on behalf of any Securityholder).

"Indemnifying Party" means, with respect to any Indemnity Claim, the party or parties against whom such Indemnity Claim may be or has been asserted (it being understood that, without in any way limiting the Securityholders' payment and other obligations under any Contractual Obligation or Governmental Order arising out of, relating to, or resulting from any Indemnity Claim, as contemplated by Section 9.04 or Article X, the Securityholders' Representative will be the sole and exclusive agent, representative and attorney-in-fact for each of the Securityholders for all purposes of responding to and defending Indemnity Claims, receiving and giving notices and service of process in respect thereof, making filings with any court or other Governmental Authority in respect thereof, controlling and otherwise making all decisions on behalf of each of the Securityholders in connection with each Indemnity Claim brought against any of the Securityholders under Section 9.01 or Article X, and the term "Indemnifying Party" shall mean the Securityholders' Representative when it is acting in such capacity on behalf of any or all of the Securityholders.

"Indemnity Claim" means a claim for indemnity under Section 9.01 or 9.02 or Article X, as the case may be.

"Intellectual Property Rights" means any and all statutory and/or common rights of every kind and nature, throughout the world, in, arising out of, or associated with:

(b)  patents, utility models and all reissues, divisions, re-examinations, renewals, extensions, provisionals, continuations and continuations-in-part thereof and patentable inventions;

8

(c)     copyrights, works of authorship, including computer programs, source code and executable code, whether embodied in software, firmware, documentation, designs, files, records, schematics, layouts or data, and mask works, rights of privacy and publicity, moral rights, database rights provided by law, and all other proprietary rights;

(d)     trademarks, trade names, service marks, service names, brands, trade dress and logos, and the goodwill associated therewith;

(e)     domain names, web addresses and uniform resource locators (URLs);

(f)     confidential information, trade secrets, and, to the extent confidential discoveries, innovations, know-how, proprietary information (including ideas, research and development, formulas, algorithms, compositions, processes and techniques, data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, graphics, illustrations, artwork, documentation, and manuals), including improvements, modifications, works in process, derivatives, or changes, to any of the foregoing;

(g)     any other intellectual property or similar corresponding or equivalent rights to any of the foregoing anywhere in the world; and

(h)     any and all registrations and applications relating to any of the foregoing.

"Key Employees" means each of the persons listed in Annex III hereto.

"Legal Requirement" means any United States federal, state or local or any foreign law, statute, standard, ordinance, code, rule, regulation, resolution or promulgation, or any Government Order, or any Permit granted under any of the foregoing, or any similar provision having the force or effect of law.

"Liability" means, with respect to any Person, any liability or obligation of such Person whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether directly incurred or consequential, whether due or to become due and whether or not required under GAAP to be accrued on the financial statements of such Person.

"Licensed Intellectual Property Rights" means Intellectual Property Rights licensed to the Company or any of its Subsidiaries that are used in and/or necessary for the conduct of the Business as currently conducted.

"Material Adverse Effect" means a material adverse effect on the business, assets, properties, financial condition, or results of operations or prospects of the Company; provided, however, that in no event shall any change resulting from changes in general

9

business, financial, political, capital market or economic conditions (including any change resulting from any hostilities, war or military or terrorist attack) be taken into account in the determination of whether a Material Adverse Effect has occurred, except to the extent such change adversely affects the Company more than other companies in its industry.

"Merger Consideration" means the Per Common Share Initial Merger Consideration or Per Preferred Share Initial Merger Consideration, as applicable plus any Deferred Merger Consideration.

"Net Working Capital" means the remainder of (a) the current assets of the Company reflected in the line items included in the Net Working Capital Calculation Schedule, but excluding cash and cash equivalents, minus (b) the current liabilities of the Company reflected in the line items included in the Net Working Capital Calculation Schedule, in each case, calculated as of the close of business on the day immediately preceding the Closing Date in accordance with the Accounting Principles; provided, that Net Working Capital shall not take into account any amounts in respect of Tax assets or Tax liabilities, the current portions of any amounts reflected in the Closing Debt Amount or any accrued liabilities that constitute Company Transaction Expenses.

"Net Working Capital Adjustment Amount" means the difference between (a) the amount of the Net Working Capital as finally determined pursuant to Section 3.05 and (b) the Net Working Capital Target.

"Net Working Capital Calculation Schedule" means the calculation of Net Working Capital attached as Annex II hereto.

"Net Working Capital Target" means $5,314,000.

"Option Payments" means the amount to be paid to any holder of Vested Options pursuant to Section 3.04 and the Escrow Agreement.

"Ordinary Course of Business" means an action taken by any Person in the ordinary course of such Person's business that is consistent with the past customs and practices of such Person (including past practice with respect to quantity, amount, magnitude and frequency, standard employment and payroll policies and past practice with respect to management of working capital and the making of capital expenditures) and that is taken in the ordinary course of the normal day-to-day operations of such Person.

"Organizational Conflict of Interest" means that because of other activities or relationships with other Persons, a Person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage as further defined in FAR subpart 9.5.

10

"Organizational Documents" means, with respect to any Person (other than an individual), (a) the certificate or articles of incorporation or organization and any joint venture, limited liability company, operating or partnership agreement and other similar documents adopted or filed in connection with the creation, formation or organization of such Person and (b) all by-laws, voting agreements and similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Owned Intellectual Property Rights" means Intellectual Property Rights owned by the Company or any of its Subsidiaries that are used in or necessary for the conduct of the Business as currently conducted.

"Parent Disclosure Schedule" means the separate set of schedules relating to this Agreement and prepared and delivered by Parent to the Company and the Securityholders' Representative immediately prior to the execution and delivery of this Agreement.

"Paying Agent Agreement" means the written agreement between the Company and the Paying Agent regarding the Paying Agent's services.

"Per Common Share Initial Merger Consideration" means the quotient obtained by dividing (a) the sum of the Total Common/Option Merger Consideration plus the aggregate exercise price of all Vested Options less $8,621,428.57 by (b) the Fully-Diluted Common Share Number.

"Per Option Gross Merger Consideration" means the quotient obtained by dividing (a) the Total Common/Option Merger Consideration by (b) the Fully-Diluted Common Share Number.

"Per Preferred Share Initial Merger Consideration" means an amount equal to (i) the Total Preferred Merger Consideration less $2,028,571.43 divided by (ii) the total number of shares of Preferred Stock outstanding immediately prior to the Effective Time.

"Permits" means, with respect to any Person, any license, franchise, permit, consent, approval, right, privilege, certificate or other similar authorization issued by, or otherwise granted by, any Governmental Authority to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Permitted Encumbrance" means (a) statutory liens for current Taxes not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with the Accounting Principles, (b) mechanics', materialmen's, carriers', workers', repairers' and similar statutory liens arising or incurred in the Ordinary Course of Business the existence of which would not constitute an event of default under, or breach of, a Real Property Lease and the Liabilities of the Company in respect of which are not overdue or otherwise in default, and (c) liens to secure landlords, lessors or

11

renters under leases or rental agreements (to the extent the Company or the applicable Subsidiary is not in default under such lease or rental agreement).

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Pre-Closing Tax Period" means taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any Taxable period that includes (but does not end on) the Closing Date.

"Pro Rata Common/Option Payment Percentage" means, as to any holder of Common Shares or Vested Options, a fraction (expressed as a percentage) (i) the numerator of which is the total number of Common Shares held by such holder plus the total number of Common Shares subject to Vested Options held by such holder, immediately prior to the Effective Time, and (ii) the denominator of which is the Fully Diluted Common Share Number.

"Pro Rata Escrow Percentage" means:

(i)      with respect to any former holder of Preferred Stock, a fraction (expressed as a percentage) equal to (A) times (B), where (A) equals 2/10.5 and (B) equals a fraction, (x) the numerator of which is the total amount of Total Preferred Merger Consideration paid to such Securityholder as a holder of Preferred Stock pursuant to Section 3.03 and (y) the denominator of which is the Total Preferred Merger Consideration paid to all holders of Preferred Stock pursuant to Section 3.03; and

(ii)     with respect to any former holder of Common Stock or Vested Options, a fraction (expressed as a percentage) equal to (A) times (B), where (A) equals 8.5/10.5 and (B) equals a fraction, (x) the numerator of which is the total amount of Total Common/Option Merger Consideration paid to such Securityholder as a holder of Common Stock and the total Option Payments paid to such Securityholder as a holder of Vested Options, pursuant to Sections 3.03 and 3.04 and (y) the denominator of which is the total payments to holders of Common Stock and Vested Options pursuant to Sections 3.03 and 3.04.

"Pro Rata Proceeds Percentage" means, with respect to any Securityholder, a fraction (expressed as a percentage) (i) the numerator of which is the total amount of Total Preferred Merger Consideration paid to such Securityholder as a holder of Preferred Stock, the Total Common/Option Merger Consideration paid to such Securityholder as a holder of Common Stock and the total Option Payments paid to such Securityholder as a holder of Vested Options, pursuant to Sections 3.03 and 3.04 and (ii) the denominator of which is the total payments to Securityholders paid pursuant to Sections 3.03 and 3.04

"Publicly Available Software" means each of: (a) any software that contains, or is derived in any manner (in whole or in part) from, any software that is distributed as free software, open source software (e.g. Linux) or similar licensing or distribution models;

12

and (b) any software that requires as a condition of use, modification and/or distribution of such software that such software or other software incorporated into, derived from or distributed with such software (i) be disclosed or distributed in source code form, (ii) be licensed for the purpose of making derivative works, or (iii) be redistributable at no charge.

"Representative" means, with respect to any Person, any director, officer, employee, agent, manager, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Return Arbiter" means an independent accounting firm mutually acceptable to Parent and the Securityholders' Representative which is engaged to resolve a dispute related to a Tax Return for a Pre-Closing Tax Period.

"Small Business Concern" means a concern, including its Affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government Contracts, and qualified as a small business under the criteria and size standards in 13 CFR part 121 (*See*, FAR section 19.102 and 15 U.S.C. § 632).

"SR Escrow Amount" equals $150,000.

"Straddle Period" means any taxable period that includes, but does not end, on the Closing Date.

"Subsidiary" means, with respect to any specified Person, any other Person of which such specified Person, directly or indirectly through one or more Subsidiaries, (a) owns at least 50% of the outstanding Equity Interests entitled to vote generally in the election of the Board of Directors or similar governing body of such other Person, or (b) has the power to generally direct the business and policies of that other Person, whether by contract or as a general partner, managing member, manager, joint venturer, agent or otherwise.

"Tax" or "Taxes" means any and all federal, state, local, or foreign taxes, charges, fees, levies or other assessments, including income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, escheat, withholding, social security (or similar, including FICA), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Total Common/Option Merger Consideration" means the Total Merger Consideration less the Total Preferred Merger Consideration.

13

"Total Preferred Merger Consideration" means an amount equal to $6.9371 multiplied by the number of shares of Preferred Stock outstanding immediately prior to the Effective Time.

"Treasury Regulations" means the regulations promulgated under the Code.

"Vested Options" means any Options that, at the Effective Time and after giving effect to any acceleration of vesting made by the Company Board, are presently exercisable for shares of Common Stock.

"Veteran-Owned Small Business Concern" means a small business concern-- (1) not less than 51% of which is owned by one or more veterans (as defined at 38 U.S.C. § 101(2)) or, in the case of any publicly owned business, not less than 51% of the stock of which is owned by one or more veterans; and (2) the management and daily business operations of which are controlled by one or more veterans.

(j)     In addition to the defined terms in paragraph (a) above, the following terms are defined elsewhere in this Agreement:

| Term | Section |
|------|---------|
| Accounting Firm | Section 3.05(e) |
| Agreement | Preamble |
| Assets | Section 4.09(a) |
| Audited Financials | Section 4.06(a)(i) |
| Audits | Section 4.17(b)(iv) |
| Certificates | Section 3.03(c) |
| CGCL | Recitals |
| Closing | Section 2.02(a) |
| Common Stock | Recitals |
| Company | Preamble |
| Company Board | Recitals |
| Company Plan | Section 4.14(a) |
| Company Registrations | Section 4.11(c) |
| Company Stock Plans | Section 3.04(a) |
| Continuing Employee | Section 6.08(a) |
| Current Liability Policies | Section 4.22 |
| Dissenting Shares | Section 3.07(a) |
| DoD | Section 4.17(b)(ix) |
| Effective Time | Section 2.02(b) |
| Eligible Holder | Section 3.01(a) |
| ERISA Affiliate | Section 4.14(a) |
| Escrow Agent | Recitals |
| Escrow Agreement | Recitals |
| Estimated Closing Balance Sheet | Section 3.05(a) |
| Estimated Closing Statement | Section 3.05(a) |
| Estimated Closing Date Merger Consideration | Section 3.05(b) |

14

| Term | Section |
|------|---------|
| Exchange Fund | Section 3.03(b) |
| FAR | Section 4.17(b)(ix) |
| Final Closing Balance Sheet | Section 3.05(e) |
| Final Closing Statement | Section 3.05(e) |
| Financials | Section 4.06(a)(ii) |
| Inbound IP Contracts | Section 4.11(d) |
| Indemnified Parties | Section 6.09(a) |
| IP Contracts | Section 4.11(d) |
| Internal Revenue Service | Section 4.14(a) |
| Leased Real Property | Section 4.10(a) |
| Letter of Transmittal | Section 3.03(c) |
| Liability Policies | Section 4.22 |
| Losses | Section 9.01(a) |
| Material Company Contract | Section 4.16(b) |
| Merger | Recitals |
| Merger Sub Common Stock | Section 5.06 |
| Most Recent Balance Sheet | Section 4.06(a)(ii) |
| Most Recent Balance Sheet Date | Section 4.06(a)(ii) |
| Non-Competition Agreements | Section 7.13 |
| Option Cancellation Acknowledgement | Section 3.04(a) |
| Options | Recitals |
| Outbound IP Contracts | Section 4.11(d) |
| Outside Date | Section 4.10(a) |
| Parent Indemnified Person | Section 9.01(a) |
| Paying Agent | Section 3.03(a) |
| PDI | Section 4.01(b) |
| Preferred Stock | Recitals |
| Principal Shareholders | Recitals |
| Principal Shareholders Agreements | Section 7.14 |
| Proposed Final Closing Balance Sheet | Section 3.05(c) |
| Proposed Final Closing Statement | Section 3.05(c) |
| Real Property | Section 4.10(a) |
| Real Property Leases | Section 4.10(a) |
| SBA | Section 4.17(b)(vi) |
| Scheduled Intellectual Property Rights | Section 4.11(c) |
| Security Clearance Holder | Section 4.17(g) |
| Securityholder | Recitals |
| Securityholder Indemnified Person | Section 9.02(a) |
| Securityholders' Representative | Section 12.04(a) |
| Severance Plan | Section 6.08(f) |
| Shareholder | Recitals |
| Shareholder Approval | Section 10.10 |
| Shareholder Approval Rules | Section 10.10 |
| Shareholder Documents | Section 3.03(c) |
| Shares | Recitals |

15

| Term | Section |
|------|--------|
| Specified Indemnity Matters | Section 9.01(a)(iv) |
| Straddle Period | Section 10.01 |
| Surviving Corporation | Section 2.01 |
| Tax Contest Claims | Section 10.09(a) |
| Tax Claims | Section 9.04(a) |
| Third Party Claim | Section 9.04(a) |
| Total Merger Consideration | Section 3.02 |
| Working Capital Dispute Notice | Section 3.05(d) |

Section 1.02.   Certain Matters of Construction.

(a)      The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(b)      Section and subsection headings are not to be considered part of this Agreement, are included solely for convenience, are not intended to be full or accurate descriptions of the content of the Sections or subsections of this Agreement and shall not affect the construction hereof.

(c)      Except as otherwise explicitly specified to the contrary herein, (i) the words "hereof," "herein," "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular Section or subsection of this Agreement and reference to a particular Section of this Agreement shall include all subsections thereof, (ii) references to a Section, Exhibit or Annex means a Section of, or Exhibit or Annex to this Agreement, unless another agreement is specified, (iii) definitions shall be equally applicable to both the singular and plural forms of the terms defined, and references to the masculine, feminine or neuter gender shall include each other gender, (iv) the word "including" means including without limitation, (v) any reference to "$" or "dollars" means United States dollars and (vi) references to a particular statute or regulation include all rules and regulations thereunder and any successor statute, rule or regulation, in each case as amended or otherwise modified from time to time.

(d)      Neither the listing nor description of any item, matter or document in either the Company Disclosure Schedule or the Parent Disclosure Schedule nor the furnishing or availability for review of any document will be construed to modify, qualify or disclose an exception to any representation or warranty of any party made herein or in connection herewith, except to the extent that such representation or warranty specifically refers to either the Company Disclosure Schedule or the Parent Disclosure Schedule, as applicable, and such modification, qualification or exception is clearly described in such Schedule.

16

(e)     The parties intend that each representation, warranty and covenant contained herein will have independent significance.  If any party has breached or violated, or if there is an inaccuracy in, any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached or violated, or in respect of which there is not an inaccuracy, will not detract from or mitigate the fact that the party has breached or violated, or there is an inaccuracy in, the first representation, warranty or covenant.

(f)     Unless the context clearly requires otherwise, when used herein "or" shall not be exclusive (i.e., "or" shall mean "and/or").

(g)     Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

(h)     Where this Agreement states that the Company has "made available" any document to the Parent, that means the document has been posted to the Company's data room as of 7:00 a.m. E.S.T. on December 22, 2011.

(i)     In the event any inconsistency between this Agreement and the agreement of merger to be filed with the Secretary of the State of California pursuant to Section 2.02(b), the terms of this Agreement shall control.

ARTICLE II
THE MERGER.

Section 2.01.  The Merger.  Upon the terms and subject to the satisfaction or waiver, if permissible, of the conditions set forth in Article VII and VIII hereof, and in accordance with the CGCL, at the Effective Time, (a) Merger Sub shall be merged with and into the Company, (b) the separate corporate existence of Merger Sub shall cease and (c) the Company shall, as the surviving corporation in the Merger, continue its existence under the CGCL as a wholly-owned subsidiary of Parent.  The Company as the surviving corporation after the Merger is hereinafter sometimes referred to as the "Surviving Corporation."

Section 2.02.  Closing; Effective Time.

(a)     The closing of the transactions contemplated by this Agreement (the "Closing") shall be held at the offices of Bingham McCutchen LLP, One Federal Street, Boston MA 02110, or at such other location as Parent and the Company may agree, at 11:00 a.m., Boston, Massachusetts time, on December 27, 2011 or if the conditions set forth in Article VII and VIII are not satisfied or waived, if permissible, on such date, on the next Business Day following the satisfaction or waiver of such conditions, if permissible (other than in each case conditions which by their nature are to be satisfied or waived at the Closing and are expected to be satisfied at the Closing, but subject to the satisfaction or, if permissible, waiver of such conditions) (such date, the "Closing Date"), unless another date and time is agreed to in writing by Parent and the Company.

17

(b)     On the Closing Date, the parties hereto shall cause the Merger to be consummated by filing an agreement of merger, in substantially the form attached hereto as <u>Exhibit B</u>, together with the related officers' certificates required by Section 1103 of the CGCL, with the Secretary of State of the State of California in such form as required by, and executed in accordance with, the relevant provisions of the CGCL (the date and time of such filing, or such later date and time as may be specified in such filing by mutual agreement of Parent, Merger Sub and the Company, the "<u>Effective Time</u>").

Section 2.03.   <u>Articles of Incorporation and Bylaws of the Surviving Corporation</u>.  As of the Effective Time, (i) the articles of incorporation of the Company shall be amended and restated in their entirety to read as the articles of incorporation of Merger Sub as in effect immediately prior to the Effective Time; <u>provided</u>, <u>however</u>, that Article I of the Articles of Incorporation of the Surviving Corporation shall be amended to read as follows: "The name of this corporation is KOR Electronics" and such amended and restated articles of incorporation shall be the articles of incorporation of the Surviving Corporation until thereafter changed or amended in accordance with the provisions thereof and applicable Legal Requirements and (ii) the bylaws of the Company shall be the bylaws of the Surviving Corporation until thereafter changed or amended in accordance with the provisions thereof and applicable Legal Requirements.

Section 2.04.   <u>Directors and Officers of the Surviving Corporation</u>.  Subject to applicable Legal Requirements, as of the Effective Time, (i) the persons named on <u>Annex IV</u> hereto shall be the directors of the Surviving Corporation until their respective successors are duly elected and qualified or their earlier death, resignation or removal and (ii) the officers of the Company shall be the officers of the Surviving Corporation until their respective successors are duly appointed and qualified, or their earlier death, resignation or removal.

Section 2.05.   <u>Effects of the Merger</u>.  As of the Effective Time, the Merger shall have the effects set forth in the CGCL.  Without limiting the generality of the foregoing, from and after the Effective Time, all the property, rights, privileges and powers of the Company and Merger Sub shall vest in the Surviving Corporation, and all claims, obligations, liabilities, debts and duties of the Company and Merger Sub shall become the claims, obligations, liabilities, debts and duties of the Surviving Corporation.


ARTICLE III
MERGER CONSIDERATION; CONVERSION OF SHARES.

Section 3.01.   <u>Conversion of Stock</u>.

(a)     At the Effective Time, each Share (other than Shares held by the Company and any Dissenting Shares) shall, by virtue of the Merger and without any action on the part of the holder thereof (any such holder, an "<u>Eligible Holder</u>"), be converted into and thereafter evidence the right to receive the Per Common Share Initial Merger Consideration or Per Preferred Share Initial Merger Consideration, in cash,

18

without interest, together with any additional portion of the Deferred Merger Consideration that becomes payable with respect to the Common Stock or Preferred Stock, as applicable, pursuant to this Agreement or the Escrow Agreement. Each Share issued and outstanding immediately prior to the Effective Time, when converted in accordance with this <u>Section 3.01(a)</u>, shall no longer be outstanding, shall automatically be canceled and shall cease to exist.

(b)     After the Effective Time, each Eligible Holder who holds certificates formerly representing Shares shall have no rights with respect to the Surviving Corporation in such Eligible Holder's capacity as a Shareholder, except the right to receive, without interest, the Per Common Share Initial Merger Consideration or Per Preferred Share Initial Merger Consideration, in cash, without interest, upon delivery of the Shareholder Documents, together with any Deferred Merger Consideration in respect of each such Share that becomes payable pursuant to this Agreement or the Escrow Agreement.

(c)     At the Effective Time, each share of common stock, with no stated par value, of Merger Sub ("<u>Merger Sub Common Stock</u>") issued and outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of Parent, be converted into and thereafter evidence one share of common stock, with no stated par value, of the Surviving Corporation.

(d)     At the Effective Time, each Share held by the Company as a treasury share immediately prior to the Effective Time shall be canceled and retired and shall cease to exist, and no payment shall be made with respect thereto.

(e)     At and after the Effective Time, there shall be no transfers on the share transfer books of the Company of any shares of capital stock that were outstanding immediately prior to the Effective Time.  If, after the Effective Time, certificates representing Shares are presented to the Surviving Corporation, they shall be canceled and exchanged as provided in this <u>Section 3.01</u> and <u>Section 3.03</u>.

Section 3.02.  <u>Total Merger Consideration</u>.  The aggregate consideration payable with respect to the Shares (other than Dissenting Shares) and the cancellation of all other Equity Interests in the Company at Closing will be equal to an amount in cash (such aggregate consideration, the "<u>Total Merger Consideration</u>") calculated as follows:

(a)     $70,000,000 U.S. dollars;

(b)     <u>less</u> the Closing Debt Amount;

(c)     <u>less</u> the amount of any Company Transaction Expenses not otherwise paid prior to the Closing Date and prior to the calculation of Net Working Capital;

(d)     <u>plus</u> the Closing Cash Amount;

19

        (e)    <u>plus</u> the Net Working Capital Adjustment Amount (if Net Working Capital is greater than the Net Working Capital Target);

or

<u>less</u> the Net Working Capital Adjustment Amount (if Net Working Capital is less than the Net Working Capital Target).

The Total Merger Consideration shall be subject to adjustment in accordance with <u>Section 3.05</u> and <u>Article IX</u>.

Section 3.03.   <u>Surrender of Certificates</u>.

        (a)    <u>Paying Agent</u>.  Wells Fargo Bank, N.A., or such other institution selected by Parent with the reasonable consent of the Company, shall act as payment agent (the "<u>Paying Agent</u>") in the Merger.

        (b)    <u>Parent to Provide Cash</u>.  Promptly (and in any event within two (2) Business Days) after the Effective Time, Parent shall deliver to the Paying Agent for payment in accordance with this <u>Section 3.03</u> cash in an amount sufficient to permit payment of the aggregate Estimated Closing Date Merger Consideration, calculated pursuant to <u>Section 3.05(b)</u> (the "<u>Exchange Fund</u>").  At the Closing, Parent shall deposit the Escrow Amount and the SR Escrow Amount with the Escrow Agent pursuant to the Escrow Agreement.

        (c)    <u>Exchange Procedures</u>.  Promptly after the Effective Time, Parent shall cause to be mailed to each holder of record of a certificate or certificates (the "<u>Certificates</u>") that immediately prior to the Effective Time represented outstanding Shares, whose Shares were converted into the right to receive the Merger Consideration: (i) a letter of transmittal in the form attached hereto as <u>Exhibit C</u> (the "<u>Letter of Transmittal</u>"); (ii) such other customary documents as may be required pursuant to the Letter of Transmittal; (iii) instructions for use in effecting the surrender of the Certificates in exchange for the Merger Consideration.  Upon surrender of a Certificate for cancellation to the Paying Agent, together with such Letter of Transmittal and such other documents, duly completed and validly executed in accordance with the instructions thereto (collectively, the "<u>Shareholder Documents</u>"); and (iv) in the case of the Principal Shareholders, execution and delivery of a Principal Shareholders Agreement (in the event not delivered at the Closing and the Parent elects to waive the conditions set forth in <u>Section 7.14</u>), the holder of such Certificate shall be entitled to receive in exchange therefor the Estimated Closing Date Merger Consideration determined in accordance with <u>Section 3.05(b)</u>, and the Certificate so surrendered shall forthwith be canceled. Until so surrendered, each outstanding Certificate that prior to the Effective Time represented Shares will be deemed from and after the Effective Time, for all corporate purposes other than the payment of dividends. to evidence the right to receive the Merger Consideration.

20

(d)      Termination of Exchange Fund.  Any portion of the Exchange Fund which remains undistributed to the Shareholders six (6) months after the Effective Time shall be delivered to Parent, upon demand, and any former Shareholders who have not previously complied with this Section 3.03 shall thereafter look only to Parent for payment of their claim for the Merger Consideration.

Section 3.04.   Treatment of Options.

(a)      Options.  A listing of each of the Company's stock option plans, programs and arrangements (collectively, the "Company Stock Plans") and all outstanding Options is set forth in Section 3.04(a) of the Company Disclosure Schedule. Section 3.04(a) of the Company Disclosure Schedule also sets forth with respect to each Option the name of the Company Stock Plan under which such Option was issued, the holder thereof, the number of shares subject thereto, the exercise price thereof and the dates of scheduled vesting thereof and describes any terms thereof that require acceleration of such vesting by virtue of the Contemplated Transactions and any proposed additional vesting of such Options prior to the Effective Time.  On or prior to the Closing Date, the Company Board (or an authorized committee thereof) shall take all actions necessary to ensure that all outstanding Options shall be cancelled effective as of the Effective Time.  At the Closing or as soon as thereafter practicable, each holder of an outstanding Vested Option shall deliver to the Paying Agent, on behalf of the Company and Parent, an acknowledgement of such cancellation in the form of Exhibit D (each an "Option Cancellation Acknowledgement").  Effective as of the Effective Time, each optionholder who is a holder of an outstanding Vested Option, upon the delivery of such optionholder's duly executed Option Cancellation Acknowledgement, shall become entitled to receive (i) a cash payment in an amount equal to (a) minus (b) where (a) equals (A) the excess of (x) the Per Option Gross Merger Consideration over (y) the exercise price per share of Common Stock subject to such Vested Option, multiplied by (B) the number of shares of Common Stock subject to such Vested Option for which such Option shall not theretofore have been exercised and (b) equals the sum of the Escrow Amount and SR Escrow Amount multiplied by such optionholder's Pro Rata Escrow Percentage.  For the avoidance of doubt, no consideration shall be payable hereunder in respect of the cancellation of any unvested Options or any Options having an exercise price equal to or in excess of the Per Option Gross Merger Consideration.  The Company will not accelerate the vesting of any Options except as set forth in Section 3.04(a) of the Company Disclosure Schedule.

(b)      Company Stock Plans.  On or prior to the Closing Date, the Company Board (or an authorized committee thereof) shall take any actions necessary to ensure that the Company Stock Plans terminate as of the Effective Time (including amending such Company Stock Plans), the provisions in any other plan or agreement providing for the issuance, transfer or grant of any Equity Interests of the Company shall terminate as of the Effective Time, and no holder of an Option or any participant in any Company Stock Plan or other plan or any party to a Contractual Obligation with the Company shall have any right thereunder to acquire any Equity Interests of the Company.

21

Section 3.05.   Working Capital Adjustment.

(a)      Estimated Closing Balance Sheet and Estimated Closing Statement.  The Company has prepared in good faith and provided to Parent prior to the execution and delivery of this Agreement an estimated consolidated balance sheet of the Company as of the close of business on the day immediately preceding the Closing Date (as the same may be adjusted upon agreement of the Company and the Parent in response to comments of Parent and its Representatives provided to the Company prior to the Closing, the "Estimated Closing Balance Sheet"), together with a written statement setting forth in reasonable detail its good faith estimates of the Closing Debt Amount, Closing Cash Amount and Net Working Capital, each as derived from the Estimated Closing Balance Sheet, and the Company Transaction Expenses (as the same may be adjusted upon the agreement of the Company and Parent in response to comments of Parent and its Representatives provided to the Company prior to the Closing (the "Estimated Closing Statement").  The Estimated Closing Balance Sheet and the Company's good faith estimate of Net Working Capital contained in the Estimated Closing Statement will be prepared in accordance with the Accounting Principles. Following the delivery of the Estimated Closing Balance Sheet and the Estimated Closing Statement, the Company shall provide Parent and its Representatives reasonable access to the work papers and other books and records of the Company for purposes of assisting Parent and its Representatives in their review of the Estimated Closing Balance Sheet and the Estimated Closing Statement.  Prior to Closing, the parties shall cooperate in good faith to answer any questions and resolve any issues raised by Parent and its Representatives in connection with their review of the Estimated Closing Balance Sheet and the Estimated Closing Statement, but the foregoing shall not require any party to waive any of its rights under this Agreement or the Ancillary Agreements.

(b)      Estimated Closing Date Merger Consideration.  The Total Merger Consideration initially payable pursuant to the procedures set forth in Sections 3.03 and 3.04 (the "Estimated Closing Date Merger Consideration") shall be calculated using the estimated Closing Debt Amount, estimated Closing Cash Amount, estimated Company Transaction Expenses and estimated Net Working Capital set forth on the Estimated Closing Statement and shall be reduced by the Escrow Amount and the SR Escrow Amount.

(c)      Proposed Final Closing Balance Sheet and Proposed Final Closing Statement.  As promptly as possible and in any event within sixty (60) calendar days after the Closing Date, the Company shall prepare or cause to be prepared, and will provide to the Securityholders' Representative, a consolidated balance sheet of the Company as of the close of business on the day immediately preceding the Closing Date (the "Proposed Final Closing Balance Sheet"), together with a written statement setting forth in reasonable detail its proposed final determination of the Closing Debt Amount, the Company Transaction Expenses and Net Working Capital (the "Proposed Final Closing Statement").  The Proposed Final Closing Balance Sheet and the determination of Net Working Capital reflected on the Proposed Final Closing Statement will be prepared in accordance with the Accounting Principles.  The Securityholders' Representative and its

22

Representatives shall have reasonable access to the work papers and other books and records of the Company for purposes of assisting the Securityholders' Representative and its Representatives in their review of the Proposed Final Closing Balance Sheet and the Proposed Final Closing Statement.  The parties shall cooperate in good faith to answer any questions and resolve any issues raised by the Securityholders' Representative and its Representatives in connection with their review of the Proposed Final Closing Balance Sheet and the Proposed Final Closing Statement, but the foregoing shall not require any party to waive any of its rights under this Agreement or the Ancillary Agreements.

(d)     <u>Dispute Notice</u>.  The Proposed Final Closing Balance Sheet and the Proposed Final Closing Statement (and the proposed final determinations of the Closing Debt Amount, Closing Cash Amount, the Company Transaction Expenses and Net Working Capital reflected thereon) will be final, conclusive and binding on the parties hereto unless the Securityholders' Representative provides a written notice (a "<u>Working Capital Dispute Notice</u>") to Parent no later than the twentieth (20th) Business Day after the delivery to the Securityholders' Representative of the Proposed Final Closing Balance Sheet and the Proposed Final Closing Statement.  The Securityholders' Representative shall not be entitled to issue a Working Capital Dispute Notice or otherwise dispute any item set forth in the Proposed Final Balance Sheet or proposed Final Closing Statement except on the grounds that such matter was not prepared on the basis set forth in paragraph (c) above or contains mathematical errors. Any Working Capital Dispute Notice must set forth in reasonable detail (i) any item on the Proposed Final Closing Balance Sheet or the Proposed Final Closing Statement which the Securityholders' Representative believes has not been prepared in accordance with this Agreement and the correct amount of such item and (ii) the Securityholders' Representative's alternative calculation of the Closing Debt Amount, Closing Cash Amount, the Company Transaction Expenses or Net Working Capital, as the case may be.  Any item or amount to which no dispute is raised in the Working Capital Dispute Notice will be final, conclusive and binding on the parties on such twentieth (20th) Business Day.

(e)     <u>Resolution of Disputes</u>.    Parent and the Securityholder's Representative will attempt to promptly resolve the matters raised in any Working Capital Dispute Notice in good faith.  Beginning ten (10) Business Days after delivery of any Working Capital Dispute Notice pursuant to <u>Section 3.05(d)</u>, either Parent or the Securityholders' Representative may provide written notice to the other that it elects to submit the disputed items to Ernst & Young LLP's Boston office (the "<u>Accounting Firm</u>").   The Accounting Firm will promptly, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, review only those unresolved items and amounts specifically set forth and objected to in the Working Capital Dispute Notice and resolve the dispute with respect to each such specific unresolved item and amount in accordance with this Agreement. The Accounting Firm shall be instructed in writing by the Parent and the Securityholders' Representative that the Accounting Firm must accept the Proposed Final Balance Sheet and Proposed Final Closing Statement except to the extent that any item is not calculated in accordance with paragraph (c) above or reflects mathematical errors.   In any such case, a single partner of the

23

Accounting Firm selected by such Accounting Firm in accordance with its normal procedures and having expertise with respect to settlement of such disputes shall act for the Accounting Firm in the determination proceeding, and the Accounting Firm shall render a written decision as to each disputed matter, including a statement in reasonable detail of the basis for its decision.  In no event shall the decision of the Accounting Firm (i) provide for a calculation of Net Working Capital that is less than the calculation thereof shown in the Proposed Final Closing Statement or greater than the Securityholders' Representatives' alternative calculation thereof shown in the Working Capital Dispute Notice or (ii) provide for a determination of any item of Debt reflected in the Closing Debt Amount or any Company Transaction Expense that is greater in amount than the amount thereof shown in the Proposed Final Closing Statement or less in amount than the Securityholders' Representatives' alternative calculation thereof shown in the Working Capital Dispute Notice.  The fees and expenses of the Accounting Firm shall be borne equally by the Securityholders and the Company.  The decision of the Accounting Firm with respect to the disputed items of the Proposed Final Closing Balance Sheet and the Proposed Final Closing Statement submitted to it will be final, conclusive and binding on the parties.  As used herein, the Proposed Final Closing Balance Sheet and the Proposed Final Closing Statement, as adjusted to reflect any changes agreed to by the parties and any decision of the Accounting Firm, in each case, pursuant to this Section 3.05, are referred to herein as the "Final Closing Balance Sheet" and the "Final Closing Statement", respectively.  Each of the parties to this Agreement agrees to use its commercially reasonable efforts to cooperate with the Accounting Firm (including by executing a customary engagement letter reasonably acceptable to it) and to cause the Accounting Firm to resolve any such dispute as soon as practicable after the commencement of the Accounting Firm's engagement.

(f)  Working Capital Adjustment.  If any of the Net Working Capital, the Closing Debt Amount or the Company Transaction Expenses (as finally determined pursuant to this Section 3.05 and as set forth in the Final Closing Balance Sheet and the Final Closing Statement) differs from the estimated amounts thereof set forth in the Estimated Closing Statement, the Total Merger Consideration shall be recalculated using such final figures in lieu of such estimated figures, and (i) the Company shall pay to each former holder of Common Shares (other than Dissenting Shares) and each former holder of Vested Options by wire transfer of immediately available funds its Pro Rata Common/Option Payment Percentage of the amount, if any, by which such re-calculated final Total Merger Consideration exceeds the estimated Total Merger Consideration calculated on the Estimated Closing Statement or (ii) the amount, if any, by which such estimated Total Merger Consideration calculated on the Estimated Closing Statement exceeds such re-calculated final Total Merger Consideration shall be paid to Parent from the Escrow Amount.

(g)  Payments.  Any payment due pursuant to Section 3.05(f) shall be made within five (5) calendar days after the final amount thereof has been determined in accordance with this Section 3.05.

Section 3.06.   <u>Withholding</u>.   The Company, Parent, the Paying Agent and the Escrow Agent will be entitled to deduct and withhold from any amounts payable under this Agreement any withholding Taxes or other amounts required under the Code or any applicable Legal Requirement to be deducted and withheld.  To the extent that any such amounts are so deducted or withheld and paid over to the appropriate Governmental Authority, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

Section 3.07.   <u>Dissenting Shares</u>.

(a)     Notwithstanding anything in this Agreement to the contrary, Shares that are issued and outstanding immediately prior to the Effective Time, and are held by Shareholders that have not voted in favor of the Merger or consented thereto in writing and are entitled to demand and have demanded properly in writing appraisal for such Shares in accordance with Chapter 13 of the CGCL or any successor provision (such shares, the "<u>Dissenting Shares</u>"), shall not be converted into or represent the right to receive such Shareholder's portion of the Total Merger Consideration as described in <u>Section 3.03</u>, but shall, by virtue of the Merger, be entitled to only such rights as are granted by Chapter 13 of the CGCL; <u>provided</u> that if any such Shareholder thereafter shall have failed to perfect or shall have effectively withdrawn or lost such Shareholder's right to appraisal and payment under the CGCL, such Shareholder's Shares shall be deemed to have been converted at the Effective Time into the right to receive such Shareholder's portion of the Total Merger Consideration as described in, and subject to the surrender and delivery requirements of <u>Section 3.03</u>.

(b)     The Company shall give Parent (i) prompt notice of any written demands received by the Company for appraisal of the Shares and withdrawals of such demands and (ii) the opportunity to participate in all negotiations and proceedings in respect of appraisal under the CGCL.  The Company shall not, except with the prior written consent of Parent, or as required by applicable Legal Requirements, make any payment with respect to any demands for appraisal or offer to settle or settle any such demand.

Section 3.08.   <u>Changes in Shares</u>.   If, between the date of this Agreement and the Effective Time, the number of outstanding Shares shall have been changed into, or exchanged for, a different number of shares or a different class of shares, by reason of any share dividend, subdivision, reclassification, recapitalization, share split (including a reverse share split), combination or exchange of shares, the Per Common Share Initial Merger Consideration or Per Preferred Share Initial Merger Consideration, as applicable, shall be correspondingly adjusted to provide the Securityholders the same economic effect as contemplated by this Agreement prior to such event.

Section 3.09.   <u>Further Assurances</u>.   If, at any time before or after the Effective Time, the Company or Parent reasonably believes or is advised that any further instruments, deeds, assignments or assurances are reasonably necessary or desirable to consummate the Merger or to carry out the purpose and intent of this Agreement, then the Company, Parent and/or the

Surviving Corporation shall execute and deliver, or cause to be executed and delivered, all such proper deeds, assignments, instruments and assurances and do all other things reasonably necessary or desirable to consummate the Merger and to carry out the purposes and intent of this Agreement.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES REGARDING
THE COMPANY.

In order to induce Parent and Merger Sub to enter into and perform this Agreement and to consummate the Contemplated Transactions, the Company hereby represents and warrants to Parent and Merger Sub as follows as of the date of this Agreement and as of the Closing Date:

Section 4.01.   Organization.

(a)      The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of California and has full corporate power and authority to lease and operate its Real Property and to carry on the Business as it is now being conducted. The Company is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction in which it leases Real Property or conducts business and is required to so qualify, except where the failure to be so qualified or licensed would not individually or in the aggregate have a Material Adverse Effect.  The Company has delivered or made available to Parent accurate and complete copies of the Organizational Documents of the Company.

(b)      As of the date of this Agreement, Paragon Dynamics, Inc. ("PDI") is the only Subsidiary of the Company.  PDI is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has full corporate power and authority to lease and operate its Real Property and to carry on the Business as it is now being conducted.  PDI is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction in which it leases Real Property or conducts business and is required to so qualify, except where the failure to be so qualified or licensed would not individually or in the aggregate have a Material Adverse Effect.  The Company has delivered or made available to Parent accurate and complete copies of the Organizational Documents of PDI.

Section 4.02.   Power and Authorization.

(a)      Contemplated Transactions.  The Company has all requisite power and authority necessary for the execution, delivery and performance by it of this Agreement and each Ancillary Agreement to which it is or will be a party.  The execution, delivery and performance by the Company of this Agreement and each Ancillary Agreement to which it is or will be a party have been duly authorized by all necessary corporate action on the part of the Company, including the requisite vote of shareholders of the Company, subject only to the requirement that the Company solicit comments from all shareholders pursuant to Section 603(b) of the CGCL.   This Agreement and each Ancillary Agreement to which the Company is, or will be at

26

Closing, a party (i) have been (or, in the case of Ancillary Agreements to be entered into at Closing, will be when executed and delivered) duly executed and delivered by the Company and (ii) is (or in the case of Ancillary Agreements to be entered into at the Closing, will be when executed and delivered) a legal, valid and binding obligation of the Company, Enforceable against the Company in accordance with its terms.

(b)     Conduct of Business.  Each of the Company and its Subsidiaries has all requisite corporate power and authority necessary to own, lease, operate and use their respective Assets and carry on the Business.

Section 4.03.  Authorization of Governmental Authorities.  Except as disclosed in Section 4.03 of the Company Disclosure Schedule, no action by (including any authorization by or consent or approval of), or in respect of, or filing with, any Governmental Authority is required by or on behalf of the Company or any of its Subsidiaries or in respect of the Company or any of its Subsidiaries, the Business or any Assets of the Company or its Subsidiaries for, or in connection with, (a) the valid and lawful authorization, execution, delivery and performance by the Company or its Subsidiaries of this Agreement or any Ancillary Agreement to which it is, or will be at Closing, a party or (b) the consummation of the Contemplated Transactions.

Section 4.04.  Noncontravention.  Except as disclosed in Section 4.04 of the Company Disclosure Schedule, none of the authorization, execution, delivery or performance by the Company of this Agreement or any Ancillary Agreement to which it is, or will be at Closing, a party, nor the consummation of the Contemplated Transactions, will:

(a)     assuming the taking of each action by (including the obtaining of each necessary authorization, consent or approval), or in respect of, and the making of all necessary filings with, Governmental Authorities, in each case, as disclosed in Section 4.03 of the Company Disclosure Schedule, conflict with or result in a breach or violation of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, any Legal Requirement applicable to the Company or any of its Subsidiaries, the Business or any Assets of the Company or any of its Subsidiaries; or

(b)     conflict with or result in a breach or violation of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in termination of, or accelerate the performance required by, or result in a right of termination or acceleration under, or require any action by (including any authorization, consent or approval) or notice to any Person, or require any offer to purchase or prepayment of any Debt or Liability under, or result in the creation of any Encumbrance upon or forfeiture of any of the rights, properties or assets of the Company or any of its Subsidiaries under, any of the terms, conditions or provisions of (i) any Permit applicable to or otherwise affecting the Company, any of its Subsidiaries, the Business or any Assets of the Company or any of its Subsidiaries, (ii) any Contractual Obligation to which the Company or any of its Subsidiaries is a party or by which any of them is bound, or (iii) the Organizational Documents of the Company or any of its Subsidiaries.

27

Section 4.05.   <u>Capitalization of the Company</u>.

(a)   <u>Authorized and Outstanding Equity Interests</u>.   The entire authorized capital stock (or, where applicable, other Equity Interests) of the Company is as set forth in <u>Section 4.05(a)</u> of the Company Disclosure Schedule.   All of the outstanding Equity Interests of the Company are held of record and, to the Knowledge of the Company, are beneficially owned by the Persons in the respective amounts set forth in <u>Section 4.05(a)</u> of the Company Disclosure Schedule.   Except as set forth in <u>Schedule 4.05(a)</u> of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries has issued or agreed to issue Equity Interests and neither holds shares of its capital stock (or other Equity Interests) in its treasury.   The  Company has delivered or made available to Parent accurate and complete copies of the stock ledger (or equivalent records) of the Company and each of its Subsidiaries, which records reflect all issuances, transfers, repurchases and cancellations of shares of capital stock (or other Equity Interests) of the Company and its Subsidiaries.   All of the outstanding shares of capital stock (or, where applicable, other Equity Interests) of the Company and its Subsidiaries have been duly authorized and validly issued and are fully paid and non-assessable. Neither the Company nor any of its Subsidiaries has violated the 1933 Act, any state "blue sky" or securities laws, any other similar Legal Requirement or any preemptive or other similar rights of any Person in connection with the issuance, repurchase or redemption of any of its Equity Interests.

(b)   <u>Encumbrances on Equity Interests, etc</u>.  The Company is the record and beneficial owner of all of the Equity Interests of its Subsidiaries, reflected in <u>Section 4.05(b)</u> of the Company Disclosure Schedule, and holds such Equity Interests free and clear of all Encumbrances except as disclosed in <u>Section 4.05(b)</u> of the Company Disclosure Schedule. Except as disclosed in <u>Section 4.05(b)</u> of the Company Disclosure Schedule:  (i) there are no preemptive rights or other similar rights in respect of any Equity Interests in the Company or its Subsidiaries, (ii) there are no Encumbrances on, or other Contractual Obligations relating to, the ownership, transfer or voting of any Equity Interests in the Company or any of its Subsidiaries, or otherwise affecting the rights of any holder of the Equity Interests in the Company or any of its Subsidiaries, (iii) except for the Contemplated Transactions, there is no Contractual Obligation, or provision in the Organizational Documents of the Company or any of its Subsidiaries which obligates the Company or any of its Subsidiaries to purchase, redeem or otherwise acquire, or make any payment (including any dividend or distribution) in respect of, any Equity Interest in the Company or any of its Subsidiaries and (iv) there are no existing rights with respect to registration under the 1933 Act of any Equity Interests in the Company or any of its Subsidiaries.

Section 4.06.   <u>Financial Matters</u>.

(a)   <u>Financial Statements</u>.  <u>Section 4.06(a)</u> of the Company Disclosure Schedule contains copies of each of the following:

28

(i)      the audited consolidated balance sheets of the Company and its Subsidiaries as of January 1, 2010 and December 31, 2010 and the related statements of income and retained earnings and cash flows for the years then ended, accompanied by the independent auditors' report of May Hoffman McCann P.C., the Company's certified public accountants (the "Audited Financials"); and

(ii)     the unaudited consolidated balance sheet of the Company and its Subsidiaries as of November 30, 2011 (the "Most Recent Balance Sheet" and the date thereof, the "Most Recent Balance Sheet Date"), and the related unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for the eleven months then ended (collectively with the Audited Financials, the "Financials").

(b)      Compliance with GAAP, etc.     Except as disclosed in Section 4.06(b) of the Company Disclosure Schedule, the Financials (including any notes thereto) (i) were prepared in accordance with the books and records of the Company, (ii) have been prepared in accordance with GAAP, consistently applied (except, in the case of the Financials described in clause (a)(ii) above, that such Financials do not include all footnotes and schedules that may be required by GAAP and are subject to normal year-end adjustments, the effect of which will not, individually or in the aggregate, be materially adverse) and (iii) fairly present the consolidated financial position of the Company and its Subsidiaries as of the respective dates thereof and the consolidated results of the operations of the Company and its Subsidiaries and changes in financial position for the respective periods covered thereby.

(c)      Absence of Undisclosed Liabilities.     Except as disclosed in Section 4.06(c) of the Company Disclosure Schedule, the Company and its Subsidiaries do not have any material Liabilities except for (i) Liabilities set forth on the face of the Most Recent Balance Sheet and (ii) Liabilities incurred in the Ordinary Course of Business since the Most Recent Balance Sheet Date (none of which results from, arises out of, or relates to any breach or violation of, or default under, a Contractual Obligation or Legal Requirement).

(d)      Accounts Receivable.  All accounts and notes receivable reflected on the Most Recent Balance Sheet and all accounts and notes receivable arising subsequent to the Most Recent Balance Sheet Date and prior to the Closing Date that will be reflected in the Final Closing Balance Sheet, have arisen or will arise in the Ordinary Course of Business of the Company and its Subsidiaries, represent or will represent legal, valid, binding and Enforceable obligations owed to the Company or one of its Subsidiaries, and subject only to consistently recorded reserves for bad debts set forth on the Most Recent Balance Sheet or Final Closing Balance Sheet have been, or will be, collected or are, or will be, collectible in the aggregate recorded amounts thereof in accordance with their terms and, to the Company's Knowledge, will not be subject to any contests, claims, counterclaims or setoffs.

(e)      Inventory.  All inventory of the Company and its Subsidiaries is of a quality usable and salable in the Ordinary Course of Business of the Company and its

29

Subsidiaries, except for obsolete items and items of below-standard quality, all of which have been or will be, as applicable, written off or written down to net realizable value in the Most Recent Balance Sheet and on the Final Closing Balance Sheet.  All inventories not written off have been priced at the lower of cost or market on a first in, first out basis. The quantities of each item of inventory (whether raw materials, work-in-process, or finished goods) are not excessive, but are reasonable in the present circumstances of the Company and its Subsidiaries, except for items of excess inventory which have been or will be, as applicable, written off or written down to reasonable quantities in the Most Recent Balance Sheet and the Final Closing Balance Sheet.

(f)      Banking Facilities.  Section 4.06(f) of the Company Disclosure Schedule sets forth an accurate and complete list as of the date of this Agreement of (i) each bank, savings and loan or similar financial institution with which the Company or any of its Subsidiaries has an account or safety deposit box or other similar arrangement, and any numbers or other identifying codes of such accounts, safety deposit boxes or such other arrangements maintained by the Company or its Subsidiaries thereat, and (ii) the names of all Persons authorized to draw on any such account or to have access to any such safety deposit box facility or such other arrangement.

Section 4.07.   Absence of Certain Developments.  From December 31, 2010 through the date of this Agreement, except as disclosed in Section 4.07 of the Company Disclosure Schedule, (a) no event, change, fact, condition or circumstance has occurred or arisen that has had, or would reasonably be expected to have, a Material Adverse Effect, and (b) the Business has been conducted in all material respects in the Ordinary Course of Business of the Company and its Subsidiaries and (c) neither the Company nor any of its Subsidiaries has suffered any loss, damage, destruction or eminent domain taking, whether or not covered by insurance, with respect to any of its material Assets or the Business.

Section 4.08.   Debt; Guarantees.    Neither the Company nor its Subsidiaries has Liabilities in respect of Debt except as set forth in Section 4.08 of the Company Disclosure Schedule.  For each item of Debt, Section 4.08 of the Company Disclosure Schedule correctly sets forth the debtor, the Contractual Obligations governing the Debt, the principal amount of the Debt as of the date of this Agreement, the creditor, the maturity date, and the collateral, if any, securing the Debt (and all Contractual Obligations governing all related Encumbrances).  Except as set forth in Section 4.08 of the Company Disclosure Schedule, neither the Company nor its Subsidiaries has any Liability in respect of a Guarantee of any Debt or other Liability of any other Person.

Section 4.09.   Assets.

(a)      Ownership of Assets.  The Company and each of its Subsidiaries has good and marketable title to, or, in the case of property held under a lease or other Contractual Obligation, a sole and exclusive, Enforceable leasehold interest in, or adequate rights to use, all of its properties, rights and assets, whether real or personal and whether tangible or intangible, including all Assets reflected in the Most Recent Balance Sheet or acquired after the Most Recent Balance Sheet Date, except for such Assets that

30

have been sold or otherwise disposed of since the Most Recent Balance Sheet Date in the Ordinary Course of Business (collectively, the "Assets").  Except as disclosed in Section 4.09(a) of the Company Disclosure Schedule, none of the Assets is subject to any Encumbrance other than a Permitted Encumbrance.

(b)     Sufficiency of Assets.  The Assets comprise all of the assets, properties and rights of every type and description, whether real or personal, tangible or intangible, that are used in or necessary to the conduct of the Business and are adequate to conduct the Business as currently being conducted by the Company and its Subsidiaries.

(c)     Condition of Tangible Assets.  All of the material fixtures and other material improvements to the Real Property included in the Assets (including any Facilities) and all of the material tangible personal property other than inventory included in the Assets (i) are in all material respects adequate and suitable for their present uses, (ii) are in good working order, operating condition and state of repair (ordinary wear and tear excepted), and (iii) have been maintained in all material respects in accordance with normal industry practice.

(d)     Investments.  Except as set forth in Section 4.09(d) of the Company Disclosure Schedule, neither the Company nor its Subsidiaries (i) controls, directly or indirectly, or owns any direct or indirect Equity Interest in any Person that is not a Subsidiary of the Company or (ii) is subject to any obligation to make any investment (in the form of a loan, capital contribution or otherwise) in any Person.

Section 4.10.   Real Property.

(a)     Neither the Company nor any of its Subsidiaries owns, or has ever owned, any real property.  Section 4.10(a) of the Company Disclosure Schedule sets forth a list of the addresses of all real property leased, subleased or licensed by, or for which a right to use or occupy has been granted to, the Company or its Subsidiaries (the "Real Property").  Section 4.10(a) of the Company Disclosure Schedule also identifies with respect to each Real Property, each lease, sublease, license or other Contractual Obligation under which such Real Property is occupied or used including the date of and legal name of each of the parties to such lease, sublease, license or other Contractual Obligation, and each amendment, modification or supplement thereto (the "Real Property Leases").

(b)     Except as set forth in Section 4.10(b) of the Company Disclosure Schedule, there are no written or oral leases, subleases, licenses, concessions, occupancy agreements or other Contractual Obligations granting to any Person other than the Company and its Subsidiaries the right of use or occupancy of any of the Real Property and there is no Person other than the Company and its Subsidiaries in possession of any of the Real Property.  With respect to each Real Property Lease that is a sublease, to the Company's Knowledge, the representations and warranties in this Section 4.10(b) and Sections 4.16(b) and 4.16(c) are true and correct with respect to the underlying lease.

31

(c)     The Company has delivered or made available to Parent accurate and complete copies of the Real Property Leases, in each case as amended or otherwise modified and in effect, together with extension notices and other material correspondence, lease summaries, notices or memoranda of lease, estoppel certificates and subordination, non-disturbance and attornment agreements related thereto.

(d)     No eminent domain or condemnation Action is pending or, to the Company's Knowledge, threatened, that would preclude or materially impair the use of any Real Property.  To the Company's Knowledge, the current use of the Real Property by the Company and its Subsidiaries does not violate in any material respect any restrictive covenant of record that affects any of the Real Property.

(e)     Each Facility is supplied with utilities and other services necessary for the operation of such Facility as the same is currently operated, all of which utilities and other services are provided via public roads or via permanent, irrevocable appurtenant easements benefiting the parcel of Real Property. Each parcel of Real Property abuts on, and has direct vehicular access to, a public road, or has access to a public road via a permanent, irrevocable appurtenant easement benefiting the parcel of Real Property, in each case, to the extent necessary for the conduct of the Business as currently conducted.

Section 4.11.   Intellectual Property.

(a)     Company IP.   Except as disclosed in Section 4.11(a) of the Company Disclosure Schedule, the Company or its Subsidiaries (i) exclusively own the entire right, title and interest in and to all Owned Intellectual Property Rights free and clear of all Encumbrances (other than Permitted Encumbrances), and (ii) has the right to use all Licensed Intellectual Property Rights free and clear of all Encumbrances (other than Permitted Encumbrances and the covenants, conditions and restrictions under which such Licensed Intellectual Property is licensed).  Except, with respect to the Company Intellectual Property Rights licensed (A) to the Company and/or its Subsidiaries under the Inbound IP Contracts identified in Section 4.11(d) of the Company Disclosure Schedule, or (B) by the Company and/or its Subsidiaries under the Outbound IP Contracts identified in Section 4.11(d) of the Company Disclosure Schedule, in each case, to the extent provided in such IP Contracts, none of the Company Intellectual Property Rights is in the possession, custody, or control of any Person other than the Company or its Subsidiaries.

(b)     Infringement.   Except as disclosed in Section 4.11(b) of the Company Disclosure Schedule, (i) the conduct of the Business as currently conducted and/or the manufacture, use, sale, offer for sale, promotion, marketing, distribution, export or import of the Company Products has not infringed upon, misappropriated, or otherwise violated any Intellectual Property Rights of any Person and is not currently doing so in any manner, and (ii) neither the Company nor its Subsidiaries has (A) received any charge, complaint, claim, demand, or notice alleging interference, infringement, misappropriation, or other violation of the Intellectual Property Rights of any Person (including any offers to license or request or demand to refrain from using

32

any Intellectual Property Rights of any Person in connection with the conduct of the Business as currently conducted and/or the manufacture, use, sale, offer for sale, promotion, marketing, distribution, export or import of the Company Products), or (B) agreed to or has any Contractual Obligation to indemnify any Person for or against any interference, infringement, misappropriation, or other violation with respect to any Intellectual Property Rights, except as provided in the Outbound IP Contracts.  Except as disclosed in Section 4.11(b) of the Company Disclosure Schedule, to the Company's Knowledge, no Person has infringed upon, misappropriated, or otherwise violated any Company Intellectual Property Rights.

(c)    Scheduled Intellectual Property Rights.  Section 4.11(c) of the Company Disclosure Schedule contains a complete and accurate list of all patents and patent applications (whether pending or in the process of preparation), registered trademarks, applications for trademark registration, registered copyrights, applications for copyright registrations, and domain names owned by or licensed to the Company and/or its Subsidiaries (collectively, the "Company Registrations").  Section 4.11(c) of the Company Disclosure Schedule also identifies (i) each unregistered trademark, service mark, trade name, brand name, slogan or trade dress, (ii) each unregistered copyright, and (iii) a general description of the trade secrets and Company Products, in each case that is owned by or licensed to the Company and/or its Subsidiaries that, in each case, is material to the Business as currently conducted.  For purposes of this Agreement, all items listed in Section 4.11(c) of the Company Disclosure Schedule shall be called "Scheduled Intellectual Property Rights".  Section 4.11(c) of the Company Disclosure Schedule specifically identifies those items of Scheduled Intellectual Property Rights that are licensed to the Company and/or its Subsidiaries, including the identification of the IP Contract pursuant to which each such Intellectual Property Right is licensed.  For each of the Company Registrations, Section 4.11(c) of the Company Disclosure Schedule includes the following information: (i) for each patent and patent application, the title, patent number or application serial number, jurisdiction, filing date, date issued (if applicable), inventors, owner of record, and present status thereof; (ii) for each registered trademark and trademark application, the trademark, application serial number or registration number, jurisdiction, filing date, registration date (if applicable), class of goods or services covered, description of goods or services, owner of record, and present status thereof; (iii) for each domain name, the registration date, any renewal date, owner of record, and name of the registrar; (iv) for each copyright registration and copyright application, the title of the work, number and date of such registration or application, owner of record, and jurisdiction; and (v) any actions that must be taken within ninety (90) days after the date hereof for the purposes of obtaining, maintaining, perfecting, preserving, or renewing any Company Registrations, including the payment of any registration, maintenance, or renewal fees or the filing of any responses to office actions, documents, applications, or certificates.  Each of the Company Registrations (other than applications) that is owned by the Company and/or its Subsidiaries and, to the Company's Knowledge, each of the Company Registrations (other than applications) that is licensed to the Company and/or its Subsidiaries is valid, subsisting, and enforceable.

33

(d)    IP Contracts.    Section 4.11(d) of the Company Disclosure Schedule identifies under separate headings each Contractual Obligation, whether written or oral, (i) under which the Company and/or its Subsidiaries uses or licenses Licensed Intellectual Property Rights that any Person except the Company or its Subsidiaries owns (other than licenses for generally available off-the-shelf software) (the "Inbound IP Contracts"), (ii) under which the Company and/or its Subsidiaries has granted any Person any right or interest in any Company Intellectual Property Rights (the "Outbound IP Contracts"), and (iii) that otherwise materially affects the Company's and/or its Subsidiaries' use of or ownership rights in the Company Intellectual Property Rights (including settlement agreements and covenants not to sue) (such Contractual Obligations, together with the Inbound IP Contracts and Outbound IP Contracts, the "IP Contracts").  Except as provided in the Inbound IP Contracts, or as otherwise disclosed in Section 4.11(d) of the Company Disclosure Schedule, the Company and/or its Subsidiaries do not, as of the Closing Date, owe any royalties or other payments to any Person for the use of any Company Intellectual Property Rights or the manufacture, use, sale, offer for sale, marketing, promotion and/or distribution of any Company Products. The Company has delivered or made available to Parent accurate and complete copies of each of the IP Contracts (or, where an IP Contract is an oral agreement, an accurate and complete written description of such IP Contract), in each case, as amended or otherwise modified and in effect.

(e)    Title to Company Intellectual Property Rights.  Except as disclosed in Section 4.11(e) of the Company Disclosure Schedule, with respect to (i) each item of Owned Intellectual Property Rights, and (B) to the Company's Knowledge, each item of Licensed Intellectual Property Rights licensed to the Company and/or its Subsidiaries, such item or right is not subject to any outstanding Government Order specific to such Company Intellectual Property Rights, and no Action (including any opposition, interference, or re-examination) is pending or to the Company's Knowledge, threatened, which challenges the legality, validity, enforceability, use, or ownership of such right or item, other than routine office actions of the U.S. Patent and Trademark Office pertaining to Company Registrations.

(f)    Sufficiency.  The Company Intellectual Property Rights include all of the Intellectual Property Rights necessary to or used in the conduct of the Business including the development, manufacturing, sale and import of products, and there are no other Intellectual Property Rights that are material to the conduct of the Business.

(g)    Confidentiality and Invention Assignments.  The Company and its Subsidiaries have maintained commercially reasonable practices to protect the confidentiality of the Company's and its Subsidiaries' confidential information and trade secrets and, except as disclosed in Section 4.11(g) of the Company Disclosure Schedule, has required all current and former employees and other Persons with access to the Company's and its Subsidiaries' confidential information and/or trade secrets to execute Enforceable Contractual Obligations requiring them to maintain the confidentiality of such information and/or trade secrets and use such information and/or trade secrets only for the benefit of the Company and/or its Subsidiaries.  All current and former employees

34

and contractors of the Company and its Subsidiaries who contributed to the creation or development of the Company Products and/or the Company Intellectual Property have executed Contractual Obligations that assign to the Company and its Subsidiaries all of such Person's Intellectual Property Rights in such contribution.

(h)     <u>Open Source Software</u>.     <u>Section 4.11(h)</u> of the Company Disclosure Schedule lists all Publicly Available Software contained in or used by the Company and/or its Subsidiaries in the development of Company Products or any product or service of the Company and/or its Subsidiaries and describes (i) the applicable software name and version number, (ii) the licensor, (iii) the license under which such code was obtained, (iv) whether (and if so, how) such code was modified by or for the Company and/or its Subsidiaries, (v) whether (and, if so, how) such code was distributed by or for the Company and/or its Subsidiaries, and (vi) how such code is integrated with or interacts with any other software.   Except as disclosed in <u>Section 4.11(h)</u> of the Company Disclosure Schedule, none of the Company Products constitute, contain, or are distributed by the Company and/or its Subsidiaries together with Publicly Available Software, and none of the Company Products are subject to any IP Contract or other Contractual Obligation of any Publicly Available Software that would require the Company and/or its Subsidiaries to divulge to any Person any source code or trade secret that is part of the Company Products or to grant, or purport to grant, to any Person, any rights or immunities under the Owned Intellectual Property Rights or to any Licensed Intellectual Property Rights in a manner which would exceed or violate the Company's or its Subsidiaries' license to such Licensed Intellectual Property Rights.

(i)     <u>Privacy and Data Security</u>.     The Company's and/or its Subsidiaries' use and dissemination of any personally-identifiable information concerning individuals is in compliance in all material respects with all applicable privacy policies, terms of use, Legal Requirements, and Contractual Obligations applicable to the Company and/or its Subsidiaries' or to which the Company and/or its Subsidiaries are bound.   Except as described in <u>Section 4.11(i)</u> of the Company Disclosure Schedule, the Company and its Subsidiaries maintain policies and procedures regarding data security and privacy and maintain administrative, technical, and physical safeguards that are commercially reasonable and, in any event, in compliance in all material respects with all applicable Legal Requirements and Contractual Obligations applicable to the Company and/or its Subsidiaries or to which the Company and/or its Subsidiaries are bound.   To the Company's Knowledge, there have been no security breaches relating to, or violations of any security policy regarding, or any unauthorized access of, any data or information used by the Company and/or its Subsidiaries.   The Contemplated Transactions will not, as of the Closing, violate in any material respect any privacy policy, terms of use, Legal Requirements or Contractual Obligations relating to the use, dissemination, or transfer of any data or information.

Section 4.12.   <u>Legal Compliance; Illegal Payments; Permits.</u>

(a)     <u>Legal Compliance</u>.   Except as disclosed in <u>Section 4.12(a)</u> of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries is in any

35

material respect, in breach or violation of, or default under, its Organizational Documents or any Legal Requirement.

(b)     <u>Illegal Payments, Foreign Corrupt Practices Act etc.</u>   In the conduct of the Business, neither the Company nor any of its Subsidiaries nor any of their Representatives (insofar as it relates to their services on behalf of the Company or its Subsidiaries), has (i) directly or indirectly, given, or agreed to give, any illegal gift, contribution, payment or similar benefit to any supplier, customer, governmental official or employee or other Person who was, is or may be in a position to help or hinder the Company or any of its Subsidiaries (or assist in connection with any actual or proposed transaction) or made, or agreed to make, any illegal contribution, or reimbursed any illegal political gift or contribution made by any other Person, to any candidate for federal, state, local or foreign public office or (ii) established or maintained any unrecorded fund or asset or made any false entries on any books or records for any purpose. Without limiting the foregoing, the Company and each of its Subsidiaries and, to the Company's Knowledge, each of their Representatives, has complied with and is in compliance with, and none of them has taken any action that has violated or would reasonably be expected to result in a failure to comply with or a violation of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder, the OECD Convention on Combating Bribery of Foreign Public Officials in International Transactions, dated 21 November 1977, any other Legal Requirements that prohibit commercial bribery, domestic corruption or money laundering, and the standards established by the Financial Action Task Force on Money Laundering.  The books and records of the Company and the Subsidiaries have been and are maintained in compliance, in all material respects, with the applicable requirements of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

(c)     <u>Permits</u>.   The Company and its Subsidiaries have been duly granted all material Permits necessary for the conduct of the Business by it and the ownership use and operation of its Assets.  <u>Section 4.12(c)</u> of the Company Disclosure Schedule describes each material Permit affecting, or relating to, the Assets or the Business together with the Governmental Authority responsible for issuing such Permit. Except as disclosed in <u>Section 4.12(c)</u> of the Company Disclosure Schedule, (i) the Permits listed or required to be listed thereon are valid and in full force and effect, (ii) neither the Company nor any of its Subsidiaries is, in any material respect, in breach or violation of, or default under, any such material Permit and (iii) to the Company's Knowledge, no fact, situation, circumstance, condition or other basis exists which, with notice or lapse of time or both, would constitute a material breach, violation or default under such Permit or give any Governmental Authority grounds to suspend, revoke or terminate any such Permit.

Section 4.13.  <u>Tax Matters</u>.

(a)     The Company and its Subsidiaries have timely filed, or have caused to be timely filed on their behalf, all Tax Returns required to be filed by them in accordance with all Legal Requirements.  All such Tax Returns are true, correct and

complete in all material respects.  All Taxes owed by the Company and its Subsidiaries (whether or not shown on any Tax Return) have been timely paid in full.  No claim has ever been made by a Governmental Authority in a jurisdiction where the Company or its Subsidiaries do not file Tax Returns that the Company or its Subsidiaries are or may be subject to taxation by that jurisdiction, and, to the Company's Knowledge, there is no basis for any such claim to be made.  There are no Encumbrances with respect to Taxes upon any Asset other than Permitted Encumbrances for current Taxes not yet delinquent.

(b)     The Company and its Subsidiaries have collected, deducted, withheld and timely paid to the appropriate Governmental Authority all Taxes required to be collected, deducted, withheld or paid to a Governmental Authority and the Company and its Subsidiaries have complied with all reporting and recordkeeping requirements in respect thereto.

(c)     No Action relating to any Taxes of the Company or any of its Subsidiaries is currently in progress. There is no pending, or to the Company's Knowledge threatened, claim or Action concerning any Tax Liability of the Company or its Subsidiaries.  The Company has delivered or made available to Parent accurate and complete copies of all income Tax Returns and other material Tax Returns, and all examination reports, and statements of deficiencies filed, assessed against, or agreed to by the Company and its Subsidiaries since December 31, 2006.

(d)     Neither the Company nor any of its Subsidiaries has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, which waivers or extensions are currently in effect. Except as described in Section 4.13(d) of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries has executed any power of attorney with respect to any Tax, other than powers of attorney that are no longer in force.   No closing agreements, private letter rulings, technical advice memoranda or similar agreements or rulings relating to Taxes have been entered into or issued by any Governmental Authority with or in respect of the Company or its Subsidiaries.

(e)     The unpaid Taxes of the Company and its Subsidiaries (i) did not as of the Most Recent Balance Sheet Date exceed the reserve for Taxes (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) and (ii) will not, as of the Closing Date, exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company in filing its Tax Returns.

(f)     Except as disclosed in Section 4.13(f) of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries has made any payments, or is or has been a party to any Contractual Obligation that could result in it making payments, separately or in the aggregate, of any "excess parachute payment" within the meaning of Code Section 280G (or any corresponding provisions of state, local or foreign Tax law) or that were or would not be deductible under Code Sections 162 or 404.

(g)     Except as described in <u>Section 4.13(g)</u> of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries have ever been a member of an "affiliated group" within the meaning of Code Section 1504(a) filing a consolidated federal income Tax Return, other than an affiliated group the common parent of which is the Company.  Neither the Company nor any of its Subsidiaries is a party to any Contractual Obligation relating to Tax sharing or Tax allocation, other than commercial agreements the principal purpose of which is unrelated to Taxes and which were entered into in the Ordinary Course of Business.  Neither the Company nor any of its Subsidiaries has Liability for the Taxes of any Person (other than the Company or any of its Subsidiaries) under Treasury Regulation 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise.

(h)     Neither the Company nor any of its Subsidiaries has filed a consent under Code Section 341(f).

(i)     Except as described in <u>Section 4.13(i)</u> of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries is or has been required to make any adjustment pursuant to Code Section 481(a) (or any predecessor provision) or any similar provision of state, local or foreign Tax law by reason of any change in any accounting methods, and there is no application pending with any Governmental Authority requesting permission for any changes in any of its accounting methods for Tax purposes.  To the Company's Knowledge, no Governmental Authority has proposed any such adjustment or change in accounting method of the Company or its Subsidiaries.

(j)     Neither the Company nor any of its Subsidiaries will be required to include any amount in taxable income or exclude any item of deduction or loss from taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of (i) any "closing agreement" as described in Code Section 7121 (or any corresponding or similar provision of state, local or foreign Income Tax law) executed on or prior to the Closing Date, (ii) any deferred intercompany gain or excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision or administrative rule of federal, state, local or foreign income Tax law), (iii) installment sale or open transaction disposition made on or prior to the Closing Date, (iv) any prepaid amount received on or prior to the Closing Date, or (v) a deferral of election made on or prior to the Closing Date with respect to any cancellation of indebtedness income.

(k)     Neither the Company nor any of its Subsidiaries has been either a "distributing corporation" or a "controlled corporation" in a distribution in which the parties to such distribution treated the distribution as one to which Section 355 of the Code is applicable.

(l)     Neither the Company nor any of its Subsidiaries has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(l)(A)(ii) of the Code.

A/74600477.20

(m)     Neither the Company nor any of its Subsidiaries has engaged in any transaction that could give rise to (i) a reporting obligation under Section 6111 of the Code or the regulations thereunder, (ii) a list maintenance obligation under Section 6112 of the Code or the regulations thereunder, (iii) a disclosure obligation of a "reportable transaction" under Section 6011 of the Code and the regulations thereunder, or (iv) any similar obligation under any predecessor or successor law or regulation or comparable provision of state or local law.

Section 4.14.   <u>Employee Benefit Plans</u>.

(a)     <u>Section 4.14(a)</u> of the Company Disclosure Schedule lists all Employee Plans which the Company and its Subsidiaries sponsor or maintain, or to which the Company and its Subsidiaries contribute or are obligated to contribute, or in respect of which the Company or  its or any of its Subsidiaries has or may have any Liability (including but not limited to by reason of being or having been treated as a single employer with any other Person under Section 414 of the Code or Section 4001(b) of ERISA (an "<u>ERISA Affiliate</u>"), or which benefits any current or former employee, director, consultant or independent contractor of the Company, its Subsidiaries, or the beneficiaries or dependents of any such Person (each a "<u>Company Plan</u>").  With respect to each Company Plan, each of the Company and its Subsidiaries has delivered or made available to Parent accurate and complete copies of each of the following:  (i) if the plan has been reduced to writing, the plan document together with all amendments thereto, (ii) if the plan has not been reduced to writing, a written summary of all material plan terms, (iii) if applicable, any trust agreements, custodial agreements, insurance policies or material contracts, material administrative agreements and similar agreements, and investment management or investment advisory agreements, (iv)  any summary plan descriptions, employee handbooks or similar material employee communications, (v) in the case of any plan that is intended to be qualified under Code Section 401(a), the most recent determination letter from the Internal Revenue Service ("<u>IRS</u>") and any related material correspondence with the IRS, and any pending request for determination with respect to the plan's qualification, (vi) in the case of any funding arrangement intended to qualify as a VEBA under Code Section 501(c)(9), the IRS letter determining that it so qualifies, (vii) in the case of any plan for which Forms 5500 are required to be filed, the three most recently filed Forms 5500, with schedules attached, (viii) any notices, letters or other correspondence from the IRS or the Department of Labor relating to such Company Plan, and (ix) any written policies or procedures used in and material to the administration of such Company Plan.

(b)     Neither the Company nor any of its Subsidiaries, nor any ERISA Affiliate of the Company or its Subsidiaries has ever maintained or contributed to or incurred any Liability in respect of a plan subject to Title IV of ERISA or Code Section 412, including any "multiemployer plan" as defined in Section 4001(a)(8) of ERISA, and no condition exists that presents a material risk to the Company of incurring a material liability under Title IV of ERISA or Section 412 or Section 430 of the Code.

39

(c)     Each Company Plan that is intended to be qualified under Code Section 401(a) is so qualified.  Each Company Plan, including any associated trust or fund, has been administered in all material respects in accordance with its terms and any applicable collective bargaining agreements and with applicable Legal Requirements, and, nothing has occurred with respect to any Company Plan that has subjected or could reasonably be expected to subject the Company to a penalty under Section 502 of ERISA or to an excise tax under the Code, or that has subjected or could reasonably be expected to subject any participant in, or beneficiary of, a Company Plan to a tax under Code Section 4973.  Each Company Plan that is a qualified defined contribution plan has been administered in all material respects as, and is intended to be, an "ERISA section 404(c) Plan" within the meaning of Department of Labor regulations section 2550.404c-1(b).

(d)     All required contributions to, and premium payments on account of, each Company Plan have been made on a timely basis, as applied through the Closing Date.  The fair market value of the assets of each Company Plan for which a separate fund of assets is or is required to be maintained, as of the end of the most recently ended plan year of that Plan, equals or exceeds the present value of all benefits liabilities under that Plan.  None of the assets of any Company Plan include any capital stock or other securities issued by the Company or its Subsidiaries or any ERISA Affiliate of the Company or any of its Subsidiaries.

(e)     There is no pending or, to the Company's Knowledge, threatened Action or other legal proceeding relating to a Company Plan or any fiduciary or service provider thereof, other than routine claims in the Ordinary Course of Business for benefits provided for by the Company Plans, and to the Knowledge of the Company there is no basis for any such Action or legal proceeding.  No Company Plan is or, within the last six years, has been the subject of an examination or audit by a Governmental Authority, is the subject of an application or filing under, or is a participant in, a government-sponsored amnesty, voluntary compliance, self-correction or similar program.

(f)     Except as required under Section 601 et seq. of ERISA or applicable state insurance laws, no Company Plan provides benefits or coverage in the nature of health, life or disability insurance following retirement or other termination of employment.

(g)     The exercise price of each Option is not less than the fair market value of a share of Common Stock determined on the date of grant of such Option (and as of any later modification thereof within the meaning of Section 409A of the Code).  Each "nonqualified deferred compensation plan" (as defined in Code Section 409A(d)(1) and applicable regulations) with respect to any service provider to the Company (i) complies and has been operated in compliance in all material respects with the requirements of Code Section 409A and regulations promulgated thereunder, or (ii) is exempt from compliance under the "grandfather" provisions of IRS Notice 2005-1 and applicable regulations and has not been "materially modified" (within the meaning of IRS Notice 2005-1 and Treasury Regulations §1.409A-6(a)(4)) subsequent to October 3, 2004.

40

(h)     Neither the Company nor any of its Subsidiaries has undertaken to maintain any Company Plan for any period of time, and each Company Plan and any related contracts may be amended or terminated without penalty other than the payment of benefits, fees or charges accrued or incurred through the date of termination. No communication, report or disclosure has been made which, at the time made, did not accurately reflect the material terms and operations of any Company Plan. Neither the Company nor any of its Subsidiaries has announced its intention, or undertaken (whether or not legally bound) to modify or terminate any Company Plan or adopt any arrangement or program which, once established, would come within the definition of Company Plan.

(i)     With respect to each Company Plan that is subject to Legal Requirements of a jurisdiction outside the United States, each such plan required to be registered has been registered and is in good standing with applicable Governmental Authorities, all contributions required to be made to or in connection with each such plan have been made and each such plan has been established and administered in accordance with its terms and all applicable Legal Requirements.

(j)     Neither the Company nor any of its Subsidiaries has Liability, including under any Company Plan, arising out of the treatment of any service provider as a consultant or independent contractor and not as an employee, or vice-versa.

(k)     The execution and delivery of this Agreement and the consummation of the Contemplated Transactions will not, by itself or in combination with any other event (regardless of whether that other event has or will occur), result in any payment (whether of severance pay or otherwise) becoming due from or under any Company Plan to any current or former director, officer, consultant or employee of the Company or result in the vesting, acceleration of payment, or increases in the amount of any benefit payable to or in respect of any such current or former director, officer, consultant or employee.

Section 4.15.  Environmental Matters.   Except as set forth in Section 4.15 of the Company Disclosure Schedule, (a) each of the Company and its Subsidiaries is, and has been, in compliance in all material respects with all Environmental Laws, (b) there has been no release or threatened release of any material amount of any Hazardous Substance on, upon, into or from any site currently or heretofore owned, leased or otherwise operated or used by the Company or any of its Subsidiaries, (c) there have been no Hazardous Substances generated by the Company or any of its Subsidiaries that have been disposed of or come to rest at any site that has been included in any published U.S. federal, state or local "superfund" site list or any other similar list of hazardous or toxic waste sites published by any Governmental Authority in the United States, (d) there are no underground storage tanks located on, no PCBs (polychlorinated biphenyls) or PCB-containing equipment used or stored on, and no hazardous waste as defined by the Resource Conservation and Recovery Act stored on, any site owned or operated by the Company, except for the storage of hazardous waste in compliance with Environmental Laws and (e) the Company has delivered or made available to Parent accurate and complete copies of all material environmental records, reports, notifications, certificates of need, permits, pending

41

permit applications, correspondence, engineering studies, and environmental studies or assessments for the Company and any of its Subsidiaries, in each case as amended and in effect.

Section 4.16.   <u>Contracts</u>.

(a)   <u>Contracts</u>.   Except as disclosed in the applicable subsection in <u>Section 4.16</u> of the Company Disclosure Schedule (which is arranged in subsections numbered (i) to (xiv) to correspond to the subsections of this <u>Section 4.16(a))</u>, neither the Company nor any of its Subsidiaries is bound by or a party to:

(i)   any Contractual Obligation (or group of related Contractual Obligations) for the purchase, sale, construction, repair or maintenance of inventory, raw materials, commodities, supplies, goods, products, equipment or other property, or for the furnishing or receipt of services, in each case, the performance of which will extend over a period of more than one year or which provides for (or would be reasonably expected to involve) annual payments to or by the Company or any of its Subsidiaries in excess of $100,000 or aggregate payments to or by the Company or any of its Subsidiaries in excess of $250,000;

(ii)   any Contractual Obligation relating to the acquisition or disposition by the Company or any of its Subsidiaries of (A) any business (whether by merger, consolidation or other business combination, sale of securities, sale of assets or otherwise) or (B) any material Asset (other than in the Ordinary Course of Business of the Company and its Subsidiaries);

(iii)   any Contractual Obligation concerning or consisting of a partnership, limited liability company, joint venture or similar agreement;

(iv)   any Contractual Obligation under which the Company or any of its Subsidiaries has permitted any Asset to become Encumbered (other than by a Permitted Encumbrance);

(v)   any Contractual Obligation (A) under which the Company or any of its Subsidiaries has created, incurred, assumed or guaranteed any Debt or (B) under which any other Person has guaranteed any Debt of the Company or any of its Subsidiaries;

(vi)   any Contractual Obligation containing covenants that in any way purport to (A) restrict any business activity (including the solicitation, hiring or engagement of any Person or the solicitation of any customer) of the Company or any of its Subsidiaries or any Affiliate thereof or (B) limit the freedom of the Company or any of its Subsidiaries or any Affiliate thereof to engage in any line of business or compete with any Person;

(vii)   any Contractual Obligation under which the Company or any of its Subsidiaries is, or may become, obligated to incur any severance pay or Compensation

42

obligations that would become payable by reason of this Agreement or the Contemplated Transactions;

(viii)   any Contractual Obligation under which the Company or any of its Subsidiaries is, or may, have any Liability to any investment bank, broker, financial advisor, finder or other similar Person (including an obligation to pay any legal, accounting, brokerage, finder's, or similar fees or expenses) in connection with this Agreement or the Contemplated Transactions;

(ix)   any Contractual Obligation providing for the employment or consultancy of any Person on a full-time, part-time, consulting or other basis or otherwise providing Compensation or other benefits to any officer, director, employee or consultant (other than a Company Plan);

(x)   any material agency, dealer, distributor, sales representative, marketing or other similar Contractual Obligation;

(xi)   any outstanding general or special powers of attorney executed by or on behalf of the Company or any of its Subsidiaries;

(xii)   any Contractual Obligation, other than Real Property Leases relating to the lease or license of any Asset, including Company Products and Intellectual Property Rights (and including all customer license and maintenance agreements) that is not included in Section 4.11(d) of the Company Disclosure Schedule;

(xiii)   any Contractual Obligation under which the Company or any of its Subsidiaries has advanced or loaned an amount to any of its Affiliates or employees other than in the Ordinary Course of Business; and

(xiv)   any other Contractual Obligation between the Company and any of its Subsidiaries, on the one hand, and any Securityholder (or Affiliate or Family Member thereof), on the other hand, that will continue in effect after the Closing.

The Company has delivered or made available to Parent accurate and complete copies of each written Contractual Obligation listed in Section 4.16 of the Company Disclosure Schedule, in each case, as amended or otherwise modified and in effect.  The Company has delivered or made available to Parent a written summary setting forth all of the material terms and conditions of each oral Contractual Obligation listed in Section 4.16 of the Company Disclosure Schedule.

(b)   Enforceability, *etc.*  Each Contractual Obligation required to be disclosed in Section 4.10(a) (*Real Property*), Section 4.11(d) (*IP Contracts*), Section 4.14 (*Employee Benefit Plans*), Section 4.16 (*Contracts*), Section 4.17 (*Government Contracts*) Section 4.19 (*Customers or Suppliers*) or Section 4.22 (*Insurance*) of the Company Disclosure Schedule (each, a "Material Company Contract") is Enforceable against the Company and, to the Knowledge of the Company, each other party to such Contractual Obligation, and is in full force and effect, and, subject to obtaining any necessary consents disclosed in Sections 4.03 and 4.04 of the Company Disclosure

43

Schedule, will continue to be so Enforceable and in full force and effect on identical terms following the consummation of the Contemplated Transactions.

(c)     Breach, *etc.*  Neither the Company nor any of its Subsidiaries, nor, to the Company's Knowledge, any other party to any Material Company Contract is in material breach or violation of, or default under, or has repudiated any material provision of, any Material Company Contract.

Section 4.17.   Government Contracts.

(a)     Except as described in Section 4.17(a) of the Company Disclosure Schedule, neither the United States Government nor any prime contractor, subcontractor or other Person has notified the Company or any of its Subsidiaries in writing (which written notification is still outstanding and has not been canceled, withdrawn or resolved) that the Company or any of its Subsidiaries have in any material respect breached or violated any Legal Requirement, certification, representation, clause, provision or requirement pertaining to a Government Contract or Government Subcontract, and all material facts set forth or acknowledged by any such representations or certifications submitted by or on behalf of the Company in connection with a Government Contract or Government Subcontract were current, accurate and complete in all material respects on the date of submission.

(b)     Except as set forth in Section 4.17(b) of the Company Disclosure Schedule:

(i)     (A) each of the Company's and its Subsidiaries' Government Contracts and Government Subcontracts were legally awarded and (B) no Government Contract is the subject of bid or award protest proceedings as of the date of this Agreement;

(ii)     neither the Company nor any of its Subsidiaries has received any written notice of termination for convenience, notice of termination for default, notice of breach, cure notice or show cause notice pertaining to a Government Contract or Government Subcontract, and no event, condition or omission has occurred or exists that would constitute grounds for such action;

(iii)    no cost incurred by the Company or any of its Subsidiaries pertaining to a Government Contract or Government Subcontract has been questioned or challenged, is the subject of any audit or investigation or has been disallowed by any Governmental Authority in an amount that individually exceeds $10,000 or in the aggregate exceeds $25,000;

(iv)    other than in the Ordinary Course of Business, neither the Company nor any of its Subsidiaries has undergone, and is not currently undergoing, any internal or external audit, review, inspection, investigation, survey or examination of records (collectively "Audits") relating to any of its Government Contracts, Government Subcontracts, or bids, and no Audit has resulted in any disallowance of costs in a material

44

amount or adverse finding with respect to any alleged unlawful conduct, misstatement or omission arising under or relating to any Government Contract, Government Subcontract, or bid;

(v)       from January 1, 2007 through the date of this Agreement, neither the Company nor any of its Subsidiaries has had any adverse or negative past performance evaluation or rating relating to a Government Contract or Government Subcontract;

(vi)       no Government Contract or Government Subcontract was awarded based upon the Company or its Subsidiaries qualifying as a Small Business Concern, HUBZone Small Business Concern, Veteran-Owned Small Business Concern, 8(a) Business Development Concern or other preferential status as afforded by the FAR, small business administration ("SBA") regulations, other regulations or statutes;

(vii)       no reasonable basis exists to give rise to a claim for fraud (as such concept is defined under the state or federal laws of the United States) in connection with any Government Contract or Government Subcontract or bid under the United States or a state civil or criminal False Claims Acts, the United States Procurement Integrity Act, the Truth in Negotiations Act, or other laws adopted by any Governmental Authority;

(viii)       neither the Company nor any of its Subsidiaries has made any mandatory disclosure under FAR 52.203-13 or any voluntary disclosure to any Governmental Authority with respect to any alleged. unlawful conduct, misstatement or omission arising under or relating to any Government Contract or Government Subcontract, and to the Knowledge of the Company there are no facts that would require mandatory disclosure under FAR 52.203-13;

(ix)       there are no agreements or arrangements to which the Company or any of its Subsidiaries is a party under which any Governmental Authority acquires rights with respect to any Company Products or Owned Intellectual Property Rights except "limited rights" with respect to technical data or "restricted rights" with respect to software as contemplated by the provisions of Federal Acquisition Regulations ("FAR") 48 C.F.R. 12.212, 2.101, and 227.7202-1 through 227.7202-4 (June 1995), 252.227-7013(a)(14) (Limited Rights), and 252.227-7014(a)(15) (Restricted Rights) of the Department of Defense ("DoD") FAR Supplement and its successors, or the equivalent thereof under foreign applicable law, nor has any Governmental Authority acquired any rights outside of any such agreements, arrangements or subcontract as the result of providing any funding relating to the development of any Company Intellectual Property Rights; and the Company has complied with all applicable requirements for each subject invention (as defined in FAR section 52.227-11) such that the Company or one of its Subsidiaries exclusively owns the entire right, title and interest in and to each such subject invention free and clear of all Encumbrances; and

(x)       there are no facts, involving the Company or any of its Subsidiaries that could reasonably be expected to result in an "Organizational Conflict of Interest" as

45

defined in the FAR.  The Company and its Subsidiaries are unaware of any such Organizational Conflict of Interest that could reasonably be expected to result from the execution and delivery of this Agreement and completion of the Contemplated Transactions.

(c)    Except as set forth in <u>Section 4.17(c)</u> of the Company Disclosure Schedule, from January 1, 2007 through the date of this Agreement, none of the Company, its Subsidiaries, and, to the Knowledge of the Company, none of their directors, officers or employees, is or has been under administrative, civil or criminal investigation or indictment by any Governmental Authority, or any audit or investigation by the Company or its Subsidiaries, with respect to any alleged act or omission arising under or relating to any Government Contract or Government Subcontract.

(d)    All invoices submitted under each Government Contract were accurate and complete, in all material respects, as of their submission date.

(e)    From January 1, 2007 through the date of this Agreement, none of the Company or its Subsidiaries or any of their directors or officers has been debarred or suspended or proposed for debarment or suspension, or has been the subject of a finding of non-responsibility, and, to the Knowledge of the Company, no such debarment or suspension is threatened in writing, in each case, from participation in the award of any Government Contract or Government Subcontract. To the Knowledge of the Company there are no circumstances that would likely become a basis for the suspension or debarment of the Company or any of its Subsidiaries, or any of their officers, or employees, from bidding on or being awarded Government Contracts or Government Subcontracts.

(f)    <u>Section 4.17(f)</u> of the Company Disclosure Schedule sets forth all of the facility clearances held by the Company or any of its Subsidiaries.  The Company and its Subsidiaries possess all of the facility and personnel security clearances reasonably necessary to conduct the Business.  The Company and its Subsidiaries are in compliance with all applicable national security obligations and security measures required by the Company's and its Subsidiaries' Government Contracts, Government Subcontracts or applicable Legal Requirements including, but not limited to, compliance with the National Industrial Security Operating Manual (DoD 5220.22-M, as amended), and, to the Knowledge of the Company, there are no facts or circumstances that would, or would reasonably be expected to, result in the suspension or termination of any Government security clearances or that would reasonably be expected to render the Company or its Subsidiaries ineligible for such security clearances in the future.

(g)    <u>Section 4.17(g)</u> of the Company Disclosure Schedule sets forth a complete and correct list of each officer, employee or consultant of the Company or any of its Subsidiaries who currently holds or maintains or has otherwise been granted a security clearance by any Governmental Authority (each, a "<u>Security Clearance Holder</u>") and the type, level or classification of each such security clearance.  During the last three years, there has not been, and, to the Company's Knowledge, there are no facts that could

46

reasonably be expected to give rise to, any revocation, suspension or failure to renew any security clearance of the Company, any of its Subsidiaries, any site or facility operated by the Company or any of its Subsidiaries or, to the Company's Knowledge, any Security Clearance Holder.

(h)     No Governmental Authority has revoked, suspended or failed to renew any security clearance held or maintained by or otherwise granted to the Company, nor has any Governmental Authority threatened to revoke, suspend or fail to renew any security clearance held or maintained by or otherwise granted to the Company any of its Subsidiaries or any site or facility operated by the Company or any of its Subsidiaries.

(i)     Except as set forth in <u>Section 4.17(i)</u> of the Company Disclosure Schedule there are no outstanding claims against the Company or its Subsidiaries, either by a Governmental Authority or by any prime contractor, subcontractor, vendor or other third party arising under or relating to any Government Contract, Government Subcontract, bid or teaming agreement to which the Company or its Subsidiaries is a party.

(j)     Unless prohibited by a Legal Requirement, and only to the extent allowed by Legal Requirement, the Company has disclosed or made available to Parent all material information relating to the nature and scope of its or any of its Subsidiaries' material Classified Government Contracts and has provided Parent with access to complete and accurate copies of all contracts, statements of work and other documentation related thereto.

(k)     There are no actual or to the Company's Knowledge threatened prohibitions on the Company or any of its Subsidiaries to do business with, directly or indirectly, any Governmental Authority.

Section 4.18.  <u>Related Party Transactions</u>.   Except for the matters disclosed in <u>Section 4.18</u> of the Company Disclosure Schedule, no Securityholder or Affiliate of any Securityholder and no officer or director or holder of more then 5% of any outstanding class of capital stock of the Company (or equivalent) of the Company or any of its Subsidiaries (or, to the Company's Knowledge, any Family Member of any such Person who is an individual or any entity in which any such Person or any such Family Member thereof owns a material interest): (a) has any material interest in any material Asset owned or leased by the Company or any of its Subsidiaries or used in connection with the Business or (b) has engaged in any material transaction, arrangement or understanding with the Company or any of its Subsidiaries since January 1, 2009 (other than payments made to, and other Compensation provided to, such officers and directors in the Ordinary Course of Business of the Company and its Subsidiaries).

Section 4.19.  <u>Customers and Suppliers</u>.   <u>Section 4.19</u> of the Company Disclosure Schedule sets forth a complete and accurate list of (a) the ten (10) largest customers of the Company and its Subsidiaries (measured by aggregate billings) during the eleven (11) month period ended on the Most Recent Balance Sheet Date, indicating the existing Contractual Obligations with each such customer by product or service provided and (b) the ten (10) largest

47

suppliers of materials, products or services to the Company and its Subsidiaries (measured by the aggregate amount purchased by the Company) during the eleven (11) month period ended on the Most Recent Balance Sheet Date, indicating the Contractual Obligations for continued supply from each such supplier.   Except as disclosed in <u>Section 4.19</u> of the Company Disclosure Schedule, none of such customers or suppliers has cancelled, terminated or otherwise materially altered (including any material reduction in the rate or amount of sales or purchases or material increase in the prices charged or paid, as the case may be) or notified the Company or its Subsidiaries of any intention to do any of the foregoing or otherwise threatened in writing to cancel, terminate or materially alter (including any material reduction in the rate or amount of sales or purchases or material increase in the prices charged or paid as the case may be) its relationship with the Company or its Subsidiaries.

Section 4.20.   <u>Labor Matters</u>.   Except as disclosed in <u>Section 4.20</u> of the Company Disclosure Schedule, there are no labor troubles (including any work slowdown, lockout, stoppage, picketing or strike) pending, or to the Company's Knowledge, threatened between the Company or any of its Subsidiaries, on the one hand, and their employees, on the other hand, and there have been no such troubles since January 1, 2010.  Except as disclosed in <u>Section 4.20</u> of the Company Disclosure Schedule, (a) no employee of the Company or any of its Subsidiaries is represented by a labor union, (b) neither the Company nor any of its Subsidiaries is a party to, or otherwise subject to, any collective bargaining agreement or other labor union contract, (c) no petition has been filed or, to the Company's Knowledge, any proceedings instituted by an employee or group of employees of the Company or any of its Subsidiaries with any labor relations board seeking recognition of a bargaining representative, (d) to the Company's Knowledge, there is no organizational effort currently being made or threatened by, or on behalf of, any labor union to organize employees of the Company or any of its Subsidiaries, and (e) no demand for recognition of employees of the Company or any of its Subsidiaries has been made by, or on behalf of, any labor union.   No executive officer's or other Key Employee's employment with the Company or any of its Subsidiaries has been terminated for any reason nor has any such officer or Key Employee notified the Company or any of its Subsidiaries of his or her intention to resign or retire since January 1, 2010.

Section 4.21.   <u>Litigation; Governmental Orders</u>.

(a)   <u>Litigation</u>.  Except as disclosed in <u>Section 4.21(a)</u> of the Company Disclosure Schedule as of the date of this Agreement, there is no Action to which the Company or any of its Subsidiaries is a party (either as plaintiff or defendant) or to which their Assets are or may be subject that is pending, or to the Company's Knowledge, threatened, nor, to the Company's Knowledge, is there any basis for any of the foregoing. Except as disclosed in <u>Section 4.21(a)</u> of the Company Disclosure Schedule, there is no Action which the Company or any of its Subsidiaries currently intend to initiate.

(b)   <u>Governmental Orders</u>.  Except as disclosed in <u>Section 4.21(b)</u> of the Company Disclosure Schedule, neither the Company nor any of its Subsidiaries has received any written Government Order or any written notice of any Government Order that is applicable to the Company or any of its Subsidiaries or their Assets or the Business.

48

Section 4.22.  <u>Insurance</u>.  <u>Section 4.22</u> of the Company Disclosure Schedule sets forth an accurate and complete list of all insurance policies by which the Company or any of its Subsidiaries, or any of their Assets, employees, officers or directors (or equivalent) or the Business have been insured since January 1, 2010 (the "<u>Liability Policies</u>") and, with respect to such Liability Policies under which the Company or any Subsidiary, or any of their Assets, employees, officers or directors (or equivalent) or the Business are currently insured (the "<u>Current Liability Policies</u>"), their respective expiration dates.  The list includes for each Liability Policy the type of policy, form of coverage, policy number and name of insurer.  The Company has delivered or made available to Parent accurate and complete copies of all Liability Policies, in each case, as amended or otherwise modified and in effect.  <u>Section 4.22</u> of the Company Disclosure Schedule describes any self-insurance arrangements affecting the Company or any Subsidiary.  The Company and its Subsidiaries maintain and have since January 1, 2005 maintained with financially sound and reputable insurers insurance with respect to its Assets, employees, officers and directors (or equivalent) and the Business, in such amounts and against such losses and risks as is required under the terms of any applicable Real Property Leases or other Contractual Obligations.  Except as disclosed in <u>Section 4.22</u> of the Company Disclosure Schedule, since January 1, 2005 no insurer (a) has questioned, denied or disputed coverage of any claim pending under any Liability Policy or (b) has threatened to cancel any Liability Policy.  Except as disclosed in <u>Section 4.22</u> of the Company Disclosure Schedule, to the Company's Knowledge, no insurer plans to materially increase the premiums for, or materially alter the coverage under, any Current Liability Policy.  Except as disclosed in <u>Section 4.22</u> of the Company Disclosure Schedule, the Company and its Subsidiaries will after the Closing continue to have coverage under all of the Liability Policies with respect to events occurring prior to the Closing.

Section 4.23.  <u>Books and Records</u>.  The minute books and stock record books of the Company and its Subsidiaries are complete and correct and have been maintained in accordance with sound business practices and the stock record books of the Company and its Subsidiaries and the minute books of the Company and its Subsidiaries for the last three (3) years have been made available to Parent. The minute books of the Company and its Subsidiaries contain accurate and complete records of all meetings, and actions taken by written consent of, the stockholders, the Company Board and the Board of Directors of any of its Subsidiaries and any of their respective committees, respectively, and no meeting, or action taken by written consent, of any such stockholders, board of directors or committee has been held for which minutes have not been prepared and are not contained in such minute books. At the Closing, all of those books and records will be in the possession of the Company.

Section 4.24.  <u>No Brokers</u>.  Neither the Company nor its Subsidiaries has Liability of any kind to, or is subject to any claim of, any broker, finder or agent in connection with the Contemplated Transactions other than fees and expenses payable or reimbursable to Pagemill Partners, pursuant to Contractual Obligations that have been disclosed to Parent.

ARTICLE V
REPRESENTATIONS AND WARRANTIES
OF PARENT AND MERGER SUB.

In order to induce the Company to enter into and perform this Agreement and to consummate the Contemplated Transactions, each of Parent and Merger Sub, jointly and severally, represents and warrants to the Company that as of the date of this Agreement and as of the Closing Date:

Section 5.01.   Organization.

(a)   Parent is a corporation duly organized, validly existing and in good standing under the laws of The Commonwealth of Massachusetts and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

(b)   Merger Sub is a corporation duly organized, validly existing and in good standing under the laws of the State of California.  Merger Sub was organized for the purpose of engaging in the Contemplated Transactions, and has conducted no other business.

Section 5.02.   Power and Authorization.  Each of Parent and Merger Sub has all requisite power and authority necessary for the execution, delivery and performance by it of its obligations under this Agreement and each Ancillary Agreement to which it is or will be a party. The execution, delivery and performance by each of Parent and Merger Sub of this Agreement and each Ancillary Agreement to which it is or will be a party and the consummation of the Contemplated Transactions by each of Parent and Merger Sub are within the power and authority of Parent and/or Merger Sub, as the case may be, and have been duly authorized by all necessary corporate action on the part of Parent and Merger Sub.  This Agreement and each Ancillary Agreement to which Parent and/or Merger Sub is, or will be at Closing, a party (a) have been (or, in the case of Ancillary Agreements to be entered into at the Closing, will be when executed and delivered) duly executed and delivered by Parent and/or Merger Sub, as the case may be, and (b) is (or in the case of Ancillary Agreements to be entered into at the Closing, will be when executed and delivered) a legal, valid and binding obligation of Parent and/or Merger Sub, as the case may be, Enforceable against Parent and/or Merger Sub in accordance with its terms.

Section 5.03.   Authorization of Governmental Authorities.   Except as disclosed in Section 5.03 of the Parent Disclosure Schedule, no action by (including any authorization, consent or approval of), or in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful (a) authorization, execution, delivery and performance by Parent or Merger Sub of this Agreement and each Ancillary Agreement to which either of them is, or will be at Closing, a party or (b) consummation of the Contemplated Transactions by Parent and Merger Sub.

Section 5.04.   Noncontravention.   Except as disclosed in Section 5.04 of Parent Disclosure Schedule, none of the authorization, execution, delivery and performance by either

50

Parent or the Merger Sub of this Agreement or any Ancillary Agreement to which either of them is, or will be at Closing, a party nor the consummation of the Contemplated Transactions will:

        (a)      assuming the taking of any action by (including the obtaining of each necessary authorization, consent or approval) or in respect of, and the making of all filings with, Governmental Authorities, in each case, as disclosed in <u>Section 5.03</u> of the Parent Disclosure Schedule, violate any provision of any Legal Requirement applicable to Parent or Merger Sub; or

        (b)      conflict with or result in a breach or violation of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in termination of, or accelerate the performance required by, or result in a right of termination or acceleration under, or require any action by (including any authorization, consent or approval) or notice to any Person under, any of the terms, conditions or provisions of (i) any Governmental Order applicable to or otherwise affecting Parent or Merger Sub or any of their respective assets or properties, (ii) any material Contractual Obligation of Parent or Merger Sub, or (iii) the Organizational Documents of the Parent or Merger Sub.

Section 5.05.  <u>No Brokers</u>.  Neither Parent nor Merger Sub has Liability of any kind to any broker, finder or agent with respect to the Contemplated Transactions for which any of the Securityholders could be liable.

Section 5.06.  <u>Merger Sub Capitalization</u>.  The authorized capital stock of Merger Sub consists of 1,000 shares of Merger Sub Common Stock, all of which is issued and outstanding and is owned, of record and beneficially, by Parent, as Merger Sub's sole stockholder.  All of the outstanding shares of Merger Sub Common Stock have been duly authorized and validly issued and are fully paid and nonassessable, and not subject to or issued in violation of any preemptive rights, any purchase option, call option, right of first refusal, subscription right or any similar right.

Section 5.07.  <u>Litigation</u>.  There is no Action pending or as to which Parent has received any written notice of assertion, which in any manner challenges or seeks to prevent, enjoin, alter or materially delay any of the Contemplated Transactions.

Section 5.08.  <u>Financing</u>.  Parent has or will have sufficient cash and/or available borrowing capacity to pay the Total Merger Consideration and to make all other payments of fees and expenses in connection with the negotiation and Closing of the Contemplated Transactions.

ARTICLE VI<br/>COVENANTS OF THE PARTIES.

Section 6.01.  <u>Conduct of the Business of the Company and its Subsidiaries</u>.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement and the Effective Time, the Company will (except to the extent that Parent shall otherwise consent in writing), and will cause each of its Subsidiaries to, carry on its business in

51

the usual and ordinary course in substantially the same manner as heretofore conducted, pay its Debts and Taxes when due, pay or perform other obligations when due, and use its commercially reasonable efforts consistent with past practice and policies to preserve intact its present business organization, keep available the services of its present officers and Key Employees and preserve its relationships with customers, suppliers, distributors, licensors, licensees, and others having business dealings with it.  Without limiting the foregoing and except as expressly contemplated by this Agreement, the Company shall not, and shall cause its Subsidiaries to not, without the prior written consent of Parent:

   (a) authorize or effect any amendment to or change any of its Organizational Documents;

   (b) (i) make any payments or enter into any commitment or transaction, (ii) waive or release any right or claim, (iii) fail to pay, or delay in paying, accounts payable when due, (iv) accelerate the payment of any accounts receivable, or (v) change any cash management practices, in each case outside of the Ordinary Course of Business or inconsistent with prior practice;

   (c) create any Subsidiary of the Company;

   (d) issue, grant, deliver or sell, or authorize or propose the issuance, grant, delivery or sale of, or purchase or propose the purchase of, any Equity Interest with respect to the Company or any Subsidiary;

   (e) re-price or amend the terms of any Equity Interest or the terms of any agreement with respect to an Equity Interest, including accelerating the vesting thereof, except as contemplated by Section 3.04(a);

   (f) acquire or agree to acquire by merging or consolidating with, or by purchasing any assets or equity securities of, or by any other manner, any business or any Person or division thereof, or otherwise acquire or agree to acquire outside of the ordinary course of business consistent with prior practice any assets in any amount;

   (g) modify or amend any material Contractual Obligation, Government Contract or Government Subcontract;

   (h) initiate, cancel, compromise, settle, waive or release any Action;

   (i) make any changes to its financial accounting principles or practices, other than as may be required by GAAP;

   (j) (i) hire or engage any employees, consultants or contractors, or encourage any employees, consultants or contractors to resign from the Company or any of its Subsidiaries, or promote any employees or change the employment status or titles of any employees, except for the hiring or promotion of employees or engagements of consultants or contractors in the Ordinary Course of Business at compensation rates comparable to other employees, consultants or contractors at similar levels; (ii) adopt,

52

enter into, materially amend or terminate any Company Plan, or (iii) grant any increase in the wages, salary, bonus or other compensation, remuneration or benefits of any employee of the Company or its Subsidiaries;

(k)     fail to use commercially reasonable efforts to keep in full force all insurance policies described in Section 4.22;

(l)     enter into any agreement that contains any provision relating to the "change of control" of the Company or any of its Subsidiaries or that would trigger a Change of Control Payment;

(m)     take any action that would have been a breach of or would reasonably be expected to cause a breach of any of the provisions of Section 4.07 (*Absence of Certain Developments*) had such action occurred after December 31, 2010 and prior to the date of this Agreement (without regard to disclosures in the Company Disclosure Schedule);

(n)     incur any Debt, draw down or borrow any amounts under any existing agreements with respect to Debt, guarantee any Debt of any Person, issue or sell any Debt securities of the Company or any of its Subsidiaries or purchase or guarantee any Debt securities of others, except for advances to employees for travel and business expenses in the Ordinary Course of Business and consistent with prior practice;

(o)     make any payment of, or in respect of, any Tax to any Person or any Governmental Authority, except to the extent that the Company reasonably believes in good faith such payment is in respect of a Tax that is due and payable or has been properly estimated in accordance with applicable Legal Requirement as applied in a manner consistent with the prior practice of the Company and its Subsidiaries;

(p)     make or change any material Tax election, change an annual accounting period, adopt or change any accounting method with respect to Taxes, file any amended Tax Return, enter into any closing agreement, settle or compromise any proceeding with respect to any Tax claim or assessment relating to the Company or any of its Subsidiaries, surrender any right to claim a refund of Taxes, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment relating to the Company or any of its Subsidiaries, or file any material Tax Return, if such election, adoption, change, amendment, agreement, settlement, surrender, consent or filing would have the effect of increasing the Tax liability of the Company or any of its Subsidiaries for any period ending after the Closing Date or decreasing any Tax attribute of the Company or any of its Subsidiaries existing on the Closing Date;

(q)     make any Distribution; or

(r)     take, or agree in writing or otherwise to take, any of the actions described in 6.01(a) through (q) above, or any other action that would prevent the Company from performing or cause the Company not to perform its obligations hereunder.

53

Section 6.02.  <u>Access to Information</u>.  The Company shall provide Parent and its Representatives reasonable and prompt access during normal business hours during the period prior to the Effective Time to (a) all of the properties, facilities, books, agreements, records, customers and employees of the Company and its Subsidiaries and (b) all other information concerning the business, finances, properties, products, services, ongoing disputes, litigation, technology and personnel of the Company and its Subsidiaries as Parent may request.  The Company will provide Parent and its Representatives copies of internal financial statements promptly upon request.  No information or knowledge obtained in any investigation pursuant to this <u>Section 6.02</u> or otherwise shall affect or be deemed to modify or qualify any representation or warranty of the Company or the conditions to the obligations of the parties to consummate the Merger or the other Contemplated Transactions.

Section 6.03.  <u>Commercially Reasonable Efforts; Notices and Consents</u>.  Subject to the terms and conditions of this Agreement, each of the parties hereto shall use its commercially reasonable efforts to take or cause to be taken all actions, to file or cause to be filed all documents, to give or cause to be given all notices to Governmental Authorities or other Persons, to obtain or cause to be obtained all authorizations, consents, waivers, approvals, permits or orders from Governmental Authorities or other Persons, and to do or cause to be done all other things necessary, proper or advisable, in order to consummate and make effective the Contemplated Transactions (including satisfaction, but not waiver, of the closing conditions set forth in <u>Articles VII</u> and <u>VIII</u>) and to allow the Business to be operated following the Closing in the same manner as it is operated prior to the Closing.

Section 6.04.  <u>Expenses</u>.  Each party will pay its own respective financial advisory, legal, accounting and other expenses incurred by it or for its benefit in connection with the preparation and execution of this Agreement and the Ancillary Agreements, the compliance herewith and therewith and the Contemplated Transactions; <u>provided</u>, that in the event that the Merger is consummated, such expenses incurred by the Company will be borne by the Securityholders as contemplated by <u>Section 3.02</u>.

Section 6.05.  <u>Notification of Certain Matters</u>.  The Company shall give prompt written notice to Parent of:  (a) the occurrence or non-occurrence of any event that is likely to cause any of its representations or warranties contained in this Agreement to be untrue or inaccurate in any material respect at or prior to the Effective Time; (b) any failure to comply with or satisfy in any material respect any of the covenants, conditions or agreements to be complied with or satisfied by it hereunder; and (c) any event, condition, fact or circumstance that would reasonably be expected to make any of the conditions set forth in <u>Article VII</u> required to be satisfied by it incapable of being satisfied in a timely manner; <u>provided</u>, <u>however</u>, that the delivery of any notice pursuant to this <u>Section 6.05</u> shall not limit or otherwise affect any remedies available to the party receiving such notice.

Section 6.06.  <u>Publicity</u>.  Prior to the Effective Time, no public announcement or disclosure (including any general announcement to employees, customers or suppliers) will be made by any party with respect to the subject matter of this Agreement or the Contemplated Transactions without the prior written consent of Parent, Merger Sub, the Company and the Securityholders' Representative; <u>provided</u>, that the provisions of this <u>Section 6.06</u> shall not

prohibit (a) any disclosure required by any applicable Legal Requirements (in which case the disclosing party will provide the other parties with the opportunity to review and comment in advance of any proposed press releases) or (b) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement or any Ancillary Agreement or the Contemplated Transactions.

Section 6.07.    Conditions to the Contemplated Transactions; Further Assurances.

(a)    Each of the parties to this Agreement shall use its commercially reasonable efforts to:  (a) fulfill and cause to be fulfilled the conditions to Closing to be satisfied by it under this Agreement; (b) comply promptly with all Legal Requirements which may be imposed on such party with respect to the Contemplated Transactions and will promptly cooperate with and furnish information to any other party hereto in connection with any such requirements imposed upon such other party in connection with the Contemplated Transactions; (c) obtain and make (and will cooperate with the other parties in obtaining or making) any consent, authorization, order or approval of, or any registration, declaration, or filing with, or an exemption by, any Governmental Authority, or other third party, required to be obtained or made by such party in connection with the Contemplated Transactions or the taking of any action contemplated thereby or by this Agreement or any Ancillary Agreement; and (d) at the request of another party hereto, execute and deliver such other instruments and do and perform such other acts and things as may be reasonably necessary or desirable for effecting completely the consummation of the Merger and the other Contemplated Transactions.

(b)    From and after the Closing Date, upon the request of either the Securityholders' Representative or the Company, each of the parties hereto shall do, execute, acknowledge and deliver all such further acts, assurances, deeds, assignments, transfers, conveyances and other instruments and papers as may be reasonably required or appropriate to carry out the Contemplated Transactions.  No party shall take any action that is designed or intended to have the effect of discouraging any lessor, licensor, supplier, distributor or customer of the Company or other Person with whom the Company has a relationship from maintaining the same relationship with the Company after the Closing as it maintained prior to the Closing.

Section 6.08.    Certain Employment and Employee Benefits Matters.

(a)    Each Person who was an employee of the Company or any Subsidiary immediately prior to the Effective Time, shall be, at the Effective Time, an at-will employee of the Surviving Corporation or such Subsidiary, as applicable, to the extent permitted by applicable law (a "Continuing Employee"); provided that each employee employed in the United States shall provide proof of the right to work in the United States.

(b)    Until the first anniversary of the Closing, each Continuing Employee shall, while employed by the Surviving Corporation or the applicable Subsidiary, either (i) be eligible to receive salary and benefits (such as medical benefits,

55

bonus opportunities and 401(k) plan participation) that are substantially comparable in the aggregate to those provided to the Continuing Employees as of the date of this Agreement or (ii) be eligible to receive salary and benefits that are comparable in the aggregate to those provided to employees of Parent with comparable duties.

(c)     With respect to each benefit plan, program, practice, policy or arrangement maintained by Parent, if Parent allows any Continuing Employee to participate in any such benefit plan, program, procedure, policy or arrangement, Parent shall take commercially reasonable action to provide that each Continuing Employee shall be given credit, for the purpose of any service requirements for participation eligibility, vesting and vacation accrual for his or her period of continuous coverage under comparable benefit plans, programs, practices, policies and arrangements of the Company or its Subsidiaries prior to the Effective Time; provided, however, that Continuing Employees shall not be credited for service with the Company or any Subsidiary for purposes of benefit accruals under any ERISA retirement plan of Parent or its Subsidiaries.  Parent shall take commercially reasonable action to provide that no Continuing Employee, or any of his or her eligible dependents, who, at the Effective Time, are participating in a Company group health plan shall be excluded from Parent's group plan, or limited in coverage thereunder, by reason of any waiting period restriction or pre-existing condition limitation.  Parent shall take commercially reasonable action to provide that each Continuing Employee shall receive credit for any deductibles that such individual has paid or has been charged with under any Company group health plan during the calendar year in effect at the Effective Time to the extent consistent with the applicable policies of the insurance carrier or other provider.

(d)     Except as otherwise provided herein, Parent is under no obligation to hire or retain any employee, independent contractor or consultant, or provide any employee, independent contractor or consultant with any particular benefits, or make any payments or provide any benefits to those employees, independent contractors or consultants whom Parent chooses not to employ or subsequently terminates, except as otherwise required by applicable law.

(e)     Parent hereby acknowledges the Company's obligations under the Company's Executive Retention and Severance Plan (the "Severance Plan"), a copy of which has been furnished or made available to Parent.  The Company confirms that Kevin Carnino and Thomas O'Hara are the only participants in the Severance Plan.  In accordance with the provisions of the Severance Plan, Parent confirms that it will cause the Surviving Corporation to perform its Contractual Obligations under the Severance Plan, except to the extent that such Contractual Obligations are waived by such participants.

(f)     Notwithstanding anything herein to the contrary in this Agreement, except as provided in Section 6.08(e), nothing in this Section 6.08 shall create any third party beneficiary right in any Person, and no provision in this Agreement shall create any right to employment or continued employment or to a particular term or condition of employment with the Parent, or any of their respective Affiliates (including, following

the Closing, the Surviving Corporation or any of its Subsidiaries).   Nothing in this Section 6.08 or any other provision of this Agreement (i) shall be construed to establish, amend, or modify any benefit or compensation plan or program, agreement, or (ii) shall limit the ability of Parent or any of its Affiliates (including, following the Closing, the Surviving Corporation) to amend, modify or terminate any benefit plan, program or agreement at any time assumed, established, sponsored or maintained by any of them.

Section 6.09.   Directors' and Officers' Indemnification and Insurance.

(a)      Subject to the provisions of Section 9.05, for a period of six (6) years after the Closing Date, in the event of any threatened or actual Action, whether civil, criminal or administrative, in which any person who is now, or has been at any time prior to the Closing, a director or officer of the Company (the "Indemnified Parties") is, or is threatened to be, made a party thereto based in whole or in part on (i) the fact that such person is or was a director or officer of the Company or (ii) this Agreement or any of the Contemplated Transactions hereby, whether in any case asserted or arising before, on or after the Closing, the Company shall indemnify and hold harmless such person from and against such Action to the full extent required under, and subject to the terms and conditions of, the Company's Articles of Incorporation  as in effect on the date hereof.

(b)      Prior to the Closing Date, the Company shall purchase an extended reporting period endorsement under the Company's existing directors' and officers' liability insurance coverage for the Company's directors and officers in a form acceptable to the Securityholders' Representative that shall provide such directors and officers with coverage for six (6) years following the Closing Date of not less than the existing coverage and have other terms not materially less favorable to the insured persons than the directors' and officers' liability insurance coverage presently maintained by the Company.  The cost of such coverage shall be a Company Transaction Expense.

(c)      The provisions of this Section 6.09 are intended to be for the benefit of, and enforceable by, each Indemnified Party and such Indemnified Party's estate, administrators, executors, heirs and representatives, and nothing herein shall affect any indemnification rights that any such person may have under the Company's Organizational Documents, any contract or applicable law.

(d)      The obligations of Parent, Merger Sub, the Company and the Surviving Corporation under this Section 6.09 shall continue in full force and effect for a period commencing as of the Closing and ending as of the sixth anniversary of the Closing Date; provided, that all rights to indemnification in respect of any matter for which indemnification under this Section 6.09 has been asserted or made within such period shall continue until the final disposition of such matter.

(e)      In the event that all or substantially all of the business or assets of the Surviving Corporation are sold, whether by merger, consolidation, sale of assets or securities or otherwise, in one transaction or a series of transactions, then Parent and the

Surviving Corporation shall, in each such case, take action to ensure that either (i) the successors and assigns of the Surviving Corporation assume the obligations set forth in this <u>Section 6.09</u>, or (ii) the Surviving Corporation remains responsible for the obligations set forth in this <u>Section 6.09</u>. The provisions of this <u>Section 6.09</u> shall apply to all of the successors and assigns of the Surviving Corporation.

Section 6.10.  <u>Merger Sub and Surviving Corporation</u>.  Parent shall take all actions necessary to (a) cause Merger Sub and the Surviving Corporation to perform promptly their respective obligations under this Agreement (including to cause Merger Sub to consummate the Merger on the terms and conditions set forth in this Agreement) and (b) ensure that, prior to the Effective Time, Merger Sub shall not conduct any business, make any investments or incur or guaranty any Indebtedness, other than consummating the Merger pursuant to this Agreement.

Section 6.11.  <u>Section 280G Approval</u>.  If the Company or any of its Subsidiaries is obligated to make any payments, or is a party to any agreement that under certain circumstances could obligate it to make any payments, that will not be deductible under Section 280G of the Code if the stockholder approval requirements of Section 280G(b)(5)(B) of the Code are not satisfied, then the Company shall use its commercially reasonable efforts to obtain the Shareholder Approval (defined in <u>Section 10.10</u> below) after the date hereof and in any event prior to the Effective Time.

Section 6.12.  <u>Shareholder Merger Approval</u>.

(a)    Pursuant to Section 603(b) of the CGCL, no later than December 23, 2011, the Company shall transmit to all of the Shareholders a solicitation of their approval and adoption of this Agreement and the Contemplated Transactions by written consent as provided by the CGCL and the Company's Organizational Documents. Such submission, and any proxy or consent in connection therewith, shall specify that adoption of this Agreement shall constitute approval by the Shareholders of:  (i) the escrow and indemnification obligations of the Securityholders set forth in <u>Articles III</u>, <u>IX</u> and <u>X</u> hereof and the deposit of the Escrow Amount  and SR Escrow Amount with the Escrow Agent and (ii) the appointment of the Securityholders' Representative, with the rights and responsibilities set forth in this Agreement.

(b)    Any materials to be submitted to the Shareholders in connection with the solicitation of their approval of the Contemplated Transactions and this Agreement shall be subject to review and reasonable approval by Parent and shall include information regarding the Company, the terms of the Merger, this Agreement and the Ancillary Agreements, and the recommendation of the Company Board to adopt and approve this Agreement, the Escrow Agreement and the other Contemplated Transactions, and approve the Merger, and a statement that the Company Board has unanimously determined that the terms of the Merger and this Agreement are fair to and in the best interests of the Company and the Shareholders.

(c)     The Company shall use its commercially reasonable efforts to obtain the approval or consent of as many of its Shareholders as possible as promptly as practicable following the date hereof.

## ARTICLE VII
## CONDITIONS TO THE OBLIGATIONS
## OF PARENT AND MERGER SUB AT THE CLOSING.

The obligations of Parent and Merger Sub to consummate the Contemplated Transactions is subject to the fulfillment, or, to the extent permitted by law, waiver by Parent of each of the following conditions:

Section 7.01.   Representations and Warranties.  The representations and warranties of the Company contained in this Agreement shall have been true and correct (in the case of representations and warranties qualified as to materiality) or true and correct in all material respects (in the case of other representations and warranties) on and as of the date of this Agreement and shall be so true and correct on and as of the Closing Date with the same force and effect as if made on and as of the Closing Date.

Section 7.02.   Agreements and Covenants.   The Company shall have performed or complied in all material respects with all covenants and obligations of this Agreement required to be performed or complied with by it on or prior to the Closing Date.

Section 7.03.   Delivery of Closing Certificates.  The Company shall have delivered to the Buyer the following:

(a)     Officer's Certificate. A certificate, dated as of the Closing Date, signed by the Chief Executive Officer or the Chief Financial Officer of the Company, that each of the conditions set forth in Sections 7.01, 7.02 and 7.10 has been satisfied in all respects.

(b)     Secretary's Certificate.  A certificate, dated as of the Closing Date, signed by the Secretary of the Company certifying as to (i) the names and incumbency of each of the officers of the Company executing this Agreement or any Ancillary Agreement, (ii) the Organizational Documents of the Company, (iii) all resolutions adopted by the Board of Directors and Shareholders of the Company in connection with this Agreement and the Contemplated Transactions, and (iv) such other matters as reasonably requested by counsel for Parent;

(c)     FIRPTA Certificate.  A certificate in the form of Exhibit E, dated as of the Closing Date, signed by the Chief Financial Officer of the Company; and

(d)     Good Standing Certificates.  Certificates of good standing with respect to the Company issued by the relevant Governmental Authorities of the Company's jurisdiction of organization, as of a recent date.

59

Section 7.04.   Qualifications.  No provision of any applicable Legal Requirement and no Government Order will prohibit the consummation of any of the Contemplated Transactions.

Section 7.05.   Absence of Litigation.  No Action will be pending, and no Action will be threatened, by any Governmental Authority which seeks a Government Order, nor will there be any Government Order in effect, (a) which would prevent consummation of any of the Contemplated Transactions, (b) which would result in any of the Contemplated Transactions being rescinded following consummation, (c) which would limit or otherwise adversely affect the right of Parent (or any Affiliate thereof) to own the shares of the Surviving Corporation (including the right to vote such shares), to control the Company, or to operate all or any portion of the Business or Assets or any portion of the business or assets of Parent or any of its Affiliates or (d) which would compel Parent or any of its Affiliates to dispose of all or any portion of either the Business or Assets or the business or assets of Parent or any of its Affiliates.

Section 7.06.   Consents, etc.  All actions by (including any authorization, consent or approval) or in respect of (including notice to), or filings with, any Governmental Authority or other Person that are required to consummate the Contemplated Transactions, as disclosed in Section 7.06 of the Company Disclosure Schedule or as otherwise reasonably requested by Parent, will have been obtained or made, in a manner reasonably satisfactory in form and substance to Parent, and no such authorization, consent or approval will have been revoked.

Section 7.07.   Proceedings and Documents.   All corporate and other proceedings in connection with the Contemplated Transactions and all documents incident thereto will be reasonably satisfactory in form and substance to Parent and its counsel, and they will have received all such counterpart original and other copies of such documents as they may reasonably request.

Section 7.08.   Ancillary Agreements.  Each of the Ancillary Agreements will have been executed and delivered to the Parent and Merger Sub by each of the other parties thereto.

Section 7.09.   Resignations.  The Parent will have received the resignations, effective as of the Closing, of each of the officers and directors of the Company and PDI listed in the applicable section of Annex IV.

Section 7.10.   No Material Adverse Change.  Since the Most Recent Balance Sheet Date, there will not have occurred or arisen any events, changes, facts, conditions or circumstances, nor will there exist any events, changes, facts, conditions or circumstances, which individually or in the aggregate have resulted in or would reasonably be expected to result in a Material Adverse Effect.

Section 7.11.   Payoff Letters and Lien Releases, etc.  The Company will have obtained and delivered to the Parent customary payoff letters and lien release documentation reasonably satisfactory to the Parent and its counsel and lenders relating to the repayment of all Debt to be repaid at the Closing and the termination of all Encumbrances on any Assets securing any such Debt.

Section 7.12.  <u>DLA Opinion</u>.  DLA Piper shall have delivered a written opinion in the form of <u>Exhibit F</u> hereto.

Section 7.13.  <u>Non-Competition Agreements</u>.  Each of the persons named on <u>Annex III</u> hereto shall have executed and delivered to the Parent a non-competition agreement on the form of <u>Exhibit G-1</u> or <u>Exhibit G-2</u>, hereto (the "<u>Non-Competition Agreements</u>"), as applicable, and the Non-Competition Agreements shall be in full force and effect.

Section 7.14.  <u>Principal Shareholders Agreements</u>.  Each of the Principal Shareholders will have entered into an agreement in the form of <u>Exhibit H</u> hereto (the "<u>Principal Shareholders Agreements</u>") and the Principal Shareholders Agreements shall be in full force and effect.

ARTICLE VIII
CONDITIONS TO THE COMPANY'S
OBLIGATIONS AT THE CLOSING.

The obligations of the Company to consummate the Contemplated Transactions is subject to the fulfillment, or, to the extent permitted by law, waiver by the Company of each of the following conditions:

Section 8.01.  <u>Representations and Warranties</u>.  The representations and warranties of Parent and Merger Sub contained in this Agreement shall have been true and correct (in the case of representations and warranties qualified as to materiality) or true and correct in all material respects (in the case of other representations and warranties) on and as of the date of this Agreement and shall be so true and correct on and as of the Closing Date with the same force and effect as if made on and as of the Closing Date.

Section 8.02.  <u>Agreements and Covenants</u>.  Parent and Merger Sub shall have performed or complied in all material respects with all covenants and obligations of this Agreement required to be performed or complied with by them on or prior to the Closing Date.

Section 8.03.  <u>Officers Certificate</u>.  Parent shall have delivered to the Company an officer's certificate confirming that each of the conditions set forth in <u>Section 8.01</u> and <u>Section 8.02</u> have been satisfied in all respects.

Section 8.04.  <u>Qualifications</u>.  No provision of any applicable Legal Requirement and no Government Order will prohibit the consummation of any of the Contemplated Transactions.

Section 8.05.  <u>Absence of Litigation</u>.  No Action will be pending, and no Action will be threatened, by any Governmental Authority which seeks a Governmental Order, nor will there be any Governmental Order in effect, (a) which would prevent consummation of any of the Contemplated Transactions or (b) which would result in any of the Contemplated Transactions being rescinded following consummation.

Section 8.06.  <u>Ancillary Agreements</u>.  Each of the Ancillary Agreements to which the Company is party will have been executed and delivered to the Company by each of the other

61

parties thereto (other than the Company, any Securityholders and the Securityholders' Representative).

ARTICLE IX

INDEMNIFICATION.

Section 9.01.   <u>Indemnification by the Securityholders</u>.

(a)      <u>Indemnification</u>.      Subject to the limitations set forth in this <u>Article IX</u>, from and after the Effective Date, each Securityholder shall severally, and not jointly, in accordance with their respective Pro Rata Escrow Percentages (or in the case of subclause (iii) below, severally and solely as to itself and in the case of Tax Claims not covered by the Escrow Amount, as provided in paragraph (b) below) indemnify and hold harmless Parent and its Affiliates (including, following the Closing, the Company and its Subsidiaries), and the Representatives, Affiliates, successors and assigns of each of the foregoing Persons (each, a "<u>Parent Indemnified Person</u>"), from, against and in respect of any and all Actions, Liabilities, Government Orders, Encumbrances, losses, damages, bonds, dues, assessments, fines, penalties, Taxes, fees, costs (including costs of investigation, defense and enforcement of this Agreement), expenses or amounts paid in settlement (in each case, including reasonable attorneys' and experts' fees and expenses, but excluding internal personnel costs related thereto), whether or not involving a Third Party Claim (collectively, "<u>Losses</u>"), incurred or suffered by the Parent Indemnified Persons or any of them as a result of, arising out of or relating to, directly or indirectly:

(i)      any fraud or intentional misrepresentation on the part of the Company (or any Affiliate or Representative thereof) or any breach of, or inaccuracy in, any representation, warranty or statement made by or on behalf of the Company in this Agreement or in any Schedule or certificate delivered by or on behalf of the Company pursuant to this Agreement (in each case, assuming that all qualifications contained in this Agreement and each such Schedule or certificate as to materiality, the phrase "substantial compliance", the words "material" and "materially" and all similar phrases and words were deleted therefrom);

(ii)      any breach or violation of any covenant or agreement of the Company in this Agreement to the extent required to be performed or complied with by the Company at or prior to the Closing in or pursuant to this Agreement and any other obligation set forth in this Agreement described as an obligation of the Securityholders;

(iii)      with respect to any Securityholder, any breach by such Securityholder of any representation, warranty or covenant in any Ancillary Agreement to which it is a party;

(iv)      any of the matters identified in <u>Section 9.01(a)(iv)</u> of the Company Disclosure Schedule (collectively, the "<u>Specified Indemnity Matters</u>"), but only with respect to Losses that exceed any specific reserve for the applicable Specified Indemnity Matter set forth as a current liability on the Final Closing Balance Sheet and Final Closing Statement (as finally determined pursuant to <u>Section 3.05</u>); or

62

(v)      any Company Transaction Expenses, to the extent not paid by the Company prior to the close of business on the Business Day preceding the Closing Date and prior to calculation of the Net Working Capital, and not reflected as a current liability on the Final Closing Balance Sheet and Final Closing Statement (as finally determined pursuant to Section 3.05).

(b)      <u>Monetary Limitations</u>.    The Securityholders will have no obligation to indemnify the Parent Indemnified Persons pursuant to <u>Section 9.01(a)(i)</u> in respect of Losses arising from the breach of, or inaccuracy in, any representation, warranty or statement described therein unless and until the aggregate amount of all such Losses incurred or suffered by the Parent Indemnified Persons exceeds $300,000 (at which point the Securityholders will indemnify the Parent Indemnified Persons for all such Losses incurred or suffered pursuant to <u>Section 9.1(a)(i)</u> in excess of $300,000), and the Securityholders' aggregate liability in respect of claims for indemnification pursuant to <u>Sections 9.01(a)(i)</u>, <u>9.01(a)(ii)</u>, <u>9.01(a)(iv)</u> and <u>Section 9.01(a)(v)</u> will be limited to the Escrow Amount as provided in <u>Section 9.05(b)</u>; <u>provided</u>, that:

(i)      The foregoing limitations will not apply to claims for indemnification pursuant to <u>Section 9.01(a)(i)</u> in respect of breaches of, or inaccuracies in, the representations and warranties set forth in <u>Sections 4.01</u> (*Organization*), <u>4.02</u> (*Power and Authorization*), <u>4.04(b)(iii)</u> (*Noncontravention*), <u>4.05</u> (*Capitalization of Company*), and <u>4.24</u> (*No Brokers*);

(ii)      Claims for indemnification under <u>Section 9.1(a)(ii)</u>, <u>Section 9.01(a)(iv)</u> and <u>Section 9.01(a)(v)</u> will not be subject to the $300,000 deductible referred to above but will be subject to the overall limitation set forth in <u>Section 9.05(b)</u>; and

(iii)      The foregoing limitations will not apply to claims based upon fraud or intentional misrepresentation.

Claims for indemnification pursuant to <u>Section 9.01(a)(i)</u> in respect of any breaches of <u>Section 4.13</u> (*Tax Matters*) and claims for indemnification under <u>Article X</u> (collectively, "<u>Tax Claims</u>") and claims for indemnification pursuant to any provision of <u>Section 9.01(a)(iii)</u> are not subject to the monetary limitations set forth in this <u>Section 9.01(b)</u>.

In addition to the limitations provided in <u>Section 9.05(b)</u>, the aggregate liability of any Securityholder in respect of claims for indemnification pursuant to <u>Section 9.01(a)</u> shall not exceed the total Merger Consideration and/or Option Payments received by such Securityholder; <u>provided</u>, that the foregoing limitation will not apply to claims based upon fraud or intentional misrepresentation and will not apply to any claim against such Securityholder pursuant to <u>Section 9.01(a)(iii)</u>.

Notwithstanding anything to the contrary contained herein, other than with respect to claims based on the fraud or intentional misrepresentation of such Securityholder or a claim against such Securityholder pursuant to <u>Section 9.01(a)(iii)</u> and Tax Claims, no Securityholder shall be liable for more than its Pro Rata Escrow Percentage of any Loss subject to indemnification under

63

<u>Section 9.01(a)</u>. With respect to any Tax Claims not fully covered by the Escrow Amount, each Securityholder will be liable for its Pro Rata Proceeds Percentage of such Tax Claims not fully covered by the Escrow Amount.

(c)   Notwithstanding any other provision of this Agreement, the determination of the Taxes with respect to indemnification pursuant to this <u>Article IX</u> will be calculated without taking into account any deductions described in <u>Section 10.05</u> below.

Section 9.02.   <u>Indemnification by the Parent</u>.

(a)   <u>Indemnification</u>.   Subject to the limitations set forth in this <u>Article IX</u>, from and after the Closing, Parent shall indemnify and hold harmless each of the Securityholders and each of their respective Affiliates, and the Representatives, Affiliates, successors and assigns of each of the foregoing Persons (each, a "<u>Securityholder Indemnified Person</u>"), from, against and in respect of any and all Losses incurred or suffered by the Securityholder Indemnified Persons or any of them as a result of, arising out of or relating to, directly or indirectly:

(i)   any fraud or intentional misrepresentation on the part of Parent (or any Affiliate or Representative thereof) or any breach of, or inaccuracy in, any representation, warranty or statement made by or on behalf of Parent in this Agreement or in any Schedule or certificate delivered by or on behalf of Parent pursuant to this Agreement (in each case, assuming that all qualifications contained in this Agreement and each such Schedule or certificate as to materiality, including each qualifying reference to the phrase "substantial compliance", the words "material" and "materially" and all similar phrases and words were deleted therefrom); or

(ii)   any breach or violation of any covenant or agreement of Parent (including under this <u>Article IX</u>) or any covenant or agreement of the Company to the extent required to be performed or complied with by the Company after the Closing, in either case in or pursuant to this Agreement.

(b)   <u>Monetary Limitations</u>.   Parent will have no obligation to indemnify the Securityholder Indemnified Persons pursuant to <u>Section 9.02(a)(i)</u> in respect of Losses arising from the breach of, or inaccuracy in, any representation, warranty or statement described therein unless and until the aggregate amount of all such Losses incurred or suffered by the Securityholder Indemnified Persons exceeds $300,000 (at which point the Parent will indemnify the Securityholder Indemnified Persons for all such Losses incurred or suffered pursuant to <u>Section 9.2(a)(i)</u> in excess of $300,000), and the Parent's liability in respect of claims for indemnification pursuant to <u>Section 9.02(a)(i)</u> will not exceed an amount equal to the Escrow Amount; <u>provided</u>, that the foregoing limitations will not apply to (a) claims for indemnification pursuant to <u>Section 9.02(a)(i)</u> in respect of breaches of, or inaccuracies in, the representations and warranties set forth in <u>Sections 5.01</u> (*Organization*), <u>5.02</u> (*Power and Authorization*), <u>5.04(b)(iii)</u> (*Noncontravention*) and <u>5.05</u> (*No Brokers*) or (b) claims based upon fraud or

64

intentional misrepresentation. Claims for indemnification pursuant to any other provision of Section 9.02(a) are not subject to the limitations set forth in this Section 9.02(b).

In addition to the limitations provided in this Section 9.02(b), Parent's aggregate liability in respect to claims for indemnification pursuant to Section 9.02(a) shall not exceed the Total Merger Consideration; provided that the foregoing limitation will not apply to claims based upon fraud or intentional misrepresentation.

Section 9.03.   Time for Claims; Notice of Claims.

(a)   Time for Claims.  No claim may be made or suit instituted seeking indemnification pursuant to Section 9.01(a)(i) or 9.02(a)(i) for any breach of, or inaccuracy in, any representation, warranty or statement or pursuant to Section 9.01(a)(iv) (with notice deemed to have been given as provided in paragraph (c) below) unless a written notice is provided to the Indemnifying Party:

(i)   at any time, in the case of any breach of, or inaccuracy in, the representations and warranties set forth in Sections 4.01 (*Organization*), 4.02 (*Power and Authorization*), 4.04(b)(iii) (*Noncontravention*), 4.05 (*Capitalization of the Company*), 5.01 (*Organization*), 5.02 (*Power and Authorization*), 5.04(b)(iii) (*Noncontravention*) or 5.05 (*No Brokers*);

(ii)   at any time, in the case of any claim or suit based upon fraud or intentional misrepresentation;

(iii)   at any time prior to the 60th day after expiration of the applicable Tax statute of limitations, in the case of any breach of, or inaccuracy in, the representations and warranties set forth in Section 4.13 (*Tax Matters*); and

(iv)   at any time prior to the second anniversary of the Closing Date (for example, if the Closing Date is December 27, 2011 the expiration date will be December 27, 2013), in the case of any breach of, or inaccuracy in, any other representation, warranty or statement in this Agreement or in any Schedule or certificate delivered pursuant to this Agreement.

Claims for indemnification under Article X (*Tax Matters*) may not be asserted after the 60th day after expiration of the applicable Tax statute of limitations, Claims for indemnification pursuant to any other provision of Sections 9.01(a) or 9.02(a) or are not subject to the limitations set forth in this Section 9.03.

(b)   Written Notice of Indemnification Claims.  In the event that any Indemnified Person wishes to make a claim for indemnification under this Article IX, the Indemnified Person  shall give written notice of such claim to each Indemnifying Party (with all notices to the Securityholders being given to the Securityholders' Representative within the applicable time limitations contained in Section 9.03(a)).  Any such notice shall describe the breach or inaccuracy and other material facts and circumstances upon which such claim is based and the estimated amount of Losses involved, in each case, in

65

reasonable detail in light of the facts then known to the Indemnified Person; provided, that no defect in the information contained in such notice from the Indemnified Person to any Indemnifying Party will relieve such Indemnifying Party from any obligation under this Article IX, except to the extent such failure to include information actually and materially prejudices such Indemnifying Party.

(c)     With respect to the Specified Indemnity Matters, the Parent Indemnified Parties will not be required to provide any notice pursuant to this Section 9.03 in order to trigger the indemnification obligations of the Securityholders pursuant to Section 9.01(a)(iv), and for purposes of the fifteen (15) days period referred to in Section 9.04(b) below (if applicable), shall be deemed to have provided such written notice as of the Closing Date.

Section 9.04.   Third Party Claims.

(a)     Notice of Third Party Claims.   Promptly after receipt by an Indemnified Person of written notice of the assertion of a claim by any Person who is not a party to this Agreement (a "Third Party Claim") that may give rise to an Indemnity Claim against an Indemnifying Party under this Article IX, the Indemnified Person shall give written notice thereof to the Indemnifying Party; provided, that no delay on the part of the Indemnified Person in notifying the Indemnifying Party will relieve the Indemnifying Party from any obligation under this Article IX, except to the extent such delay actually and materially prejudices the Indemnifying Party. In connection with each such claim, the Indemnified Person shall cooperate with the reasonable requests of the Indemnifying Party and make available to the Indemnifying Party all information and personnel under its control as reasonably requested by the Indemnifying Party and relevant to the defense of such Third Party Claim.

(b)     Assumption of Defense, etc.   The Indemnifying Party will be entitled to participate in the defense of any Third Party Claim that is the subject of a notice given by or on behalf of any Indemnified Person pursuant to Section 9.04(a), subject to paragraph (f) below.  In addition, the Indemnifying Party will have the right to assume control of the defense of the Indemnified Person against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Person so long as (i) the Indemnifying Party gives written notice that they or it will defend the Third Party Claim to the Indemnified Person within fifteen (15) days after the Indemnified Person has given notice of the Third Party Claim under Section 9.04(a) stating that the Indemnifying Party will, and thereby covenants to, indemnify, defend and hold harmless the Indemnified Person from and against the entirety of any and all Losses the Indemnified Person may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim (subject to any applicable monetary limitations specified in Section 9.01 or 9.02), (ii) the Indemnifying Party provides the Indemnified Person with evidence reasonably acceptable to the Indemnified Person  that the Indemnifying Party will have adequate financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder, (iii) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief against the

66

Indemnified Person, (iv) the Indemnified Person has not been advised by counsel that an actual or potential conflict exists between the Indemnified Person and the Indemnifying Party in connection with the defense of the Third Party Claim, (v) the Third Party Claim does not relate to or otherwise arise in connection with Taxes or any criminal or regulatory enforcement Action, (vi) settlement of, an adverse judgment with respect to, or conduct of the defense of the Third Party Claim by the Indemnifying Party is not, in the good faith judgment of the Indemnified Person, likely to be adverse to the Indemnified Person's reputation or continuing business interests (including its relationships with current or potential customers, suppliers or other parties material to the conduct of its business) and (vii) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently. The Indemnified Person may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim; provided, that the fees and expenses of separate counsel retained by the Indemnified Person that are incurred prior to the Indemnifying Party's assumption of control of the defense of the Third Party Claim will constitute Losses of the Indemnified Person for purposes of this Article IX.

(c)     Limitations on Indemnifying Party Control. The Indemnifying Party will not consent to the entry of any judgment or enter into any compromise or settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Person unless such judgment, compromise or settlement (i) provides for the payment by the Indemnifying Party of money as sole relief for the claimant, (ii) results in the full and general release of all Indemnified Person from all liabilities arising or relating to, or in connection with, the Third Party Claim and (iii) involves no finding or admission of any violation of Legal Requirements or the rights of any Person and no effect on any other claims that may be made against the Indemnified Person.

(d)     Indemnified Person's Control. If the Indemnifying Party does not deliver the notice contemplated by clause (i) of Section 9.04(b), or the evidence contemplated by clause (ii) of Section 9.04(b) or is not otherwise entitled under Section 9.04(b) to assume the defense of a Third Party Claim, within fifteen (15) days after the Indemnified Person has given notice of the Third Party Claim pursuant to Section 9.04(a), or otherwise at any time fails to conduct the defense of the Third Party Claim actively and diligently, the Indemnified Person may defend, and may consent to the entry of any judgment or enter into any compromise or settlement with respect to, the Third Party Claim in any manner it may deem appropriate (and the Indemnified Person need not consult with, or obtain any consent from, the Indemnifying Party in connection therewith). If such notice and evidence is given on a timely basis and the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently but any of the other conditions in Section 9.04(b) is or becomes unsatisfied, the Indemnified Person may defend, and may consent to the entry of any judgment or enter into any compromise or settlement with respect to, the Third Party Claim; provided, that the Indemnifying Party will not be bound by the entry of any such judgment consented to, or any such compromise or settlement effected, without its prior written consent (which consent will not be unreasonably withheld, conditioned or delayed). In the event that the Indemnified Person conducts the defense of the Third Party Claim pursuant to this Section 9.04(d), the

67

Indemnifying Party will (i) advance the Indemnified Person promptly and periodically for the costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses) and (ii) remain responsible for any and all other Losses that the Indemnified Person may incur or suffer resulting from, arising out of, relating to, in the nature of or caused by the Third Party Claim to the fullest extent provided in this <u>Article IX</u>.

(e)     <u>Consent to Jurisdiction Regarding Third Party Claim</u>.  The Parent and the Securityholders' Representative each hereby consents to the non-exclusive jurisdiction of any court in which any Third Party Claim may be brought against any Indemnified Person for purposes of any claim which such Indemnified Person may have against any such Indemnifying Party pursuant to this Agreement in connection with such Third Party Claim, and in furtherance thereof, the provisions of <u>Section 12.09</u> are incorporated herein by reference, <u>mutatis</u> <u>mutandis</u>.

(f)     <u>Specified Indemnity Matter</u>.  With respect to all Third Party Claims related to the first Specified Indemnity Matter listed under <u>Section 9.01(a)(iv)</u> of the Company Disclosure Schedule, the Securityholders, as the Indemnifying Parties, will not have the right to control the defense and settlement of such Third Party Claims and the Parent will have the right to control the defense and settlement of such Third Party Claims subject to the terms and conditions set forth in paragraph (d) above (but the first sentence of <u>Section 9.04(d)</u> shall not  apply).

Section 9.05.   <u>Indemnity Escrow</u>.

(a)     For as long as there are remaining funds out of the Escrow Amount, any and all amounts payable by the Securityholders as Indemnifying Party to a Parent Indemnified Person will be retained by Parent first out of such escrow funds, pursuant to the terms and conditions of the Escrow Agreement, and, subject to the next sentence, thereafter paid in cash directly by the Securityholders as herein provided in accordance with payment instructions provided by Parent.

(b)     Notwithstanding anything in this Agreement to the contrary, the sole recourse of the Parent Indemnified Persons under this <u>Article IX</u> shall be to the escrow funds held with respect to the Escrow Amount, except for:

(i)     claims under <u>Section 9.01(a)(i)</u> arising under <u>Sections 4.01</u> (*Organization*), <u>4.02</u> (*Power and Authorization*), <u>4.04(b)(iii)</u> (*Noncontravention*), <u>4.05</u> (*Capitalization of Company*), <u>4.13</u> (*Tax Matters*) and <u>4.24</u> (*No Brokers*);

(ii)     claims under <u>Section 9.01(a)(iii)</u>;

(iii)     claims under <u>Article X</u>; and

(iv)     claims based on fraud or intentional misrepresentation.

68

(c)     As provided in the Escrow Agreement, the SR Escrow Amount may be used by the Securityholders' Representative, at its sole discretion, to fund its costs and expenses incurred after the Closing Date.

Section 9.06.   <u>Knowledge and Investigation</u>.  The right of any Parent Indemnified Person or Securityholder Indemnified Person to indemnification pursuant to this <u>Article IX</u> will not be affected by any investigation conducted or knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing, with respect to the accuracy of any representation or warranty, or performance of or compliance with any covenant or agreement, referred to in <u>Sections 9.01</u> and <u>9.02</u>.  The waiver of any condition contained in this Agreement or in any Ancillary Agreement based on the breach of any such representation or warranty, or on the performance of or compliance with any such covenant or agreement, will not affect the right of any Parent Indemnified Person or Securityholder Indemnified Person to indemnification pursuant to this <u>Article IX</u> based on such representation, warranty, covenant or agreement.

Section 9.07.   <u>Remedies Cumulative</u>.  The rights of each Parent Indemnified Person and Securityholder Indemnified Person under this <u>Article IX</u> are cumulative, and each Parent Indemnified Person and Securityholder Indemnified Person will have the right in any particular circumstance, in its sole discretion, to enforce any provision of this <u>Article IX</u> without regard to the availability of a remedy under any other provision of this <u>Article IX</u>.

Section 9.08.   <u>Sole Remedy</u>.  The parties agree that in addition to rights to specific performance pursuant to <u>Section 12.10</u>, indemnification pursuant to <u>Article IX</u> and <u>Article X</u> constitutes the sole and exclusive remedy available after the Closing to the Parent Indemnified Persons with respect to any Losses pursuant to <u>Section 9.01</u> or <u>Section 9.02</u>, and breach or non-fulfillment of any representation, warranty, agreement, covenant, condition or any other obligation contained in this Agreement.

Section 9.09.   <u>Merger Consideration Adjustment</u>.   The parties agree that any indemnification payment made pursuant to this Agreement shall be treated as an adjustment to the Total Merger Consideration for Tax purposes, unless otherwise required by applicable law.

Section 9.10.   <u>Insurance</u>.  Notwithstanding anything contained in this Agreement to the contrary, but subject to the next sentence, no party shall be entitled to recover an amount pursuant to this <u>Article IX</u>, to the extent that such party or any of its Affiliates has already recovered such amount (calculated net of the costs incurred to collect such amount) from an insurance company. Nothing in this <u>Section 9.10</u> or otherwise in this Agreement is intended to require any party to pursue claims against any insurer or to waive or modify the subrogation or similar rights of any insurer of any Person.

ARTICLE X
TAX MATTERS.

Section 10.01. <u>Tax Indemnification</u>.   From and after the Closing Date, each Securityholder shall severally, and not jointly, in accordance with their respective Pro Rata Escrow Percentages (or based on their respective Pro Rata Proceeds Percentages with respect to Tax Claims not fully covered by the Escrow Amount, as provided in <u>Section 9.01(b))</u> indemnify and hold harmless each Buyer Indemnified Person from, against and in respect of any and all Losses that constitute or that result from, arise out of or relate to, directly or indirectly (a) Taxes (or the non-payment thereof) of the Company and its Subsidiaries for all Pre-Closing Tax Periods, (b) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which the Company or any of its Subsidiaries is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation Section 1.1502-6 or any analogous or similar Legal Requirement, (c) any and all Taxes incurred by the Company directly related to the distribution of proceeds for the Contemplated Transactions, and (d) any and all Taxes of any Person imposed on the Company or any of its Subsidiaries as a transferee or successor, pursuant to a Contractual Obligation, or otherwise.  Any indemnification made pursuant to this <u>Section 10.01</u> shall be made in accordance with the provisions of <u>Section 9.05</u>. Notwithstanding any other provision of this Agreement, the determination of the Taxes with respect to this <u>Section 10.01</u> will be calculated without taking into account any deductions described in <u>Section 10.05</u> below.

Section 10.02. <u>Tax Return Preparation</u>.

(a)        Securityholders' Representative shall cause to be prepared (and Parent shall cause to be subsequently filed) in a timely manner all Tax Returns related to Pre-Closing Tax Periods (other than Tax Returns for a Straddle Period) which are required to be filed by the Company and its Subsidiaries, to the extent such Tax Returns are due after the Closing Date.   For the avoidance of doubt, Securityholders' Representative shall be entitled to use funds from the SR Escrow Amount to engage any third party service providers to assist with such Tax Return preparation in its sole discretion. Securityholders' Representative shall provide the Parent with a copy of each such Tax Return at least thirty (30) days prior to the due date for filing of such Tax Return (including any extensions thereof) and Parent shall have the right to review and comment on such Tax Return for a period of twenty (20) days after receipt thereof or, if required to be filed within thirty (30) days after the Closing Date, Securityholders' Representative shall provide Parent with a copy of each such Tax Return as soon as possible following the Closing Date and sufficiently in advance of filing so Parent shall have a reasonable opportunity to review and comment on such Tax Return, and Securityholders' Representative shall make such changes to such Tax Returns as are reasonably requested by Parent.  With respect to any such Tax Return filed after the Closing Date that relates to any Pre-Closing Tax Period and upon the request of the Securityholders' Representative, the Escrow Agent shall make a distribution from the Escrow Amount to the Parent three (3) days prior to the filing of such Tax Returns the amount of the aggregate Tax liabilities due, if any, with respect to such Pre-Closing Tax Periods; <u>provided, however</u>, that for purposes of determining the Tax liability due with

70

respect to such Tax Return for purposes of calculating the Securityholders' indemnification obligations, the determination of the Tax liability for any such Pre-Closing Tax Period will be calculated and determined excluding any deductions described in Section 10.05 below.  The amounts actually due on the Tax Return (after giving effect to any deductions described in Section 10.5 below) shall promptly be paid by Parent to the appropriate Governmental Authority.  Parent shall (a) use commercially reasonable efforts to enter into or amend the Company's engagements with third party service providers assisting with such Tax Returns to assign and delegate authority to the Securityholders' Representative, subject to the limitations set forth in this Section 10.02(a), as necessary for the Securityholders' Representative to manage and direct such third party service providers with respect to the preparation of such Tax Returns, or (b) in the event that third party service providers will not agree to such assignment and delegation, then otherwise use commercially reasonable efforts to ensure that the Securityholders' Representative shall have access to and the ability to direct (even if indirectly through Parent or the Company) the Company's third party service providers in a manner reasonably sufficient to permit the Securityholders' Representative to fulfill its obligations under this Section 10.02(a).  Notwithstanding the foregoing, the Company shall retain the sole and exclusive authority and all obligations with respect to the filing of any such Tax Returns.

(b)     For any Straddle Period of the Company or any of its Subsidiaries, Parent shall timely prepare or cause to be prepared, and file or cause to be filed, all Tax Returns required to be filed and shall pay all Taxes due with respect to such Tax Returns; provided, however, that (3) days prior to the filing of such Tax Returns the Escrow Agent shall distribute from the Escrow Amount the Securityholders' allocable share of the aggregate Tax liabilities due with respect to such Tax Returns; provided, further, that for purposes of determining the Tax liability due with respect to such Tax Return for purposes of calculating the Securityholders' indemnification obligations, the Tax liability for any such Straddle Period will be calculated excluding any deductions described in Section 10.05 below.  Parent shall permit the Securityholders' Representative to review and comment on each such Tax Return described in the preceding sentence prior to the filing thereof, and Parent shall make such changes to such Tax Returns as are reasonably requested by the Securityholders' Representative.

(c)     If the filing of an amended Tax Return relating to a Pre-Closing Tax Period, the carryback of an item to a Pre-Closing Tax Period, or any election made with retroactive effect could give rise to an indemnifiable obligation under this Agreement, Parent will not allow such amendment of a Tax Return relating to a Pre-Closing Tax Period, the carryback of an item to a Pre-Closing Tax Period, or the making of such election with retroactive effect without the prior written approval of the Shareholders' Representative, which approval shall not be unreasonably withheld, delayed or conditioned.

(d)     With respect to any Tax Returns prepared pursuant to Section 10.2(a) or (b), if the parties disagree on whether a requested change is reasonable, the Securityholders' Representative and Parent shall use their best efforts to resolve the

71

dispute, and any resolution by them as to any disputed item shall be final, binding and conclusive as to the filing of such Tax Return. If Parent and the Securityholders' Representative are unable to resolve all remaining disputes related to such Tax Returns, then Parent and the Securityholders' Representative shall submit the items remaining in dispute to a Return Arbiter for resolution and any resolution by it as to any disputed item shall be final, binding and conclusive as to the filing of such Tax Return. The fees and expenses of the Return Arbiter shall be borne one half by the Securityholders (in the aggregate) and one-half by Parent.

Section 10.03. <u>Computation of Taxes for Straddle Periods</u>. For purposes of computing Taxes of the Company and its Subsidiaries for Straddle Periods:

        (a)     the amount of any Taxes of the Company including franchise taxes or Taxes based upon or measured by net income, receipts or gain for the portion of a Straddle Period tending on the Closing Date will be determined based on an interim closing of the books of the Company as of the close of business on the Closing Date (and for such purpose, the Taxable period of any partnership or other pass-through entity in which the Company holds a beneficial interest will be deemed to terminate at such time);

        (b)     the amount of Taxes, other than franchise Taxes or Taxes of the Company based upon or measured by net income, receipts or gain, for the portion of a Straddle Period ending on the Closing Date will be deemed to be the amount of such Tax for the entire Taxable period multiplied by a fraction, the numerator of which is the number of days in the Taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period;

Section 10.04. <u>Section 338(g)</u>. Parent will not make an election pursuant to Section 338(g) of the Code with respect to the Contemplated Transactions.

Section 10.05. <u>Allocation of Certain Expenses</u>.

        (a)     Any Company Transaction Expenses, to the extent not required to be capitalized and included in Parent's tax basis of the Company stock and to the extent otherwise permitted by applicable Legal Requirements, including the that requirements for accrual of the liability under Treasury Regulation Section 1.446-1(c)(1)(ii)(and any corresponding state or local provision) have been satisfied as of the end of the day on the Closing Date, shall be claimed as deductions for the Pre-Closing Tax Period ending on the Closing Date; and

        (b)     To the extent permitted by applicable Legal Requirements, including that the requirements for accrual of the liability under Treasury Regulation Section 1.446-1(c)(1)(ii)(and any corresponding state or local provision) have been satisfied as of the end of the day on the Closing Date, any income tax deductions attributable to payments due at Closing to holders of Vested Options shall be claimed as deductions for the Pre-Closing Tax Period ending on the Closing Date.

Section 10.06. <u>Tax Sharing Agreements</u>.   All Tax sharing agreements (excluding, for avoidance of doubt, any commercial contracts entered into in the Ordinary Course of Business with lenders, vendors, customers or landlords which provide for indemnification with respect to Taxes) and all powers of attorney relating to Tax matters with respect to or involving the Company and its Subsidiaries will be terminated prior to the Closing and, after the Closing, the Company and its Subsidiaries will not be bound thereby or have any Liability thereunder.

Section 10.07. <u>Certain Taxes and Fees</u>.  Parent shall cause the Company to pay 50%, and the Securityholders shall pay 50%, of all transfer, documentary, sales, use, stamp, registration and other such Taxes, and any conveyance fees or recording charges incurred in connection with the Contemplated Transactions and Parent shall cause the Company to file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges and, if required by applicable Legal Requirements.

Section 10.08. <u>Cooperation on Tax Matters</u>.   Parent, the Company and the Securityholders' Representative will cooperate fully, as and to the extent reasonably requested by any of Parent, the Company or the Securityholders' Representative, in connection with any Tax matters relating to the Company (including by the provision of reasonably relevant records or information and providing access to, and the reasonable assistance of, Parent's and the Surviving Corporation's employees and representatives in connection with the Securityholders' Representative's responsibilities under <u>Section 10.02(a)</u>).  The party requesting such cooperation will pay (or, in the case of requests by the Securityholders' Representative, the Securityholders shall pay) the reasonable out-of-pocket expenses of the other parties.

Section 10.09. <u>Control</u>.

(a)     Each of Parent and the Securityholders' Representative shall promptly notify the other in writing upon receipt of a written notice of any issues in any pending or threatened Tax audits or assessments with respect to Taxes for any Pre-Closing Tax Periods ("<u>Tax Contest Claims</u>"); <u>provided</u>, <u>however</u>, that no failure or delay to provide notice of a Tax Contest Claim shall reduce or otherwise affect the obligations of the parties hereunder except to the extent the defense of such Tax Contest Claim is actually and materially prejudiced thereby.

(b)     Parent shall cause appropriate powers of attorney to be executed to allow the Securityholders' Representative to control, and the Securityholders' Representative shall control, the conduct of any Tax Contest Claim, other than a Tax Contest Claim related to a Straddle Period, at the sole cost and expense of the Securityholders; <u>provided</u>, <u>however</u>, that (i) the Securityholders' Representative must first consult, in good faith with Parent before taking any action with respect to the conduct of such Tax Contest Claim and shall keep Parent and the Company informed regarding the progress and substantive aspects of any such Tax Contest Claim, including providing Parent and the Company with all written materials relating to such Tax Contest Claim received from the relevant taxing authority and all written materials submitted to such taxing authority by the Securityholders' Representative, (ii) Parent shall be entitled to participate in any such Tax Contest Claim at its own cost and expense, including

73

having an opportunity to comment on any written materials prepared in connection with any such Tax Contest Claim and attending any conferences relating to any such Tax Contest Claim and (iii) the Securityholders' Representative shall not compromise or settle any such Tax Contest Claim without obtaining Parent's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed.

(c)     Parent or the Company shall control the conduct of any issues in any Tax Contest Claim in respect of Taxes for Straddle Periods; provided, however, that to the extent such Taxes are allocated pursuant to Sections 10.03 or 10.05 to the portion of the Straddle Period ending on the Closing Date (i) Parent must first consult, in good faith with the Securityholders' Representative before taking any action with respect to the conduct of such Tax Contest Claim and Parent and the Company shall keep the Securityholders' Representative informed regarding the progress and substantive aspects of any such Tax Contest Claim, including providing the Securityholders' Representative with all written materials relating to such Tax Contest Claim received from the relevant taxing authority and all written materials submitted to such taxing authority by Parent or the Company, (ii) the Securityholders' Representative shall be entitled to participate in any such Tax Contest Claim at the cost and expense of the Securityholders, including having an opportunity to comment on any written materials prepared in connection with any such Tax Contest Claim and to attend any conferences relating to any such Tax Contest Claim and (iii) the Company and Parent (to the extent it has any authority to compromise or settle Tax Contest Claims) shall not compromise or settle any such Tax Contest Claim without obtaining the Securityholders' Representative's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed.

(d)     In the event of any conflict between the provisions of this Section 10.09 and any other Section of this Agreement, this Section 10.09 shall control.

Section 10.10. Section 280G Vote Solicitation.  If the Company or any of its Subsidiaries is obligated to make any payments, or is subject to a Contractual Obligation that under certain circumstances could obligate it to make any payments, that will not be deductible under Section 280G of the Code if the Shareholder approval requirements of Code Section 280G(b)(5)(B) are not satisfied, then the Company shall, as promptly as practicable after the date of this Agreement and in any event prior to the Effective Time, submit to the Shareholders for approval (the "Shareholder Approval"), in accordance with the terms of Section 280G(b)(5)(B) of the Code and regulations promulgated thereunder (the "Shareholder Approval Rules"), any payments and/or benefits that Parent  and the Company mutually determine may separately or in the aggregate, constitute "parachute payments" (within the meaning of Section 280G of the Code and the regulations promulgated thereunder), in an effort to ensure that such that such payments and benefits shall not be deemed to be "parachute payments" under Section 280G of the Code. Any submission for Shareholder Approval shall be subject to Parent's prior review and approval, which shall not be unreasonably withheld or delayed.  Prior to the Effective Time the Company shall deliver to Parent evidence satisfactory to Parent that the foregoing Shareholder Approval was solicited in conformance with the Shareholder Approval Rules and that either (A) the requisite Shareholder Approval was obtained with respect to any payments and/or benefits that were subject to the Shareholder vote, or (B) such approval was not obtained and as a

74

consequence, such "parachute payments" shall not be made or provided, pursuant to the waivers of those payments and/or benefits which were executed by the affected individuals prior to the solicitation of the stockholder approval.

Section 10.11. <u>Tax Treatment of Escrow</u>.  Parent and the Securityholders' Representative agree:

    (a)    to treat the escrow funds attributable to amounts withheld from the Company's Shareholders pursuant to <u>Section 3.03(b)</u> as a "contingent-at-closing escrow" as defined in Section 1.468B-8(b) of the proposed Treasury Regulations, with all items of taxable income or gain realized on such escrowed funds reported as taxable income or gain of the Parent; and

    (b)    to the extent permitted by applicable Legal Requirements, to treat the escrow funds attributable to amounts withheld from the Shareholders under the Company Stock Plans pursuant to <u>Section 3.04</u> as not received or constructively received by such holders until distributed, if at all, from the escrow, with the understanding that the Escrow Agent shall pay to the Company, or its designee, for the benefit of any employee and former employee holders of Equity Interests, to be paid by the Company, or its designee, to such employee and former employee holders of Equity Interests that are entitled to receive a distribution, with the payments made pursuant to customary payroll payment procedures and with payments subject to all applicable income, employment and other tax withholding.

ARTICLE XI
TERMINATION

Section 11.01. <u>Termination of Agreement</u>.  This Agreement may be terminated at any time prior to the Closing Date as follows:

    (a)    by mutual written consent of Parent and the Company;

    (b)    by either the Company or Parent if the Closing shall not have occurred on or before March 31, 2012 (the "<u>Outside Date</u>") by delivering written notice to the other party no earlier than five Business Days following the Outside Date; <u>provided, however</u>, that the right to terminate this Agreement under this <u>Section 11.01(b)</u> shall not be available to the Company or Parent if the Company's or Parent's, respectively, material breach of any representation, warranty or covenant in this Agreement shall have been the primary cause of, or primarily resulted in, the failure of the Closing to occur on or prior to such date;

    (c)    by the Company if (i) there exists a breach of any representation or warranty of either Parent or Merger Sub contained in this Agreement such that the condition set forth in <u>Section 8.01</u> would not be satisfied, or (ii) either Parent or Merger Sub shall have breached any of the covenants or agreements contained in this Agreement to be performed by it such that the condition set forth in <u>Section 8.02</u> would not be satisfied and, in the case of clauses (i) or (ii), such breach has not been cured (or is

75

incapable of being cured) by Parent and Merger Sub within 30 days following its receipt of notice from the Company of such breach;

        (d)      by Parent if (i) there exists a breach of any representation or warranty of the Company contained in this Agreement such that the condition set forth in Section 7.01 would not be satisfied, or (ii) the Company shall have breached any of the covenants or agreements contained in this Agreement to be performed by the Company such that the condition set forth in Section 7.02 would not be satisfied and, in the case of clauses (i) or (ii) such breach has not been cured (or is incapable of being cured) by the Company within 30 days following its receipt of notice from Parent of such breach; or

        (e)      by either Parent or the Company, if any Legal Requirement shall have been enacted or promulgated by any Governmental Authority or otherwise be in effect permanently enjoining or otherwise prohibiting or preventing the consummation of the transactions contemplated by this Agreement, and such Legal Requirement shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 11.01(e) shall not be available to any party whose material breach of any representation, warranty or covenant under this Agreement has been the primary cause of, or primarily resulted in, such Legal Requirement to have become applicable, and provided, further, that the party seeking to terminate this Agreement under this Section 11.01(e) shall have used its best efforts to cause the application of any such Legal Requirement to be vacated or lifted or to ameliorate the effects thereof.

Section 11.02. Effect of Termination.   In the event of termination of this Agreement by a party hereto pursuant to and in accordance with Section 11.1 hereof, written notice thereof shall promptly be given by the terminating party to the other party hereto in accordance with Section 12.01 (*Notices*), and this Agreement shall thereupon terminate and become void and have no force or effect, and the transactions contemplated hereby shall be abandoned without further action by the parties hereto, except that the provisions of Section 6.04, Article XII and the Confidentiality Agreement shall survive the termination of this Agreement; provided, however, that no party shall be relieved or released from any liabilities or damages (which the parties hereby acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs) arising out of fraud or any breach of such party's obligations under this Agreement.

ARTICLE XII
MISCELLANEOUS.

Section 12.01. Notices.   Any notice, request, demand, claim or other communication required or permitted to be delivered, given or otherwise provided under this Agreement must be in writing and must be delivered personally, delivered by nationally recognized overnight courier service, sent by certified or registered mail, postage prepaid, or (if a facsimile number is provided below) sent by facsimile (subject to electronic confirmation of good facsimile transmission). Any such notice, request, demand, claim or other communication shall be deemed to have been delivered and given (a) when delivered, if delivered personally, (b) the Business Day after it is deposited with such nationally recognized overnight courier service, if sent for overnight delivery by a nationally recognized overnight courier service, (c) the day of sending, if

76

sent by facsimile prior to 5:00 p.m. (Eastern time) on any Business Day or the next succeeding Business Day if sent by facsimile after 5:00 p.m. (Eastern time) on any Business Day or on any day other than a Business Day or (d) five Business Days after the date of mailing, if mailed by certified or registered mail, postage prepaid, in each case, to the following address or, if applicable, facsimile number, or to such other address or addresses or facsimile number or numbers as such party may subsequently designate to the other parties by notice given hereunder:

If to the Company (prior to the Closing), to:

> KOR Electronics
> 10855 Business Center Drive
> Cypress, CA 90630
> Telephone number:  (714) 898-8200
> Facsimile number:  (714) 226-1241
> Attention: Kevin Carnino

with a copy (which shall not constitute notice) to:

> DLA Piper LLP (US)
> 2000 University Avenue
> East Palo Alto, CA 94301-2215
> Telephone number: (650) 833-2243
> Facsimile number: (650) 687-1200
> Attention: Dennis C. Sullivan

If to the Parent (or to the Surviving Corporation after the Closing), to:

> 201 Riverneck Road
> Chelmsford, MA 01824
> Telephone number: (978) 967-1788
> Facsimile number: (978) 256-0013
> Attention: Gerald M. Haines II

with a copy (which shall not constitute notice) to:

> Bingham McCutchen LLP
> One Federal Street
> Boston, MA  02110-1726
> Telephone number: (617) 951-8852
> Facsimile number: (617) 428-6419
> Attention:  John R. Utzschneider

If to the Securityholders' Representative, to:

> Shareholder Representative Services LLC

601 Montgomery Street
Suite 2020
San Francisco, CA 94111
Attention:  Managing Director
Email:  deals@shareholderrep.com
Telephone number: (415) 367-9400
Facsimile number: (415) 962-4147

with a copy (which shall not constitute notice) to:

DLA Piper LLP
2000 University Avenue
East Palo Alto, CA 94301-2215
Telephone number: (650) 833-2243
Facsimile number: (650) 687-1200
Attention: Dennis C. Sullivan

Each of the parties to this Agreement may specify a different address or addresses or facsimile number or facsimile numbers by giving notice in accordance with this Section 12.01 to each of the other parties hereto.

Section 12.02. Succession and Assignment; No Third-Party Beneficiaries.  Subject to the immediately following sentence, this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, each of which such successors and permitted assigns will be deemed to be a party hereto for all purposes hereof.  No party may assign, delegate or otherwise transfer either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other parties (with the Securityholders' Representative acting for all of the Securityholders), and any attempt to do so will be null and void *ab initio*; provided, that (a) the Parent may assign this Agreement and any or all of its rights and interests hereunder to one or more of its Affiliates or designate one or more of its Affiliates to perform its obligations hereunder, in each case, so long as the Parent is not relieved of any liability or obligations hereunder, (b) the Parent may assign this Agreement and any or all of its rights and interest hereunder to any purchaser of all or substantially all its assets or designate such purchaser to perform its obligations hereunder and (c) any of the Parent Indemnified Persons may collaterally assign any or all of its rights and obligations hereunder to any provider of debt financing to it or any of its Affiliates.  Except as expressly provided herein, this Agreement is for the sole benefit of the parties hereto and their successors and permitted assignees and nothing herein expressed or implied will give or be construed to give any Person, other than the parties hereto and such successors and permitted assignees, any other right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.  For the avoidance of doubt, it is hereby acknowledged and agreed by the parties hereto that an Indemnified Person that is not party hereto is intended to be an express third party beneficiary of this Agreement.

Section 12.03. Amendments and Waivers.  No amendment or waiver of any provision of this Agreement will be valid and binding unless it is in writing and signed, in the case of an amendment, by Parent, the Company and the Securityholders' Representative, or in the case of a

78

waiver, against whom the waiver is to be effective.  No waiver by any party of any breach or violation of, default under or inaccuracy in any representation, warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any prior or subsequent breach or violation of, default under, or inaccuracy in, any such representation, warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  No delay or omission on the part of any party in exercising any right, power or remedy under this Agreement will operate as a waiver thereof.

Section 12.04. <u>Provisions Concerning the Securityholders' Representative</u>.

(a)  <u>Appointment</u>.  Upon the effectiveness of the Merger, each Securityholder shall be deemed to have irrevocably appointed Shareholder Representative Services LLC as the sole and exclusive agent, proxy and attorney-in-fact for each Securityholder for and on behalf of each such Securityholder, for all purposes of this Agreement, the Ancillary Agreements and the Contemplated Transactions, with full and exclusive power and authority to act on such Securityholder's behalf (the "<u>Securityholders' Representative</u>").  The appointment of the Securityholders' Representative hereunder is coupled with an interest, shall be irrevocable and shall not be affected by the death, incapacity, insolvency, bankruptcy, illness or other inability to act of any Securityholder.  Without limiting the generality of the foregoing, the Securityholder' Representative is hereby authorized, on behalf of the Securityholders, to:

(i)  in connection with the Closing, execute and receive all documents, instruments, certificates, statements and agreements on behalf of and in the name of each Securityholder necessary to effectuate the Closing and consummate the Contemplated Transactions;

(ii)  receive and give all notices and service of process, make all filings, enter into all Contractual Obligations, make all decisions, bring, prosecute, defend, settle, compromise or otherwise resolve all claims, disputes and Actions, authorize payments in respect of any such claims, disputes or Actions, and take all other actions, in each case, with respect to the matters set forth in <u>Section 3.05</u>, <u>Article IX</u> or <u>Article X</u> or any other Actions directly or indirectly arising out of or relating to this Agreement or the Contemplated Transactions;

(iii)  receive and give all notices, make all decisions and take all other actions on behalf of the Securityholders in connection with the Escrow Amount and SR Escrow Amount and the escrow funds, including giving any instructions or authorizations to the Escrow Agent to pay from such escrow funds any amounts owed by the Securityholders pursuant to this Agreement or otherwise in connection with the Contemplated Transactions;

(iv)  execute and deliver, should it elect to do so in its good faith discretion, on behalf of the Securityholders, any amendment to, or waiver of, any term or provision of this Agreement, or any consent, acknowledgment or release relating to this Agreement; and

79

(v)    take all other actions permitted or required to be taken by or on behalf of the Securityholders under this Agreement and exercise any and all rights that the Securityholders or the Securityholders' Representative are permitted or required to do or exercise under this Agreement.

(b)    <u>Liability</u>.  The Securityholders' Representative shall not be held liable by any of the Securityholders for actions or omissions in exercising or failing to exercise all or any of the power and authority of the Securityholders' Representative pursuant to this Agreement, except in the case of the Securityholders' Representative's gross negligence, bad faith or willful misconduct.  The Securityholders' Representative shall be entitled to rely on the advice of counsel, public accountants or other independent experts that it reasonably determines to be experienced in the matter at issue, and will not be liable to any Securityholder for any action taken or omitted to be taken in good faith based on such advice.  The Securityholders will jointly and severally indemnify (in accordance with their Pro Rata Escrow Percentages) the Securityholders' Representative from any Losses arising out of its serving as the Securityholders' Representative hereunder as such Losses are incurred or suffered, except for Losses finally adjudicated to have been primarily caused by the Securityholders' Representative's gross negligence, bad faith or willful misconduct.  If not paid directly to the Securityholders' Representative by the Securityholders, any such Losses may be recovered by the Securityholders' Representative from (i) the funds in the SR Escrow Amount and (ii) the amounts of the Escrow Amount otherwise distributable to the Securityholders pursuant to the terms hereof and the Escrow Agreement at the time of distribution in accordance with written instructions delivered by the Securityholders' Representative to the Escrow Agent; provided, that while this paragraph (b) allows the Securityholders' Representative to be paid from the SR Escrow Amount and the Escrow Amount, this does not relieve the Securityholders form their obligation to promptly pay such Losses as such Losses are suffered or incurred, nor does it prevent the Securityholders' Representative from seeking any remedies available to it at law or otherwise. The Securityholders' Representative will be entitled to withdraw funds from the SR Escrow Amount to fund its expenses, as provided in the Escrow Agreement.  The Securityholders' Representative is serving in its capacity as such solely for purposes of administrative convenience, and is not personally liable in such capacity for any of the obligations of the Securityholders hereunder, and the Parent agrees that it will not look to the personal assets of the Securityholders' Representative, acting in such capacity, for the satisfaction of any obligations to be performed by the Securityholders hereunder.

(c)    <u>Reliance on Appointment; Successor Securityholders' Representative</u>.  The Parent and the other Parent Indemnified Persons may rely on the appointment and authority of the Securityholders' Representative granted pursuant to this <u>Section 12.04</u> until receipt of written notice of the resignation of the Securityholders' Representative or the appointment of a successor Securityholders' Representative made in accordance with this <u>Section 12.04</u>.  In so doing, the Parent and the other Parent Indemnified Persons may rely on any and all actions taken by and decisions of the Securityholders' Representative under this Agreement notwithstanding any dispute or disagreement among any of the Securityholders' or the Securityholders' Representative

80

with respect to any such action or decision without any Liability to, or obligation to inquire of, any Securityholder, the Securityholders' Representative or any other Person. Any decision, act, consent or instruction of the Securityholders' Representative shall constitute a decision of all the Securityholders and shall be final and binding upon each of the Securityholders.  At any time after the Closing, with or without cause, by a written instrument that is signed in writing by holders of at least a majority-in-interest of the Securityholders (determined by reference to their respective Pro Rata Escrow Percentages) and delivered to Parent, the Securityholders may remove and designate a successor Securityholders' Representative; <u>provided</u>, that such successor Securityholders' Representative must be reasonably acceptable to Parent.  If the Securityholders' Representative shall at any time resign or otherwise cease to function in its capacity as such for any reason whatsoever, and no successor that is reasonably acceptable to Parent is appointed by such holders of a majority-in-interest of the Securityholders within ten (10) Business Days, then Parent shall have the right to appoint another Securityholder to act as the replacement Securityholders' Representative who shall serve as described in this Agreement and, under such circumstances, the Parent and the other Parent Indemnified Persons shall be entitled to rely on any and all actions taken and decisions made by such replacement Securityholders' Representative.

Section 12.05. Entire Agreement.  This Agreement, together with the other Ancillary Agreements and any documents, instruments and certificates explicitly referred to herein, constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto.  There are no restrictions, promises, warranties, covenants, or undertakings, other than those expressly provided for herein and therein.

Section 12.06. Counterparts; Facsimile Signature.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute but one and the same instrument.  This Agreement will become effective when duly executed and delivered by each party hereto.  Counterpart signature pages to this Agreement may be delivered by facsimile or electronic delivery (*i.e.*, by email of a PDF signature page) and each such counterpart signature page will constitute an original for all purposes.

Section 12.07. Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  In the event that any provision hereof would, under applicable Legal Requirements, be invalid or unenforceable in any respect, each party hereto intends that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable Legal Requirements.

Section 12.08. Governing Law.  This Agreement, the rights of the parties hereunder and all Actions arising in whole or in part under or in connection herewith, will be governed by and

81

construed and enforced in accordance with the domestic substantive laws of The Commonwealth of Massachusetts, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction, except to extent the CGCL applies to the Merger.

Section 12.09. <u>Jurisdiction; Venue; Service of Process</u>.

(a) <u>Jurisdiction</u>. Subject to the provisions of <u>Sections 3.05</u> and <u>9.04(e)</u>, each of the parties to this Agreement, by its execution hereof, (i) hereby irrevocably submits to the exclusive jurisdiction of the United States District Court located in The Commonwealth of Massachusetts, or if such Action may not be brought in federal court, the state courts of The Commonwealth of Massachusetts located in the City of Boston  for the purpose of any Action among any of the parties relating to or arising in whole or in part under or in connection with this Agreement, any Ancillary Agreement or the Contemplated Transactions, (ii) hereby waives to the extent not prohibited by applicable Legal Requirements, and agrees not to assert, by way of motion, as a defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such Action brought in one of the above-named courts should be dismissed on grounds of *forum non conveniens*, should be transferred or removed to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other Action in any other court other than one of the above-named courts or that this Agreement, any Ancillary Agreement or the subject matter hereof or thereof may not be enforced in or by such court and (iii) hereby agrees not to commence any such Action other than before one of the above-named courts. Notwithstanding the previous sentence a party may commence any Action in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts.

(b) <u>Venue</u>. Each of the parties to this Agreement agrees that for any Action among any of the parties relating to or arising in whole or in part under or in connection with this Agreement, any Ancillary Agreement or the Contemplated Transactions, such party shall bring such Action only in the City of Boston. Notwithstanding the previous sentence a party may commence any Action in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts.  Each party hereto further waives any claim and will not assert that venue should properly lie in any other location within the selected jurisdiction.

(c) <u>Service of Process</u>. Each of the parties to this Agreement hereby (i) consents to service of process in any Action among any of the parties hereto relating to or arising in whole or in part under or in connection with this Agreement, any Ancillary Agreement or the Contemplated Transactions in any manner permitted by Massachusetts law, (ii) agrees that service of process made in accordance with clause (i) or made by registered or certified mail, return receipt requested, at its address specified pursuant to <u>Section 12.01</u>, will constitute good and valid service of process in any such Action and

(iii) waives and agrees not to assert (by way of motion, as a defense, or otherwise) in any such Action any claim that service of process made in accordance with clause (i) or (ii) does not constitute good and valid service of process.

Section 12.10. <u>Specific Performance</u>.  Each of the parties acknowledges and agrees that the other parties would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached or violated.  Accordingly, each of the parties agrees that, without posting a bond or other undertaking, the other parties will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any Action instituted in any court of the United States or any state thereof having jurisdiction over the parties and the matter in addition to any other remedy to which it may be entitled, at law or in equity.  Each party further agrees that, in the event of any action for specific performance in respect of such breach or violation, it will not assert that the defense that a remedy at law would be adequate.

Section 12.11. <u>Waiver of Jury Trial</u>.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION WHATSOEVER BETWEEN OR AMONG THEM RELATING TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS AND THAT SUCH ACTIONS WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

A/74600477.20

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as of the date first above written.

PARENT:                          MERCURY COMPUTER SYSTEMS, INC.

                                 By:_____
                                 Name: Mark Aslett
                                 Title: President and Chief Executive Officer

MERGER SUB:                      KING MERGER INC.
                                 By:_____
                                 Name: Mark Aslett
                                 Title: President

THE COMPANY:                              KOR ELECTRONICS

By: 

Name: Kevin Carnino
Title: President and Chief Executive Officer

SECURITYHOLDERS' REPRESENTATIVE:   SHAREHOLDER REPRESENTATIVE
SERVICES LLC, solely in its capacity as the
Securityholders' Representative

By: _____

Name: Paul Koenig

Title:  Managing Director

**Exhibit A to the Agreement and Plan of Merger**

## INDEMNITY ESCROW AGREEMENT

This INDEMNITY ESCROW AGREEMENT (this "<u>Agreement</u>") is entered into as of this _____ day of December, 2011 (the "<u>Closing Date</u>"), by and among Mercury Computer Systems, Inc., a Massachusetts corporation ("<u>Parent</u>"), Shareholder Representative Services LLC, a Colorado limited liability company, solely in its capacity as the representative of the Securityholders (the "<u>Securityholders' Representative</u>"), and Wells Fargo Bank, National Association, a national banking association (the "<u>Escrow Agent</u>").

## RECITALS

**WHEREAS,** Parent, King Merger Inc., a California corporation ("<u>Merger Sub</u>"), KOR ELECTRONICS, a California corporation (the "<u>Company</u>"), and the Securityholders' Representative, have entered into that certain Agreement and Plan of Merger, dated as of December 22, 2011 (the "<u>Merger Agreement</u>"; capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Merger Agreement), pursuant to which, (i) Merger Sub is merging with and into the Company, with the Company surviving the merger, (ii) all of the stockholders of the Company (the "<u>Shareholders</u>") will receive cash payments in exchange for their shares and (iii) certain holders of options to acquire Common Stock of the Company will receive a cash payment in connection with the termination of their options;

**WHEREAS,** pursuant to <u>Section 3.03(b)</u> of the Merger Agreement, at the Closing, Parent shall deliver or cause to be delivered to the Escrow Agent (i) the sum of $10,500,000 (the "<u>Escrowed Amount</u>") in cash by wire transfer of immediately available funds, and such amount is to be held in escrow and disbursed pursuant to this Agreement (such amount plus any interest and other income earned thereon (net of any distributions pursuant to the terms hereof) being held in escrow from time to time pursuant to this Agreement, the "<u>Indemnity Escrow Amount</u>") and (ii) the sum of $150,000 (the "<u>SR Amount</u>") in cash by wire transfer of immediately available funds, and such amount is to be held in escrow and disbursed pursuant to this Agreement (such amounts plus any interest and other income earned thereon (net of any distributions pursuant to the terms hereof) being held in escrow from time to time pursuant to this Agreement, the "<u>SR Escrow Amount</u>");

**WHEREAS,** pursuant to the Merger Agreement, the Securityholders' Representative has been appointed to represent the Shareholders and Option Holders ("<u>Securityholders</u>") in connection with this Agreement and the indemnification provisions of the Merger Agreement; and

**WHEREAS,** Parent and the Securityholders' Representative hereby acknowledge that the Escrow Agent is not a party to, is not bound by, and has no duties or obligations under, the Merger Agreement, that all references in this Agreement to the Merger Agreement are for convenience, and that the Escrow Agent shall have no implied duties beyond the express duties set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the premises and the mutual obligations and covenants set forth herein, the parties hereto agree as follows:

1.      **Appointment of Escrow Agent**.  The parties hereto hereby constitute and appoint the Escrow Agent as, and the Escrow Agent hereby agrees to assume and perform the duties of, the escrow agent pursuant to this Agreement.

**2.**      **Receipt of Escrowed Amount**.  The Escrow Agent shall acknowledge receipt of each of the Escrowed Amount and the SR Amount when it is actually received.  The Escrowed Amount shall be held by the Escrow Agent in a separate account (the "Escrow Account") maintained for the purposes, and on the terms and subject to the conditions, set forth in this Agreement.  The SR Amount shall be held by the Escrow Agent in a separate account (the "SR Account") maintained for the purposes, and on the terms and subject to the conditions, set forth in this Agreement.  Except as indicated in Section 6 of this Agreement, each of the Indemnity Escrow Amount and the SR Escrow Amount shall be held as an escrow fund and shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any Securityholder or any creditor of a party hereto. The Escrow Agent shall provide Parent (but only with respect to the Escrow Account, not the SR Account) and the Securityholders' Representative quarterly statements related to each of the Escrow Account and the SR Account.

**3.**      **Investment of Indemnity Escrow Amount; Tax Treatment, etc**.

(a)      During the term of this Agreement, the Indemnity Escrow Amount and the SR Escrow Amount shall be invested and reinvested by the Escrow Agent in the investments indicated on Schedule 1.  Parent and Securityholders' Representative acknowledge that they have read and understand Schedule 1.  The Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Agreement.  The Escrow Agent shall have no liability for any loss sustained as a result of (i) any investment in an investment indicated on Schedule 1, (ii) any investment made pursuant to joint written instructions of Parent and the Securityholders' Representative and agreed to by the Escrow Agent, (iii) any liquidation of any investment prior to its maturity, for purposes of providing funds necessary to make required payments under this Agreement or (iv) the failure of Parent and the Securityholders' Representative to give the Escrow Agent instructions to reinvest the Indemnity Escrow Amount. Parent and Securityholders' Representative acknowledge that the Escrow Agent is not providing investment supervision, recommendations or advice.

(b)      The parties hereto agree to treat the Indemnity Escrow Amount as owned by Parent and not received by the Securityholders, in all cases to the extent not paid to the Securityholders pursuant to this Agreement, and to file all tax returns on a basis consistent with such treatment.  Until the termination of this Agreement, the beneficial interest in the Escrow Account shall remain with Parent and all interest and other income earned on the Indemnity Escrow Amount (the "Escrow Income") shall be reported as taxable income of Parent, and the parties hereto shall file applicable tax forms consistent with such treatment.  Any disbursement of the Indemnity Escrow Amount to the Securityholders may be treated for U.S. federal income tax purposes as consisting, in part, of imputed interest in accordance with the Internal Revenue Code of 1986, as amended (the "Code"), and Treasury Regulations promulgated thereunder.  Notwithstanding any other provision of this Agreement, Parent shall upon written request to the Escrow Agent, receive a distribution equal to 40% of the Escrow Income for each taxable year immediately thereafter.

(c)      The parties hereto agree to treat the SR Escrow Amount as owned by the Securityholders, and to file all tax returns on a basis consistent with such treatment.  Until the termination of this Agreement the beneficial interest in the SR Account shall remain with the Securityholders and all interest and other income earned on the SR Escrow Amount (the "SR Escrow Income") shall be reported as taxable income of the Securityholders, and the parties hereto shall file applicable tax forms consistent with such treatment.  Any disbursement of the SR Escrow Amount to the Securityholders' Representative may be treated for U.S. federal income tax purposes as constituting, in part, of imputed interest in accordance with the Code, and Treasury Regulations promulgated thereunder.

(d)      Prior to the execution of this Agreement by the parties hereto, Parent and the Securityholders' Representative have provided to the Escrow Agent original fully completed and

A/74644472.9

executed Internal Revenue Service Form W-8 or W-9s.  The Escrow Agent shall report and, as required, withhold any taxes as it determines may be required by any law or regulation in effect at the time of the distribution and in any event in accordance with Section 4.5.  Parent shall be responsible for filing any applicable tax returns with respect to the interest and other income earned on the Indemnity Escrow Amount, and the Escrow Agent shall be responsible for filing any applicable tax returns with respect to the interest and other income earned on the SR Escrow Amount, and the Escrow Agent is otherwise only responsible for income reporting and not any other type of reporting.

**4.**      **Release of Indemnity Escrow Amounts**.

4.1      Release Upon Determination of Final Purchase Price.

(a)      Within two (2) Business Days after the determination of the Final Closing Balance Sheet and the Final Closing Statement pursuant to Section 3.05 of the Merger Agreement, Parent and the Securityholders' Representative shall deliver Joint Payment Instructions (as defined below) to the Escrow Agent that direct the Escrow Agent to pay to Parent out of the Indemnity Escrow Amount, such amounts as may be required pursuant to Section 3.05(f) of the Merger Agreement.  Such payment(s) shall be made on or before the fifth (5th) Business Day following the date on which the Escrow Agent received such Joint Payment Instructions.

(b)      In the event that the Final Closing Balance Sheet and the Final Closing Statement have been determined by the Accounting Firm pursuant to Section 3.05 of the Merger Agreement, and the Joint Payment Instructions described in paragraph (a) above are not delivered to the Escrow Agent within two (2) Business Days thereafter, then unless the Joint Payment Instructions described in paragraph (a) above are thereafter delivered either Parent or the Securityholders' Representative may deliver to the Escrow Agent and the other party hereto a Judgment Notice (as defined below) accompanied by a copy of the underlying Order (as defined below) regarding such determination.  The Judgment Notice and the Order shall be delivered to each party to this Agreement at the same time as they are delivered to the Escrow Agent.  The Escrow Agent shall make the payments set forth in the Judgment Notice and the Order within five (5) Business Days after receipt thereof.

4.2      Releases to Indemnified Persons.

(a)      Subject to Article IX and Article X of the Merger Agreement, if Parent determines that any Indemnified Person may be entitled to indemnification for any amount pursuant to Article IX or Article X of the Merger Agreement, Parent shall deliver to the Securityholders' Representative and the Escrow Agent a Claim Certificate on or before the Release Date (as defined below) in substantially the form of Exhibit 1 (a "Claim Certificate"), for the payment of such amount.

(b)      Within thirty (30) days after receipt by the Securityholders' Representative of a Claim Certificate, the Securityholders' Representative may deliver to Parent and the Escrow Agent a written objection to all or any part of the Claim Certificate (an "Objection").

(c)      If the Securityholders' Representative fails to deliver an Objection to Parent and the Escrow Agent by 5:00 p.m. Eastern Time on the thirtieth (30th) day following the receipt by the Securityholders' Representative of a Claim Certificate, the Escrow Agent shall pay to the Indemnified Person out of the Indemnity Escrow Amount an amount equal to the amount requested in the Claim Certificate (up to a maximum of the Indemnity Escrow Amount).  Any such payment shall be made on or before the fifth (5th) Business Day following the expiration of such thirty (30) day period. The Escrow Agent shall continue to hold any amounts remaining in the Escrow Account following the payment of any Claim Certificate in accordance with the terms of this Agreement.

A/74644472.9

(d)      If the Securityholders' Representative delivers a timely Objection with respect to all or any portion of a Claim Certificate, the Escrow Agent shall not disburse, and shall continue to hold in the Escrow Account, the amount requested in the Claim Certificate or the disputed portion thereof, as applicable, pending receipt of either (i) payment instructions signed by Parent and the Securityholders' Representative ("Joint Payment Instructions"), specifying the agreement of the parties as to the action to be taken by the Escrow Agent in respect of such Claim Certificate, or (ii) a notice from either Parent or the Securityholders' Representative stating that either (A) such Claim Certificate has been submitted to a court of competent jurisdiction for judgment and that a judgment with respect to such matters has been rendered and is final and non-appealable or (B) such Claim Certificate has been submitted to a panel of arbitrators with proper jurisdiction and that a final nonappealable award with respect to such arbitration has been rendered (in each case of (ii)(A) or (ii)(B), a "Judgment Notice"), which Judgment Notice is accompanied by a copy of a final, nonappealable order of such court or such arbitration panel, as applicable (each an "Order"), pursuant to which such court or arbitration panel has determined whether and to what extent the Indemnified Person(s) are entitled to the amount requested in the Claim Certificate. Upon receipt of Joint Payment Instructions or a Judgment Notice accompanied by a copy of the underlying Order, as applicable, the Escrow Agent shall thereafter act in accordance with Section 4.2(e) or 4.2(f) below, as applicable.  A copy of the Judgment Notice and underlying Order shall be delivered to each party to this Agreement at the same time as it is delivered to the Escrow Agent. The Escrow Agent shall be entitled to rely upon any judgment or order that it receives from a party without any duty to inquire as to whether such judgment or order complies with the requirements of this Section 4.2.

(e)      Upon receipt by the Escrow Agent of Joint Payment Instructions, if such Joint Payment Instructions indicate that any Indemnified Persons are entitled to payment in respect of all or any portion of the Claim Certificate, then the Escrow Agent shall release from the Escrow Account and pay to the Indemnified Persons the amount indicated in such Joint Payment Instructions (up to a maximum of the Indemnity Escrow Amount).  Such payment shall be made on or before the fifth (5th) Business Day following the date on which such Joint Payment Instructions are received by the Escrow Agent.  If such Joint Payment Instructions indicate that the Indemnified Persons are not entitled to all or any portion of the amount claimed in such Claim Certificate (a "Discharge Notice"), then the Escrow Agent shall continue to hold such amount in the Escrow Account in accordance with the terms of this Agreement.

(f)      If the Escrow Agent has received a Judgment Notice accompanied by the corresponding underlying Order with respect to any Claim Certificate, then the Escrow Agent shall release from the Escrow Account and pay to the Indemnified Persons an amount equal to the amount due the Indemnified Persons as described in such Judgment Notice and Order (up to a maximum of the Indemnity Escrow Amount).  Such payment shall be made on or before the fifth (5th) Business Day following the date on which the Escrow Agent received such Judgment Notice and Order.  If such Judgment Notice and Order indicates that the Indemnified Persons were not entitled to all or any portion of the amount claimed in the Claim Certificate (a "Determination Discharge"), then the Escrow Agent shall continue to hold such amount to which the Indemnified Parties were determined not to be entitled in accordance with the terms of this Agreement.

4.3      Releases to Securityholders, Securityholders' Representative.

(a)      On December 27, 2013, (the "Release Date"), the Indemnity Escrow Amount shall be reduced by an amount (the "Disbursement Amount") equal to (i) the total Indemnity Escrow Amount at that time less (ii) the amount (if any) of the Outstanding Claims (defined below), as of the Release Date.  On the first (1st) Business Day following the Release Date, the Escrow Agent shall, subject to the provisions of this Section 4.3 and Section 4.5, release the Disbursement Amount from the Escrow Account and further direct the Paying Agent to disburse such amount to the Securityholders in accordance with Schedule 3 hereof (as it may be adjusted from time to time pursuant to Section 4.4(d).

(b)     If on or before the Release Date, the Escrow Agent shall have received one or more Claim Certificates that have not been paid in accordance with Section 4.2(c) as of the Release Date and as to which, on the Release Date, the Escrow Agent has not received and fully acted upon Joint Payment Instructions or a Judgment Notice, nor received a Discharge Notice or a Determination Discharge (any such Claim Certificate being referred to as an "Outstanding Claim"), the Escrow Agent shall retain in the Escrow Account in accordance with the terms hereof an amount equal to the lesser of (i) the amount requested in all such Outstanding Claims and (ii) the total Indemnity Escrow Amount as of the applicable Release Date prior to giving any effect to any reduction pursuant to this Section 4.3 (the "Retained Amount"). Thereafter, the Escrow Agent shall, subject to the applicable subparagraph of this Section 4.3, release from the Escrow Account all or portions of the Retained Amount to the Indemnified Persons and/or the Paying Agent for further release to the Securityholders in accordance with Schedule 3 (as it may be adjusted from time to time pursuant to Section 4.4(d)), as applicable, as and when it receives Joint Payment Instructions, Judgment Notices, Discharge Notices or Determination Discharges, as applicable, related to the Outstanding Claims. Following the Release Date, in the event that the Retained Amount at any time exceeds by $25,000 or more the amount of all Outstanding Claims (to the extent that they have not been paid to the Indemnified Parties or are not subject to a Discharge Notice or Determination Discharge), the Escrow Agent shall, subject to Section 4.3(c) and Section 4.5, release from the Escrow Account and further direct the Paying Agent to disburse to the Securityholders in accordance with Schedule 3 hereof (as it may be adjusted from time to time pursuant to Section 4.4(d)), within five (5) Business Days following receipt of Joint Payment Instructions authorizing such payment, an amount equal to such excess. Notwithstanding the foregoing provisions, if after the Release Date there are at any time no Outstanding Claims, the Escrow Agent shall release and disburse the sums remaining in the Escrow Account to the Paying Agent for further release to the Securityholders in accordance with Schedule 3 hereof (as it may be adjusted from time to time pursuant to Section 4.4(d)) and subject to the provisions of Section 4.5.

4.4     Distributions Generally.

(a)     As soon as reasonably practicable following the disbursement of any funds from the Escrow Account, the Escrow Agent shall send an account statement to the Securityholders' Representative and Parent reflecting the amount of the disbursement and the amounts remaining in the Escrow Account.

(b)     Notwithstanding anything to the contrary in this Section 4, if at any time the Escrow Agent shall receive Joint Payment Instructions to release all or a portion of the Indemnity Escrow Amount, then within five (5) Business Days after receipt of such Joint Payment Instructions, the Escrow Agent shall release such amount to the Indemnified Parties or to the Paying Agent for further release to the Securityholders in accordance with Schedule 3 hereof (as it may be adjusted from time to time pursuant to Section 4.4(d)), as applicable. Parent and the Securityholders' Representative will cooperate in executing such Joint Payment Instructions whenever reasonably necessary to ensure distributions of escrowed funds to the party entitled thereto under the terms of this Agreement and the Merger Agreement.

(c)     In connection with a release of all or a portion of the Indemnity Escrow Amount, Parent, with any delivery of Joint Payment Instructions, shall at the time of such release provide information to the Escrow Agent that would be required by law or regulation for any tax reporting. Parent and Securityholders' Representative will cooperate in executing such Joint Payment Instructions and Parent will deliver such tax reporting information whenever reasonably necessary to ensure appropriate tax reporting of such release of escrowed funds to the party entitled thereto under the terms of this Agreement and the Merger Agreement.

5

(d)     Upon the written request of Parent, on a quarterly basis, the Securityholders' Representative shall use commercially reasonable efforts to review the expenses incurred by Parent or any Parent Indemnified Person related to any outstanding Claim Certificate. The Securityholders' Representative and Parent shall execute and deliver to the Escrow Agent Joint Payment Instructions to release a portion of the Indemnity Escrow Amount to Parent in the amount of any expenses, if any, approved by the Securityholders' Representative in its sole discretion. Securityholders' Representative agrees it will approve the payment of such expenses unless they are not subject to the Securityholders' indemnification obligations in Article IX or Article X of the Merger Agreement. Parent acknowledges that, in the event the Securityholders' Representative determines that any such expenses are not subject to the Securityholders' indemnification obligations in Article IX or Article X of the Merger Agreement, and this determination subsequently proves to be incorrect, this is not intended to and shall not create any personal liability for the Securityholders' Representative, but the Parent Indemnified Person shall be entitled to interest on the  amount of expense determined to be properly payable, at a rate per annum equal to 4% plus the "Base Rate" in effect from time to time as published in the Wall Street Journal under its "Money Rates" column, from the date the Securityholders' Representative refused to approve such expense to the date of payment.  Parent also agrees that in the event the Securityholders' Representative agrees to release a portion of the Indemnity Escrow Amount to Parent to fund expenses as described above, if it is subsequently determined by mutual agreement of Parent and the Securityholders' Representative, or a court of competent jurisdiction or arbitral panel (in each case not subject to further appeal) that Parent was not entitled to any indemnification with respect to the underlying indemnification claim relating to such expenses, Parent will within seven (7) Business Days return such funds to the Escrow Agent or, if the Release Date has occurred, transfer such amount to the Paying Agent for payment to the Securityholders.  Any amounts released from the Escrow Account shall be deemed to reduce the Indemnity Escrow Amount pro rata with respect to each applicable Securityholder in accordance with such Securityholder's Pro Rata Escrow Percentage of the Indemnity Escrow Amount as set forth on Schedule 3 hereto (as adjusted from time to time pursuant to this Section 4.4(d) at the time of such release.  Notwithstanding the foregoing, any claim for indemnification under Section 9.01(iii) of the Merger Agreement against any Securityholder for breach of such Securityhoder's representations or warranties or covenants in any Ancillary Agreement to which such Securityholder is a party will reduce such Securityholder's interest in the Indemnity Escrow Amount, and the Securityholders' Representative and Parent will deliver joint written instructions to the Escrow Agent confirming such reduction and providing an updated Schedule 3 reflecting this change.

(e)     Parent and the Securityholders' Representative shall reasonably cooperate in good faith in the timely delivery of all Joint Payment Instructions required to be delivered hereunder.

(f)     In any case hereunder in which Escrow Agent is to receive instructions to disburse, the Escrow Agent shall be entitled to entirely rely on such instructions with no responsibility to calculate or confirm amounts or percentages to disburse.

(g)     To the extent that the disbursement of any funds from the Escrow Account is to be received by any Securityholder that is an employee or former employee of the Company or any Subsidiary and such amounts are to be treated as compensation, then such disbursement of funds shall be paid to the Company, or its designee, for the benefit of such employee or former employee Securityholder with the subsequent payments to such persons made pursuant to customary payroll payment procedures and with payments subject to all applicable income, employment and other tax withholding.  To the extent that the Company, or its Affiliates, including Parent, incurs any employer payroll taxes in connection with such payments, the Escrow Agent shall be directed in writing to distribute an amount from the Escrow Account to the Company equal to such taxes and the Escrow Account shall be reduced by such amounts.

6

4.5     Withholding Obligations.

(a)     Certain amounts payable to Securityholders hereunder may be subject to withholding.  If Parent determines that it or the Company is required to withhold Taxes or other amounts required under the Code or any applicable Legal Requirement in connection with any proposed release of funds by the Escrow Agent to the Securityholders (the "Proposed Payment"), Parent shall deliver a written notice to the Securityholders' Representative and the Escrow Agent for the payment of such amount, including the identity of the Securityholder to which the withholding obligation relates (a "Withholding Claim").  Parent shall deliver a Withholding Claim, if any, prior to the Release Date.  The Escrow Agent shall pay to Parent out of that portion of the Proposed Payment payable to the applicable Securityholders' an amount equal to the amount requested on the Withholding Claim up to a maximum amount of such portion of the Proposed Payment payable to the applicable Securityholders.  The amount of the Withholding Claim paid to Parent shall reduce the amount of the Proposed Payment paid to the applicable Securityholder.  Any such payment shall be made after the expiration of such thirty (30) day period and otherwise concurrently with payment of the balance of the Proposed Payment(s).

**5.      Release of SR Escrow Amounts**.

(a)     During the term of this Agreement, the Securityholders' Representative shall deliver to the Escrow Agent from time to time a notice, which describes in reasonable detail the costs and expenses incurred by the Securityholders' Representative in performing its duties and obligations under the Merger Agreement, and the total amount to be paid to the Securityholders' Representative from the SR Escrow Account (each, an "SR Disbursement Notice").  The Escrow Agent shall release from the SR Escrow Account and pay to the Securityholders' Representative the amount indicated on the SR Disbursement Notice (up to a maximum of the SR Escrow Account).  Such payment shall be made on or before the fifth (5th) Business Day following the date on which such SR Disbursement Notice is received by the Escrow Agent.  The Escrow Agent shall continue to hold any remaining SR Escrow Amount in the SR Escrow Account until the earlier of (i) the SR Escrow Account being fully disbursed, and (ii) the SR Release Date (defined below).

(b)     SR Release Date.  Unless otherwise directed by the Securityholders' Representative, on the later of December 27, 2013 and the date on which the last remaining funds are finally disbursed from the Escrow Account (the "SR Release Date"), the remaining SR Escrow Amount shall be reduced by an amount (the "SR Disbursement Amount") equal to (i) the remaining SR Escrow Amount still held in the SR Escrow Account, if any, less (ii) the amount of any outstanding payments pursuant to an SR Disbursement Notice, if any, as of the SR Release Date.  On the first (1st) Business Day following the SR Release Date, the Escrow Agent shall, subject to the provisions of this Section 5, release the SR Disbursement Amount from the SR Escrow Account and further direct the Paying Agent to disburse such amount to the Securityholders in accordance with Schedule 3 hereof (as it may be adjusted from time to time pursuant to Section 4.4(d)).

**6.      Duties of the Escrow Agent**.

6.1     Duties in General.

(a)     The Escrow Agent undertakes to perform only such duties as are expressly set forth herein (and required by applicable law), which the parties agree are ministerial in nature.  Under no circumstance will the Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Agreement.  If in doubt as to its duties and responsibilities hereunder, the Escrow Agent may consult with legal counsel of its choice and shall be protected in any action taken or omitted in accordance with the advice or opinion of such legal counsel.

(b)     If the Escrow Agent becomes involved in litigation with respect to this Agreement for any reason, it is hereby authorized to deposit the Indemnity Escrow Amount with the clerk of such court in which such litigation is pending, or in the event of any threatened litigation to interplead or implead all interested parties in any court of competent jurisdiction and to deposit with the clerk of such court the Indemnity Escrow Amount.  Upon the happening of either of the above, the Escrow Agent shall be fully relieved and discharged of any further duties hereunder.

(c)     If the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto that, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action, and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise by Joint Payment Instructions or by a final order or judgment of a court of competent jurisdiction.  In addition, if the Escrow Agent should at any time be confronted with inconsistent claims or demands by the parties hereto, the Escrow Agent shall also have the right to interplead or implead such parties in any state or federal court located in the Commonwealth of Massachusetts (or if such court does not have jurisdiction, any other court of competent jurisdiction), to deposit the Indemnity Escrow Amount with the clerk of such court and to request that such court determine the respective rights of the parties under this Agreement, and, upon doing so, the Escrow Agent automatically shall be released from any obligations or liability as a consequence of any claims or demands hereunder.

6.2     Exculpation, etc.

(a)     Except for the Escrow Agent's own willful misconduct or gross negligence or as otherwise expressly set forth herein:  (i) the Escrow Agent shall have no liability of any kind whatsoever for its performance of, or from having refrained from performing, any duties imposed upon the Escrow Agent under this Agreement or for any of its acts or omissions hereunder; (ii) the Escrow Agent shall not be responsible for any of the acts or omissions of the other parties hereto; (iii) the Escrow Agent shall not be liable to anyone for damages, losses or expenses arising out of this Agreement; (iv) the Escrow Agent may rely or act upon any written instrument, document or request believed by the Escrow Agent to be genuine and to be executed and delivered by the proper Person, may assume the authenticity, validity and effectiveness thereof and shall not be obligated to make any investigation or determination as to the truth and accuracy of any information contained therein; and (v) the Escrow Agent shall have no liability of any kind whatsoever for anything done, suffered or omitted by it in accordance with the advice or opinion of legal counsel.  Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(b)     The Escrow Agent shall have no duties except those that are expressly set forth herein, and it shall not be bound by any waiver, modification, amendment, termination or rescission of this Agreement, unless received by it in writing from Parent and the Securityholders' Representative.

(c)     The Escrow Agent may execute any of its powers or responsibilities hereunder and exercise any rights hereunder either directly or by or through its agents or attorneys.  The Escrow Agent shall not be responsible for and shall not be under a duty to examine or pass upon the validity, binding effect, execution or sufficiency of this Agreement or of any agreement amendatory or supplemental hereto.

**7.**     **Indemnity**.  The Securityholders and Parent shall jointly and severally indemnify, defend and hold harmless the Escrow Agent and its directors, officers, agents and employees (the "Indemnitees") from all loss, liability or expense (including the reasonable fees and expenses of legal counsel) arising out

of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, except in the case of any Indemnitee to the extent that such loss, liability or expense is due to the gross negligence or willful misconduct of any Indemnitee or (b) the Escrow Agent following any instructions or other directions from Parent and the Securityholders' Representative.  The parties hereto acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement.  The parties hereby grant the Escrow Agent a lien on, right of set-off against and security interest in the Escrow Account for the payment of any claim for indemnification, compensation, expenses and amounts due hereunder. As between the Securityholders, on the one hand, and Parent, on the other, any such indemnity costs shall be borne 50% by the Securityholders and 50% by Parent, unless otherwise allocated in the Merger Agreement.

8.      **Resignation, Removal or Acquisition of the Escrow Agent**.  The Escrow Agent, and any successor Escrow Agent, may resign at any time as the Escrow Agent hereunder by giving at least thirty (30) calendar days written notice to Parent and the Securityholders' Representative.  In addition, Parent and the Securityholders' Representative may jointly remove the Escrow Agent as escrow agent at any time with or without cause, by an instrument executed by Parent and the Securityholders' Representative given to the Escrow Agent, which instrument shall designate the effective date of such removal.  Upon such resignation or removal and the appointment of a successor Escrow Agent by Parent and the Securityholders' Representative, the resigning or removed Escrow Agent shall be absolved from any further duties as the Escrow Agent hereunder, except as provided below.  Upon such removal or their receipt of notice of resignation from the Escrow Agent, Parent and the Securityholders' Representative shall use their reasonable best efforts jointly to designate a successor Escrow Agent.  If Parent and the Securityholders' Representative do not agree upon a successor Escrow Agent within thirty (30) calendar days after their receipt of the Escrow Agent's resignation notice, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor Escrow Agent or other appropriate relief, and any such resulting appointment shall be binding upon all parties hereto.  Any such successor escrow agent shall deliver to Parent and the Securityholders' Representative a written instrument accepting such appointment, and thereupon it shall succeed to all the rights and duties of the escrow agent hereunder and shall be entitled to receive possession of the Indemnity Escrow Amount.  Upon receipt of the identity of the successor escrow agent, the Escrow Agent shall deliver the Indemnity Escrow Amount, less any fees and expenses due and payable to the Escrow Agent, then held hereunder to the successor escrow agent. In the event of the resignation or removal of the Escrow Agent, the resigning or removed Escrow Agent shall be absolved from any further duties as the Escrow Agent hereunder; provided, however, that the Escrow Agent or any successor escrow agent shall continue to act as the Escrow Agent until a successor is appointed and qualified to act as the Escrow Agent.

Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent may be transferred, shall be the Escrow Agent under this Agreement without further act, and the Escrow Agent shall notify Parent and the Securityholders' Representative of such occurrence.

9.      **Fees and Expenses of the Escrow Agent**.  The fees and the expenses of the Escrow Agent for its services hereunder shall be paid by Parent in accordance with Schedule 2.  The provisions of this Section 9 shall survive any termination of this Agreement and removal or resignation of the Escrow Agent.

10.      **Notices**.  All notices and other communications required or permitted pursuant to this Agreement shall be in writing and either addressed to such party for whom such communication is intended at the applicable address set forth below or (if a facsimile number is provided below) sent by facsimile (subject to electronic confirmation of good facsimile transmission).  Such notice shall be

9

deemed to have been duly given and received (a) with regard to the Escrow Agent, when actually received by the Escrow Agent and (b) with regard to any other party hereto either (i) when delivered personally (which shall include delivery by Federal Express or other nationally recognized, reputable overnight courier service that issues a receipt or other confirmation of delivery) to the party for whom such communication is intended or three (3) Business Days after the date mailed using the U.S. postal system by certified mail, return receipt requested, postage prepaid, or (ii) the day of sending, if sent, by facsimile prior to 5:00 p.m. (Eastern time) on any Business Day or the next succeeding Business Day if sent by facsimile after 5:00 p.m. (Eastern time) on any Business Day or on any day other than a Business Day, as follows:

**If to Parent:**

Mercury Computer Systems, Inc.
201 Riverneck Road
Chelmsford, MA 01824
Attention:       Gerald M. Haines II
Facsimile:       (978) 256-0013

with a copy (which shall not constitute notice hereunder) to:

Bingham McCutchen LLP
One Federal Street
Boston, MA 02110-1726
Attention:       John R. Utzschneider
Facsimile:       (617) 428-6419

**If to the Securityholders' Representative:**

Shareholder Representative Services LLC
601 Montgomery Street
Suite 2020
San Francisco, CA 94111
Attention: Managing Director
Email: deals@shareholderrep.com
Telephone number:  (415) 367-9400
Facsimile number: (415) 962-4147

with a copy (which shall not constitute notice) to:

DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94301-2215
Telephone number: (650) 833-2243
Facsimile number: (650) 687-1200
Attention: Dennis C. Sullivan

**If to the Escrow Agent:**

Wells Fargo Bank, National Association
Sixth and Marquette, MAC N9311-115

Minneapolis, MN 55479
Attention:     Aaron R. Soper
Facsimile:     (612) 667-2149

or to such other address as such party shall specify by written notice to the other parties hereto. Any notice sent to the Escrow Agent shall also be sent to the other parties to this Agreement.

**11.**     **Assignment**.  Parent may only assign its rights and obligations under this Agreement to the same extent it is permitted to assign its rights and obligations under the Merger Agreement; provided, that Parent shall notify Escrow Agent and the Securityholders' Representative fifteen (15) days in advance of any such assignment.  The Securityholders' Representative may not assign any rights and obligations under this Agreement, except to a successor Securityholders' Representative designated in accordance with the Merger Agreement. Subject to the foregoing, this Agreement shall bind, and inure to the benefit of, the parties hereto and their respective heirs, successors and permitted assigns.

**12.**     **Miscellaneous**.

(a)     Entire Agreement.   This Agreement, and as between Parent and the Securityholders' Representative, all applicable sections of the Merger Agreement, constitutes the entire agreement and understanding among the parties concerning the Indemnity Escrow Amount.  As between Parent and the Securityholders' Representative, in the event of any inconsistency between this Agreement and the Merger Agreement, the Merger Agreement shall control.

(b)     Amendments and Waivers.  This Agreement may be amended only by a writing signed by the party against whom enforcement is sought.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.  The headings in this Agreement are intended solely for convenience or reference and shall be given no effect in the construction or interpretation of this Agreement.  This Agreement shall be governed by and construed, and the rights of the parties hereto shall be determined, in accordance with the laws of the Commonwealth of Massachusetts, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof. Each party hereto irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and consents to the jurisdiction of the courts located in the Commonwealth of Massachusetts, and irrevocably consents to service of process by mail or in any other manner permitted by applicable law.  The parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising out of or relating to this Agreement.

(c)     Force Majeure.  The Escrow Agent shall not be liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, floods, strikes, equipment or transmission failure or other causes reasonably beyond its control.

(d)     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and same instrument.  All signatures of the parties to this Agreement may be transmitted by facsimile or PDF, and such facsimile or PDF will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces and will be binding upon such party.

(e)     Compliance with Court Orders.  In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order

11

affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised in writing by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

**[*The remainder of this page is intentionally left blank.*]**

12

To evidence their agreement, the parties have caused this Agreement to be executed on the date first written above.

**MERCURY COMPUTER SYSTEMS, INC.**

By:_____

Name:

Title:

**SECURITYHOLDERS' REPRESENTATIVE:**

**SHAREHOLDER REPRESENTATIVE SERVICES LLC, solely in its capacity as the Securityholders' Representative**

By:_____

Name:

Title: Managing Director

**WELLS FARGO BANK, NATIONAL ASSOCIATION, ESCROW AGENT**

By:_____

Name:

Title:

<u>Schedule 1</u>

**Direction for Investment of Cash Balances**
**Wells Fargo Advantage Funds**

The Escrow Agent is hereby directed to invest, as indicated below or as Parent and the Securityholders' Representative shall direct further from time to time, all cash in the accounts listed above in the following money market portfolio of Wells Fargo Advantage Funds (the "<u>Fund</u>") or another permitted investment selected from the following list by Parent and the Securityholders' Representative from time to time (check one of the following):

    ☑    Wells Fargo Advantage Funds, Government Money Market Fund
    ☐    Wells Fargo Advantage Funds, Cash Investment Money Market Fund
    ☐    Wells Fargo Advantage Funds, Prime Investment Money Market Fund
    ☐    Wells Fargo Advantage Funds, Treasury Plus Money Market Fund
    ☐    Wells Fargo Advantage Funds, Heritage Money Market Fund
    ☐    Wells Fargo Advantage Funds, National Tax-Free Money Market Fund
    ☐    Wells Fargo Advantage Funds, 100% Treasury Fund

Parent and the Securityholders' Representative acknowledge that they have received, at their request, and reviewed the Fund's prospectus and have determined that the Fund is an appropriate investment for the Account.

Parent and the Securityholders' Representative understand from reading the Fund's prospectus that Wells Fargo Funds Management, LLC, ("<u>Wells Fargo Funds Management</u>"), a wholly-owned subsidiary of Wells Fargo & Company, provides investment advisory and other administrative services for the Wells Fargo Advantage Funds.  Other affiliates of Wells Fargo & Company provide sub-advisory and other services for the Funds.  Boston Financial Data Services serves as transfer agent for the Funds.  The Funds are distributed by Wells Fargo Funds Distributor, LLC, Member NASD/SIPC, an affiliate of Wells Fargo & Company.  Parent and the Securityholders' Representative also understand that Wells Fargo & Company will be paid, and its bank affiliates may be paid, fees for services to the Funds and that those fees may include Processing Organization fees as described in the Fund's prospectus.  Parent and the Securityholders' Representative understand that the Escrow Agent will not exclude amounts invested in the Fund from assets in the account(s) listed above that are subject to fees under the Agreement between us.

Parent and the Securityholders' Representative understand that investments in the Fund are not obligations of, or endorsed or guaranteed by, Wells Fargo Bank or its affiliates and are not insured by the Federal Deposit Insurance Corporation.

Parent and the Securityholders' Representative acknowledge that they jointly have full power to direct investments of the account(s) listed above. Parent and the Securityholders' Representative understand that they may change this direction at any time and that it shall continue in effect until revoked or modified by them by written notice to the Escrow Agent.  Parent and the Securityholders' Representative understand that if they choose to communicate this investment direction solely via facsimile, then the investment direction will be understood to be enforceable and binding.

**MERCURY COMPUTER SYSTEMS, INC.**          **SECURITYHOLDERS' REPRESENTATIVE**

**SHAREHOLDER REPRESENTATIVE SERVICES LLC,**
**solely in its capacity as the Securityholders' Representative**

By: _____          By: _____
Name:                                   Name:
Title:                                  Title:  Managing Director

<u>Schedule 2</u>

**Fees and Expenses of Escrow Agent**

**<u>Escrow Agent Acceptance Fee</u>**                                                    **$2,500**


The Acceptance Fee includes review of all related documents and accepting the appointment of Escrow Agent on behalf of Wells Fargo Bank, National Association. The fee also includes setting up the required account(s) and accounting records, document filing, and coordinating the receipt of funds/assets for deposit to the Escrow Account and the SR Account and expenses related thereto.  The Acceptance Fee is due at the time of closing and covers the life of the Escrow.

***Wells Fargo's bid is based on the following assumptions:***

- Number of accounts to be established: (2) Two
- Term: 18 months
- Investment in Wells Fargo Funds


**<u>Out-of Pocket Expenses</u>:**                                                    **At Cost**

<u>Schedule 3</u>

**Securityholders' Pro Rata Escrow Percentage / Payment Instructions**

[*To be provided*]

Exhibit 1

Wells Fargo Bank, National Association
Sixth and Marquette, MAC N9311-115
Minneapolis, MN 55479
Attention:      Aaron R. Soper
Facsimile:      (612) 667-2149

Shareholder Representative Services LLC
601 Montgomery Street
Suite 2020
San Francisco, CA 94111
Attention: Managing Director
Facsimile number: (415) 962-4147

Claim Certificate

Ladies and Gentlemen:

In accordance with Section 4.2 of the Indemnity Escrow Agreement, dated as of December ____ 2011 (the "Escrow Agreement"), by and among Mercury Computer Systems, Inc. ("Parent"), Shareholder Representative Services LLC, as Securityholders' Representative, and Wells Fargo Bank, National Association, as Escrow Agent, we have determined that a Parent Indemnified Person may be entitled to indemnification for an amount pursuant to Article IX or Article X of the Merger Agreement. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Indemnity Escrow Agreement.

The Parent Indemnified Person has paid or properly accrued Losses, or reasonably anticipates that it may or will incur liability for Losses, for which such Parent Indemnified Person is entitled to indemnification pursuant to the Merger Agreement, with respect to the matter identified below.

The current amount of such claim is $ _____.

[*insert description and attach any related notice delivered under* Section 9.03(b) *or* 9.04 *of the Merger Agreement*]

Parent hereby certifies that a copy of this Claim Certificate is being delivered to the Securityholders' Representative concurrently with the delivery to the Escrow Agent.

Pursuant to the terms of the Indemnity Escrow Agreement, if no Objection is received from the Securityholders' Representative within thirty (30) days after receipt, the claim amount shall be delivered as per the following wire payment instructions:

      ABA:
      Name of Bank:
      Account Number:
      Account Name:

Sincerely,

Mercury Computer Systems, Inc.

By:_____
Name:
Title:

cc:     DLA Piper LLP (US)
       2000 University Avenue
       East Palo Alto, CA 94301-2215
       Telephone number: (650) 833-2243
       Facsimile number: (650) 687-1200
       Attention: Dennis C. Sullivan

**Exhibit B to the Agreement and Plan of Merger**

## AGREEMENT OF MERGER

THIS AGREEMENT OF MERGER ("Merger Agreement") is made and entered into as of December __, 2011, by and between **King Merger Inc.** ("Merger Sub"), a California corporation and a wholly-owned subsidiary of **Mercury Computer Systems, Inc.**, a Massachusetts corporation ("Parent"), and **KOR Electronics**, a California corporation (the "Company"). Merger Sub and the Company are sometimes jointly referred to herein as the "Constituent Corporations." Certain capitalized terms used in this Merger Agreement and not defined in Sections 1-12 below, are defined in Section 13 below.

1.      Agreement and Plan of Merger. Parent, Merger Sub, the Company, and Shareholder Representative Services LLC, as representative of the Company's securityholders (the "Securityholders' Representative") have entered into that certain Agreement and Plan of Merger dated as of December 22, 2011 (the "Agreement and Plan of Merger"), which provides, among other things, for the merger of Merger Sub, which is a corporation incorporated under the California Corporations Code ("California Law"), and which is sometimes hereinafter referred to as the "Disappearing Corporation", with and into the Company, which is a corporation incorporated under California Law and which is sometimes hereinafter referred to as the "Surviving Corporation," upon the terms set forth in the Agreement and Plan of Merger and this Merger Agreement (the "Merger").

2.      Effective Time. The Merger shall become effective at such time (the "Effective Time") as this Merger Agreement and officers' certificates of each Constituent Corporation are filed with the Secretary of State of California pursuant to Section 1103 of California Law.

3.      Merger. At the Effective Time, Merger Sub shall be merged with and into the Company and the separate corporate existence of Merger Sub shall cease. The Company shall be the Surviving Corporation in the Merger, and all of the property, rights, privileges and powers of the Company and Merger Sub shall vest in the Surviving Corporation, and all claims, obligations, liabilities, debts and duties of the Company and Merger Sub shall become the claims, obligations, liabilities, debts and duties of the Surviving Corporation and shall continue unaffected and unimpaired by the Merger.

4.      Effects of Merger. The Merger shall have the effects as provided in this Merger Agreement, the Agreement and Plan of Merger and applicable California Law.

5.      Articles of Incorporation; By-Laws; Directors and Officers. At the Effective Time, (i) the Articles of Incorporation of the Company shall be amended and restated in their entirety to read as set forth in Annex A hereto, and such amended and restated Articles of Incorporation shall be the Articles of Incorporation of the Surviving Corporation, (ii) the bylaws of the Surviving Corporation immediately prior to the Merger shall continue to be the bylaws of the Surviving Corporation after the Effective

Time of the Merger until such time as amended in accordance with the bylaws and Articles of Incorporation and (iii) the officers of the Surviving Corporation shall be the officers of the Company, and the directors of the Surviving Corporation shall be those individuals listed in <u>Annex IV</u> to the Agreement and Plan of Merger, each of whom shall serve until their respective successors are duly elected and qualified or their earlier death, resignation or removal.

6.    <u>Treatment of Capital Stock in Merger</u>.  The effect of the Merger on the capital stock of the Constituent Corporations shall be as set forth below:

6.1    <u>Common Stock</u>.    At the Effective Time, each issued and outstanding share of common stock (the "<u>Common Stock</u>") of the Company (the "<u>Common Shares</u>") (i) other than with respect to any Common Shares held by the Company and Dissenting Shares, shall be converted into the right to receive the Per Common Share Initial Merger Consideration (defined herein), in cash, without interest, together with any additional portion of the Deferred Merger Consideration that becomes payable with respect to the Common Stock pursuant to this Agreement or the Escrow Agreement, and (ii) shall be canceled and shall cease to exist.

6.2    <u>Preferred Stock</u>.    At the Effective Time, each issued and outstanding share of Series F Convertible Preferred Stock (the "<u>Preferred Stock</u>") of the Company (i) other than with respect to any shares of Preferred Stock held by the Company and Dissenting Shares, shall be converted into the right to receive the Per Preferred Share Initial Merger Consideration (defined herein), in cash, without interest, together with any additional portion of the Deferred Merger Consideration that becomes payable with respect to the Preferred Stock pursuant to this Agreement or the Escrow Agreement, and (ii) shall be canceled and shall cease to exist.

6.3    <u>Options</u>.  At the Effective Time, each holder of an outstanding vested option to acquire Common Stock (a "<u>Vested Option</u>"), shall become entitled to receive (i) a cash payment in an amount equal to (a) <u>minus</u> (b) where (a) equals (A) the excess of (x) the Per Option Gross Merger Consideration over (y) the exercise price per share of Common Stock subject to such Vested Option, multiplied by (B) the number of shares of Common Stock subject to such Vested Option for which such Option shall not theretofore have been exercised and (b) equals the sum of the Escrow Amount and the SR Escrow Amount <u>multiplied</u> by such optionholder's Pro Rata Escrow Percentage.

6.4    <u>Treasury Shares</u>.    At the Effective Time, each issued and outstanding share of Common Stock and Preferred Stock of the Company, held by the Company as a treasury share immediately prior to the Effective Time, shall be canceled and retired and shall cease to exist, and no payment shall be made with respect thereto.

6.5    <u>Merger Sub Shares</u>.  At the Effective Time, each issued and outstanding share of common stock of Merger Sub, issued and outstanding immediately prior to the Effective Time, shall be converted into one share of common stock of the Surviving Corporation.

6.6    <u>Adjustment to Merger Consideration</u>.    The Total Merger Consideration will be subject to adjustment as set forth below:

(a)      Estimated Closing Balance Sheet and Estimated Closing Statement.  The Company has prepared in good faith and provided to Parent an estimated consolidated balance sheet of the Company as of the close of business on the day immediately preceding the Closing Date (as the same may be adjusted upon agreement of the Company and the Parent in response to comments of Parent and its Representatives provided to the Company prior to the Closing) (the "Estimated Closing Balance Sheet"), together with a written statement setting forth in reasonable detail its good faith estimates of the Closing Debt Amount, Closing Cash Amount and Net Working Capital, each as derived from the Estimated Closing Balance Sheet, and the Company Transaction Expenses (as the same may be adjusted upon the agreement of the Company and Parent in response to comments of Parent and its Representatives provided to the Company prior to the Closing, the "Estimated Closing Statement".  The Estimated Closing Balance Sheet and the Company's good faith estimate of Net Working Capital contained in the Estimated Closing Statement will be prepared in accordance with the Accounting Principles.

(b)      Estimated Closing Date Merger Consideration.  The Total Merger Consideration initially payable pursuant to the procedures set forth in this Agreement and Sections 3.03 and 3.04 of the Agreement and Plan of Merger (the "Estimated Closing Date Merger Consideration") shall be calculated using the estimated Closing Debt Amount, estimated Closing Cash Amount, estimated Company Transaction Expenses and estimated Net Working Capital set forth on the Estimated Closing Statement and shall be reduced by the Escrow Amount and the SR Escrow Amount.

(c)      Proposed Final Closing Balance Sheet and Proposed Final Closing Statement.  As promptly as possible and in any event within sixty (60) calendar days after the Closing Date, the Company shall prepare or cause to be prepared, and will provide to the Securityholders' Representative, a consolidated balance sheet of the Company as of the close of business on the day immediately preceding the Closing Date (the "Proposed Final Closing Balance Sheet"), together with a written statement setting forth in reasonable detail its proposed final determination of the Closing Debt Amount, the Company Transaction Expenses and Net Working Capital (the "Proposed Final Closing Statement").  The Proposed Final Closing Balance Sheet and the determination of Net Working Capital reflected on the Proposed Final Closing Statement will be prepared in accordance with the Accounting Principles.

(d)      Dispute Notice.  The Proposed Final Closing Balance Sheet and the Proposed Final Closing Statement (and the proposed final determinations of the Closing Debt Amount, Closing Cash Amount, the Company Transaction Expenses and Net Working Capital reflected thereon) will be final, conclusive and binding on the parties hereto unless the Securityholders' Representative provides a written notice (a "Working Capital Dispute Notice") to Parent no later than the twentieth (20th) Business Day after the delivery to the Securityholders' Representative of the Proposed Final Closing Balance Sheet and the Proposed Final Closing Statement.  The Securityholders' Representative shall not be entitled to issue a Working Capital Dispute Notice or otherwise dispute any item set forth in the Proposed Final Balance Sheet or proposed Final Closing Statement except on the grounds that such matter was not prepared on the basis set forth in Section 6.6(c) above or contains mathematical errors.  Any Working

Capital Dispute Notice must set forth in reasonable detail (i) any item on the Proposed Final Closing Balance Sheet or the Proposed Final Closing Statement which the Securityholders' Representative believes has not been prepared in accordance with this Agreement and the correct amount of such item and (ii) the Securityholders' Representative's alternative calculation of the Closing Debt Amount, Closing Cash Amount, the Company Transaction Expenses or Net Working Capital, as the case may be. Any item or amount to which no dispute is raised in the Working Capital Dispute Notice will be final, conclusive and binding on the parties on such twentieth (20th) Business Day.

(e)     Resolution of Disputes.     Parent and the Securityholder's Representative will attempt to promptly resolve the matters raised in any Working Capital Dispute Notice in good faith. Beginning ten (10) Business Days after delivery of any Working Capital Dispute Notice pursuant to paragraph (d) above, either Parent or the Securityholders' Representative may provide written notice to the other that it elects to submit the disputed items to Ernst & Young LLP's Boston office (the "Accounting Firm"). The Accounting Firm will promptly, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, review only those unresolved items and amounts specifically set forth and objected to in the Working Capital Dispute Notice and resolve the dispute with respect to each such specific unresolved item and amount in accordance with this Agreement. The Accounting Firm shall be instructed in writing by the Parent and the Securityholders' Representative that the Accounting Firm must accept the Proposed Final Balance Sheet and Proposed Final Closing Statement except to the extent that any item is not calculated in accordance with Section 6.6(c) above or reflects mathematical errors. In any such case, a single partner of the Accounting Firm selected by such Accounting Firm in accordance with its normal procedures and having expertise with respect to settlement of such disputes shall act for the Accounting Firm in the determination proceeding, and the Accounting Firm shall render a written decision as to each disputed matter, including a statement in reasonable detail of the basis for its decision. In no event shall the decision of the Accounting Firm (i) provide for a calculation of Net Working Capital that is less than the calculation thereof shown in the Proposed Final Closing Statement or greater than the Securityholders' Representatives' alternative calculation thereof shown in the Working Capital Dispute Notice or (ii) provide for a determination of any item of Debt reflected in the Closing Debt Amount or any Company Transaction Expense that is greater in amount than the amount thereof shown in the Proposed Final Closing Statement or less in amount than the Securityholders' Representatives' alternative calculation thereof shown in the Working Capital Dispute Notice. The fees and expenses of the Accounting Firm shall be borne equally by the Securityholders and the Company. The decision of the Accounting Firm with respect to the disputed items of the Proposed Final Closing Balance Sheet and the Proposed Final Closing Statement submitted to it will be final, conclusive and binding on the parties. As used herein, the Proposed Final Closing Balance Sheet and the Proposed Final Closing Statement, as adjusted to reflect any changes agreed to by the parties and any decision of the Accounting Firm, in each case, pursuant to this Section 6.6, are referred to herein as the "Final Closing Balance Sheet" and the "Final Closing Statement", respectively.

(f)     Working Capital Adjustment.  If any of the Net Working Capital, the Closing Debt Amount or the Company Transaction Expenses (as finally determined pursuant to this Section 6.6 and as set forth in the Final Closing Balance Sheet and the Final Closing Statement) differs from the estimated amounts thereof set forth in the Estimated Closing Statement, the Total Merger Consideration shall be recalculated using such final figures in lieu of such estimated figures, and (i) the Company shall pay to each former holder of Common Shares (other than Dissenting Shares) and each former holder of Vested Options by wire transfer of immediately available funds its Pro Rata Common/Option Payment Percentage of the amount, if any, by which such re-calculated final Total Merger Consideration exceeds the estimated Total Merger Consideration calculated on the Estimated Closing Statement or (ii) the amount, if any, by which such estimated Total Merger Consideration calculated on the Estimated Closing Statement exceeds such re-calculated final Total Merger Consideration shall be paid to Parent from the Escrow Amount.

(g)     Payments.  Any payment due pursuant to Section 6.6(f) above shall be made within five (5) calendar days after the final amount thereof has been determined in accordance with this Section 6.6.

7.     Escrow.

(a)     Escrow Deposit.  At the Closing, Parent shall cause the Escrow Amount and the SR Escrow Amount to be deposited into escrow (the "Escrow") with Wells Fargo Bank, National Association (the "Escrow Agent") in accordance with and subject to the provisions of an escrow agreement to be entered into by and among Parent, Merger Sub, the Securityholders' Representative and the Escrow Agent (the "Escrow Agreement").  The Escrow Amount and the SR Escrow Amount shall be deemed to have been contributed only by the Securityholders and the portion of the Escrow Amount and the SR Escrow Amount contributed on behalf of each Securityholder shall be such Securityholder's Pro Rata Escrow Percentage.

(b)     Release of Escrow.  The Escrow Amount and the SR Escrow Amount shall be released from Escrow to the Securityholders and the Securityholders' Representative, as applicable, in accordance with the Escrow Agreement, subject to the provisions of Article IX and Article X of the Agreement and Plan of Merger and Section 4.2 of the Escrow Agreement, relating to claims for indemnification.

8.     Dissenters' Rights.

(a)     Dissenters' Rights.  Notwithstanding anything in this Agreement to the contrary, Shares that are issued and outstanding immediately prior to the Effective Time, and are held by holders of Shares that have not voted in favor of the Merger or consented thereto in writing and are entitled to demand and have demanded properly in writing appraisal for such Shares in accordance with Chapter 13 of California Law or any successor provision (such shares, the "Dissenting Shares"), shall not be converted into or represent the right to receive such holder's portion of the Total Merger Consideration as described in Section 6.1 or Section 6.2, but shall, by virtue of the Merger, be entitled to only such rights as are granted by Chapter 13 of California Law; provided that if any such

holder thereafter shall have failed to perfect or shall have effectively withdrawn or lost such holder's right to appraisal and payment under California Law, such holder's Shares shall be deemed to have been converted at the Effective Time into the right to receive such holder's portion of the Total Merger Consideration as described in, and subject to the surrender and delivery requirements set forth in the Agreement and Plan of Merger.

(b)     Notice.  The Company shall give Parent (i) prompt notice of any written demands received by the Company for appraisal of the Shares and withdrawals of such demands and (ii) the opportunity to participate in all negotiations and proceedings in respect of appraisal under California Law.  The Company shall not, except with the prior written consent of Parent, or as required by applicable legal requirements, make any payment with respect to any demands for appraisal or offer to settle or settle any such demand.

9.     Authorization of Board of Directors and Officers.  The Board of Directors and the proper officers of the Disappearing Corporation and the Surviving Corporation, respectively, are hereby authorized, empowered and directed to do any and all acts and things, and to make, execute, deliver, file and/or record any and all instruments, papers and documents which shall be or become necessary, proper or convenient to carry out or put into effect any of the provisions of this Merger Agreement herein provided for.

10.     Governing Law.  This Merger Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of California, without giving effect to principles of conflicts of law.

11.     Counterparts.  This Merger Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

12.     No Third-Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their successors and permitted assignees and nothing herein expressed or implied will give or be construed to give any Person, other than the parties hereto and such successors and permitted assignees, any other right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

13.     Definitions.   Defined terms as used in this Merger Agreement, the following terms have the following meanings:

"Accounting Principles" means GAAP as in effect on November 30, 2011 applied on a basis consistent with the methodology used to prepare the Net Working Capital Calculation Schedule.

"Ancillary Agreements" means the Escrow Agreement, the Option Cancellation Acknowledgements, the Letter of Transmittal, the Non-Competition Agreements and the Principal Shareholders Agreements referred to in the Agreement and Plan of Merger and each of the other agreements, certificates,

instruments and documents to be executed and delivered by the parties in connection with the Contemplated Transactions.

"Appraisal Costs" means any costs incurred by the Company before or after the Effective Time in connection with any Dissenting Shares pursuant to the Agreement and Plan of Merger, including payments required to be made to holders of Dissenting Shares and legal fees, but only to the extent that (i) such payments exceed the Merger Consideration that would otherwise have been payable to such holders in the Merger had their Shares not been Dissenting Shares and (ii) such fees and expenses are not paid by the Company prior to the Effective Time.

"Business Day" means any day other than a Saturday or a Sunday or a weekday on which banks in Boston, Massachusetts are authorized or required to be closed.

"Change of Control Payment" means (a) any bonus, severance or other payment or other form of Compensation that is created, accelerated, accrues or becomes payable by the Company to any present or former director, stockholder, employee or consultant thereof, including pursuant to any employment agreement, benefit plan or any other Contractual Obligation, including any Taxes payable on or triggered by any such payment (other than payments in respect of the Shares and Options under or as described in Section 6 of this Merger Agreement, including payments in respect of Vested Options that have been accelerated in connection with the Contemplated Transactions in accordance with the Agreement and Plan of Merger), to the extent the Company or any Subsidiary is responsible for the payment or reimbursement of any such Taxes and (b) without duplication of any other amounts included within the definition of Company Transaction Expenses, any other payment, expense or fee that accrues or becomes payable by the Company to any Governmental Authority or other Person under any Legal Requirement or Contractual Obligation, including in connection with the making of any filings, the giving of any notices or the obtaining of any consents, authorizations or approvals, in the case of each of (a) and (b), as a result of, or in connection with, the execution and delivery of the Agreement and Plan of Merger or any Ancillary Agreement or the consummation of the Contemplated Transactions.

"Closing" means the closing of the transactions contemplated by the Agreement and Plan of Merger.

"Closing Cash Amount" means the amount of cash and cash equivalents held by the Company and the Company's Subsidiaries, net of outstanding checks, as of the close of business on the day immediately preceding the Closing Date.

"Closing Date" means the date on which the Closing actually occurs.

"Closing Debt Amount" means the amount of Debt of the Company as of the Closing Date immediately prior to the Closing.

"Company Transaction Expenses" means all costs, fees and expenses incurred in connection with or in anticipation of the negotiation, execution and delivery of the Agreement and Plan of Merger and the Ancillary Agreements or the consummation of the Contemplated Transactions to the extent such costs, fees and expenses are payable or reimbursable by the Company, including, (i) all fees and expenses of Pagemill Partners and all other brokerage fees, commissions, finders' fees or financial advisory fees, (ii) the fees and expenses of DLA Piper LLP (US) and Mayer Hoffman McCann P.C. and all other fees and expenses of legal counsel, accountants, consultants and other experts and advisors so incurred, (iii) all Change of Control Payments, (iv) the cost of any D&O coverage obtained pursuant to Section 6.09 of the Agreement and Plan of Merger; (v) all Appraisal Costs and (iv) without duplication of any Appraisal Costs, to the extent not covered by the insurance referred to in Section 6.09(b) of the Agreement and Plan of Merger all other costs and expenses incurred by the Company or any Subsidiary in connection with any claim asserted by any Securityholders in connection with the Contemplated Transactions (other than a claim for payment of amounts due under Article III of the Agreement and Plan of Merger or the Escrow Agreement).  Company Transaction Expenses will not include the fees of the Escrow Agent pursuant to the Escrow Agreement or the Paying Agent pursuant to the Paying Agent Agreement (as defined in the Agreement and Plan of Merger).

"Compensation" means, with respect to any Person, all salaries, compensation, remuneration, bonuses or benefits of any kind or character whatsoever (including issuances or grants of Equity Interests), made directly or indirectly by the Company or any of its Subsidiaries to or for the benefit of such Person or any Family Member of such Person.

"Contemplated Transactions" means the transactions contemplated by the Agreement and Plan of Merger, including (a) the Merger, (b) the cancellation of the Options and the making of the Option Payments, (c) the execution, delivery and performance of the Ancillary Agreements, and (d) the payment of fees and expenses relating to such transactions.

"Contractual Obligation" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, sublease, license, sublicense or other commitment, promise, undertaking, obligation, arrangement, instrument or understanding, whether written or oral, to which or by which such Person is a party or otherwise subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Debt" means, with respect to any Person, and without duplication, all Liabilities of such Person (a) for borrowed money (including amounts outstanding under overdraft facilities, and all principal, accrued interest, penalties, fees and

premiums), (b) evidenced by notes, bonds, debentures or other similar Contractual Obligations, (c) in respect of "earn-out" obligations and other obligations for the deferred purchase price of property, goods or services (other than trade payables or accruals incurred in the Ordinary Course of Business), (d) for the capitalized liability under all capital leases of such Person (determined in accordance with GAAP), (e) in respect of letters of credit and bankers' acceptances, (f) for Contractual Obligations relating to interest rate protection, swap agreements and collar agreements, in each case, to the extent payable if such Contractual Obligation is terminated at the Closing, and (g) in the nature of Guarantees of the obligations described in clauses (a) through (f) above of any other Person.

"Deferred Merger Consideration" means any additional consideration payable with respect to the Shares and Vested Options pursuant to Section 6.6 of this Agreement or pursuant to the Escrow Agreement.

"Equity Interests" means, with respect to any Person, (a) any capital stock, partnership or membership interest, unit of participation or other similar interest (however designated) in such Person and (b) any option, warrant, purchase right, conversion right, exchange right or other Contractual Obligation which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"Escrow Amount" means $10,500,000.

"Family Member" means, with respect to any individual, (a) such Person's spouse, (b) each parent, brother, sister or child of such Person or such Person's spouse, (c) the spouse of any Person described in clause (b) above, (d) each child of any Person described in clauses (a), (b) or (c) above, (e) each trust created for the benefit of one or more of the Persons described in clauses (a) through (d) above and (f) each custodian or guardian of any property of one or more of the Persons described in clauses (a) through (e) above in his or her capacity as such custodian or guardian.

"Fully-Diluted Common Share Number" means the total number of issued and outstanding shares of Common Stock immediately prior to the Effective Time calculated on a fully-diluted basis assuming the exercise in full of all Vested Options that are outstanding at such time, but without giving effect to any potential conversion of the Preferred Stock.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Authority" means any United States federal, state, local, municipal or any foreign government, or political subdivision thereof, regulatory, self-regulatory, or any multinational organization or authority, or any other

authority, agency, bureau, board, court, department, tribunal, instrumentality or commission thereof entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal, or any arbitrator or arbitral body.

"Liability" means, with respect to any Person, any liability or obligation of such Person whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether directly incurred or consequential, whether due or to become due and whether or not required under GAAP to be accrued on the financial statements of such Person.

"Merger Consideration" means the Per Common Share Initial Merger Consideration or Per Preferred Share Initial Merger Consideration, as applicable, plus any Deferred Merger Consideration.

"Net Working Capital" means the remainder of (a) the current assets of the Company reflected in the line items included in the Net Working Capital Calculation Schedule, but excluding cash and cash equivalents, minus (b) the current liabilities of the Company reflected in the line items included in the Net Working Capital Calculation Schedule, in each case, calculated as of the close of business on the day immediately preceding the Closing Date in accordance with the Accounting Principles; provided, that Net Working Capital shall not take into account any amounts in respect of Tax assets or Tax liabilities, the current portions of any amounts reflected in the Closing Debt Amount or any accrued liabilities that constitute Company Transaction Expenses.

"Net Working Capital Adjustment Amount" means the difference between (a) the amount of the Net Working Capital as finally determined pursuant to Section 6.6 and (b) the Net Working Capital Target.

"Net Working Capital Calculation Schedule" means the calculation of Net Working Capital attached to the Agreement and Plan of Merger.

"Net Working Capital Target" means $5,314,000.

"Option Payments" means the amount to be paid to any holder of Vested Options pursuant to Section 6.3 and the Escrow Agreement.

"Per Common Share Initial Merger Consideration" means the quotient obtained by dividing (a) the sum of the Total Common/Option Merger Consideration plus the aggregate exercise price of all Vested Options less $8,621,428.57 by (b) the Fully-Diluted Common Share Number.

"Per Option Gross Merger Consideration" means the quotient obtained by dividing (a) the Total Common/Option Merger Consideration by (b) the Fully-Diluted Common Share Number.

"Per Preferred Share Initial Merger Consideration" means an amount equal to (i) the Total Preferred Merger Consideration less $2,028,571.43 divided by (ii) the total number of shares of Preferred Stock outstanding immediately prior to the Effective Time.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Pro Rata Common/Option Payment Percentage" means, as to any holder of Common Shares or Vested Options, a fraction (expressed as a percentage) (i) the numerator of which is the total number of Common Shares held by such holder plus the total number of Common Shares subject to Vested Options held by such holder, immediately prior to the Effective Time, and (ii) the denominator of which is the Fully Diluted Common Share Number.

"Pro Rata Escrow Percentage" means:

(i)      with respect to any former holder of Preferred Stock, a fraction (expressed as a percentage) equal to (A) times (B), where (A) equals 2/10.5 and (B) equals a fraction, (x) the numerator of which is the total amount of Total Preferred Merger Consideration paid to such Securityholder as a holder of Preferred Stock pursuant to Section 6.2 above and (y) the denominator of which is the Total Preferred Merger Consideration paid to all holders of Preferred Stock pursuant to Section 6.2 above; and

(ii)      with respect to any former holder of Common Stock or Vested Options, a fraction (expressed as a percentage) equal to (A) times (B), where (A) equals 8.5/10.5 and (B) equals a fraction, (x) the numerator of which is the total amount of Total Common/Option Merger Consideration paid to such Securityholder as a holder of Common Stock and the total Option Payments paid to such Securityholder as a holder of Vested Options, pursuant to Sections 6.1 and 6.3 above and (y) the denominator of which is the total payments to holders of Common Stock and Vested Options pursuant to Sections 6.1 and 6.3 above.

"Representative" means, with respect to any Person, any director, officer, employee, agent, manager, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Securityholders" means the holders of Shares and Vested Options.

"Shares" means the issued and outstanding shares of Common Stock and Preferred Stock.

"SR Escrow Amount" equals $150,000.

"Subsidiary" means, with respect to any specified Person, any other Person of which such specified Person, directly or indirectly through one or more Subsidiaries, (a) owns at least 50% of the outstanding Equity Interests entitled to

vote generally in the election of the Board of Directors or similar governing body of such other Person, or (b) has the power to generally direct the business and policies of that other Person, whether by contract or as a general partner, managing member, manager, joint venturer, agent or otherwise.

"Tax" or "Taxes" means any and all federal, state, local, or foreign taxes, charges, fees, levies or other assessments, including income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, escheat, withholding, social security (or similar, including FICA), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Total Common/Option Merger Consideration" means the Total Merger Consideration less the Total Preferred Merger Consideration.

"Total Merger Consideration" is equal to:

(A)     $70,000,000 U.S. dollars;

(B)     less the Closing Debt Amount;

(C)     less the amount of any Company Transaction Expenses not otherwise paid prior to the Closing Date and prior to the calculation of Net Working Capital;

(D)     plus the Closing Cash Amount;

(E)     plus the Net Working Capital Adjustment Amount (if Net Working Capital is greater than the Net Working Capital Target); or

less the Net Working Capital Adjustment Amount (if Net Working Capital is less than the Net Working Capital Target).

"Total Preferred Merger Consideration" means an amount equal to $6.9371 multiplied by the number of shares of Preferred Stock outstanding immediately prior to the Effective Time.

"Vested Options" means any Options that, at the Effective Time and after giving effect to any acceleration of vesting made by the Board of Directors of the Company, are presently exercisable for shares of Common Stock.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

**KOR Electronics**

By:_____
Name: Kevin Carnino
Title: President and Chief Executive Officer

By:_____
Name: Christopher Lewis
Title: Secretary

**King Merger Inc.**

By:_____
Name: Mark Aslett
Title: President

By:_____
Name: Gerald M. Haines II
Title: Secretary

## Annex A

**AMENDED AND RESTATED**

**ARTICLES OF INCORPORATION**

**OF**

**KOR ELECTRONICS**

### ARTICLE I

The name of the Corporation is:  KOR Electronics.

### ARTICLE II

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

### ARTICLE III

The Corporation is authorized to issue one class of shares designated as "Common Stock."  The aggregate number of shares of Common Stock which the Corporation is authorized to issue is One Thousand (1,000).

### ARTICLE IV

The liability of the directors of the Corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

### ARTICLE V

The Corporation is authorized to provide indemnification of agents (as defined in §317 of the California Corporations Code) through bylaw provisions, agreements with agents, vote of shareholders or disinterested directors, or otherwise, to the fullest extent permissible under California law.

Exhibit C to the Agreement and Plan of Merger

# LETTER OF TRANSMITTAL

### For the Surrender of Shares of Capital Stock of KOR Electronics for Cash

Mercury Computer Systems ("Parent"), King Merger Inc. ("Merger Sub"), KOR Electronics (the "Company") and Shareholder Representative Services LLC, solely in its capacity as the Securityholders' Representative, entered into an Agreement and Plan of Merger, dated as of December 21, 2011 (as amended, restated or supplemented from time to time, the "Merger Agreement"), pursuant to which, subject to the satisfaction of the conditions in the Merger Agreement, Merger Sub will merge with and into the Company with the Company continuing as the surviving corporation (the "Merger").  Upon consummation of the Merger, the Company will become a wholly-owned subsidiary of Parent.  The registered holder of shares of capital stock of the Company represented by the stock certificate(s) enclosed with this Letter of Transmittal hereby surrenders the enclosed certificate(s) listed below (or affidavit of lost security and indemnity agreement, if applicable) for a closing payment, following the Merger, determined in accordance with the Merger Agreement.  Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to them in the Merger Agreement.

**All shareholders must complete Boxes A, B, and G. Please also read the "General Instructions" on page 6.**

| BOX A – Signature of Registered Shareholders *Note: by signing this Letter of Transmittal and accepting payment for your shares of Common Stock or Preferred Stock, you are agreeing to the representations, warranties and covenants attached to this Letter of Transmittal.* | | BOX B – Certificate(s) Enclosed | |
|---|---|---|---|
| *(Must be signed by all registered shareholders; include legal capacity if signing on behalf of an entity)* | Certificate Number(s) (Attach additional signed list, if | Indicate whether Common Stock or Series F Preferred Stock | Number of Shares Represented by Each Certificate |
| | | | |
| Signature(s) of registered shareholder (provide capacity if applicable) | | | |
| | | | |
| Telephone Number: | Total Shares | | |

☐ **Lost Certificates. I have lost my certificate(s) for _____ shares and require assistance in replacing the shares. By checking this Box, I agree I have read Box B "Certificate Detail" under General Instructions and agree to the terms therein.**

| BOX C – New Registration Instructions | BOX D – One Time Delivery Instructions |
|---|---|
| To be completed *ONLY* if the check is to be issued in the name(s) of someone other than the registered holder(s) in Box E. ISSUE TO: | To be completed *ONLY* if the check is to delivered to an address other than that listed in Box E. MAIL TO: |
| | |
| **Name** | **Name** |
| **Street Address** | **Street Address** |
| **City, State and Zip Code** | **City, State and Zip Code** |

☐ **Please remember to complete and sign the Substitute Form W-9 in Box G on the next page or, if applicable, the enclosed W-8BEN form.**

| BOX E – Name and Address of Registered Shareholder(s) | BOX F – Medallion Guarantee |
|---|---|
| Please make any address corrections below | If you have completed Box C or all registered holders are not listed on the bank account provided in Box H (if you elected a wire payment), your signature must be *Medallion Guaranteed* by an eligible financial institution. |

☐ indicates permanent address change

**Note: A notarization by a notary public is not acceptable**

<u>Shareholder Representations, Warranties and Agreements</u>

Note: by signing this Letter of Transmittal and accepting payment for your shares of Common Stock and/or Preferred Stock, you are agreeing to the representations, warranties and covenants set forth below in this Letter of Transmittal.  Defined terms used below if not defined in this Letter of Transmittal have the meaning given them in the Merger Agreement.

<u>Risk of Loss</u>.   The undersigned Shareholder acknowledges and agrees that the delivery will be effected, and the risk of loss and title to its certificates representing the outstanding shares of the Company Common Stock and/or Company Preferred Stock, as the case may be, will pass only upon delivery of such certificates to Wells Fargo Bank, National association or if such certificates are lost, any documentation reasonably required by the Paying Agent to replace such certificates (See "**BOX B-CERTIFICATE DETAIL/LOST CERTIFICATES**" under the **General Instructions** below).

<u>Beneficial Ownership</u>.   The undersigned Shareholder represents and warrants that it is currently, and at the Effective Time of the Merger it was, the sole record and beneficial owner of the Shares of the Company Common Stock or Company Preferred Stock accompanying this Letter of Transmittal, or, if such Shareholder is a joint owner, has good title to such Shares, and currently has, and at the Effective Time of the Merger had, the requisite power and authority to sell, assign and transfer such Shares free and clear of all liens, claims and encumbrances, and receive Merger Consideration for such Shares as contemplated by the Merger Agreement.

<u>Securityholders' Representative</u>.   The undersigned Shareholder hereby (A) appoints Shareholder Representative Services LLC as the Securityholders' Representative and attorney-in-fact and agent with the power and authority to act on its behalf and (B) approves the provisions contained in <u>Section 12.04</u> of the Merger Agreement, including, among other things, authorizing Shareholder Representative Services LLC to enter into an escrow agreement on its behalf with Parent and Wells Fargo Bank, N.A., as Escrow Agent, pursuant to which a portion of the Merger Consideration to which such Shareholder may become entitled will be deposited with the Escrow Agent to cover certain indemnification obligations as provided in <u>Article IX</u> of the Merger Agreement and to fund expenses of the Securityholders' Representative;

<u>Escrow and Indemnification</u>.   **The undersigned Shareholder agrees to be bound by the provisions of the Merger Agreement, including the escrow and indemnification provisions set forth therein and in the Escrow Agreement pursuant to which, among other things, such Shareholder could be liable (i) up to the full amount of its pro rata interest in the Escrow Amount, pursuant to the indemnification provisions of the Merger Agreement, (ii) up to the full amount of his/her share of the Merger Consideration for certain specified indemnification obligations, as set forth in the Merger Agreement, and (iii) for amounts in excess of such amount for breaches of any Ancillary Agreements (as defined in the Merger Agreement) to which it is a party.**

<u>Closing Payment; Certificates</u>.   The undersigned Shareholder acknowledges that the Paying Agent will not deliver a closing payment to it unless the Merger occurs and only after such Shareholder delivers to the Paying Agent certificates representing any Shares covered by this Letter of Transmittal (or if such certificates are lost, any documentation reasonably required by the Paying Agent to replace such certificates (See "**BOX B-CERTIFICATE DETAIL/LOST CERTIFICATES**" under the **General Instructions** below), this Letter of Transmittal is executed by such Shareholder, and the Form W-9 or W-8 and any other document required to be delivered in accordance with this Letter of Transmittal or the Merger Agreement is delivered.  The undersigned Shareholder acknowledges that the Paying Agent may withhold certain amounts from its closing payment either that (i) such Shareholder owes the Company pursuant to the Merger Agreement or (ii) may be required to be withheld by applicable law.  In addition, the Paying Agent shall withhold amounts from its closing payment to the Shareholder if the Company delivers to the Paying Agent either (i) a court order prohibiting such payment or directing that such payment be made to the Company or (ii) a court judgment against such Shareholder in favor of the Company or any third party through whom the Company claims an interest, relating to any of the Specified Indemnity Matters and in an amount equal to or greater than the proposed amount of the payment to the Shareholder to be withheld.

3

Release by Shareholder.   The undersigned Shareholder agrees to release and forever discharge the Company, Parent, Merger Sub, the Securityholders' Representative and their respective Affiliates, stockholders, agents, directors, officers, assigns, predecessors and successors (collectively, the "Released Parties") from any and all legal, equitable or other claims, whether known or unknown, suspected or unsuspected, that such Shareholder or any Affiliate controlled by the undersigned Shareholder has any right to acquire (by purchase or otherwise) any Equity Interest in Parent, Merger Sub or the Surviving Corporation, or any subsidiary of the foregoing, (a "Shareholder Claim"), including claims (a) based on breach of duty, tort, contract (express or implied), or relief or rights under any federal, state or local law, statute or regulation or pursuant to any organizational documents of the Company, (b) at law or in equity, or (c) based in any other way upon any act or omission on the part of the Released Parties and derivative rights that such Shareholder had or now has, or that such Shareholder may hereafter have against any Released Party by reason of any event, transaction, conduct, occurrence, relationship or cause whatsoever occurring on or prior to the date of this Letter of Transmittal, in each case with respect to all of the foregoing, only to the extent it relates to a Shareholder Claim.   The foregoing Release shall not (i) relieve any of the Released Parties of their respective obligations or liabilities under the Merger Agreement, the transactions contemplated thereby, or the other documents executed in connection with the transactions contemplated thereby, (ii) relieve the Company of any indemnification obligations of the Company to the undersigned, if such person is a current or former director or officer of the Company pursuant to the Company's charter or bylaws, or (iii) be deemed to constitute a waiver of the availability of insurance to cover claims not covered by the release.

The undersigned Shareholder acknowledges that it has read section 1542 of the Civil Code of the State of California, which states in full:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

The undersigned Shareholder waives any rights that it has or may have under section 1542 (or any similar provision of the laws of any other jurisdiction) to the full extent that it may lawfully waive such rights pertaining to this release of claims, and affirms that such Shareholder is releasing all known and unknown claims that it may have against the Released Parties for any Shareholder Claims.

Access to Information.  The undersigned Shareholder acknowledges that it has received a copy of the Merger Agreement and the Company's written solicitation of such Shareholder's approval and adoption of the Merger Agreement and the Contemplated Transactions by written consent as provided by the CGCL and the Company's Organizational Documents, and has had a full opportunity to review these documents and ask the Company and its Representatives any questions the undersigned may have regarding the Merger Agreement or this Letter of Transmittal.

| BOX G – Request for Taxpayer Identification Number and Certification – Substitute Form W-9 | |
|---|---|
| Certification: Under penalties of perjury, I certify that:<br><br>1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and<br><br>2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and<br><br>3. I am a U.S. citizen or other U.S. person (as defined in the instructions below) | Social Security Number<br><br>☐☐☐ - ☐☐ - ☐☐☐☐<br><br>Employer Identification Number<br><br>☐☐ / ☐☐☐☐☐☐☐ |

Notification of Backup Withholding

____ I have been notified by the Internal Revenue Service (IRS) that I am currently subject to backup withholding as a result of a failure to report all interest and dividends on my tax return. I understand that marking this box will result in backup withholding on any disbursements made to this account. You must also cross out item 2 above. "The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding."

Required: Check appropriate box for federal tax classification:

☐ Individual/sole proprietor   ☐ C Corporation   ☐ S Corporation   ☐ Partnership Trust/estate

☐ Limited liability company.  Enter tax classification (C=C corporation, S=S corporation, P=partnership): _____

Signature: _____   Date: _____

**NOTICE TO NON-RESIDENT ALIEN INDIVIDUALS OR FOREIGN PERSONS (e.g. foreign corporation, partnership or trusts):** ***DO NOT COMPLETE THE ABOVE SUBSTITUTE FORM W-9.* COMPLETE THE ENCLOSED FORM W-8BEN, OR OBTAIN ONE AT www.irs.gov OR CALL 877-262-8260 FOR COPY OF FORM W-8BEN. COMPLETE AND RETURN THE FORM W-8BEN CERTIFICATION OF FOREIGN STATUS. FAILURE TO DO SO WILL SUBJECT YOU TO FEDERAL BACKUP WITHHOLDING AT THE CURRENT APPLICABLE RATE.**

| BOX H – Optional Bank Wire Instructions | |
|---|---|
| **NOTE:** This wire request is optional. A wire fee of $50.00 per account will be deducted from the proceeds. If you do not complete the information below, a check for the proceeds will be delivered to you at the address as it appears on the front of this Letter of transmittal. If the name on the bank account does not match the registration or does not include all registered holders, a medallion guarantee is required in Box F. If you complete Box H and any of the information is incomplete, illegible or otherwise deficient, you will receive a check for your proceeds. In connection to the above referenced merger, please wire the entitled funds as follows: | |
| **ABA Routing Number** | |
| **Bank Name** | |
| **Bank Address** | |
| **Name on Bank Account** | |
| **Account Number (DDA)** | |
| **SWIFT / IBAN (if applicable)** | |
| **For Further Credit Acct #** | |
| **For Further Credit Acct Name** | |

**By completion of Box H, the registered stockholder hereby agrees that the above wire instructions are true and correct and by endorsing this Letter of Transmittal the person authorized to act on behalf of this account is directing Wells Fargo as paying agent to make payment of the merger consideration represented by this Letter of Transmittal to the bank account listed above.**

5

# General Instructions

### *Please read this information carefully.*

- **BOX A-Signatures:** All registered shareholders must sign as indicated in Box A. If you are signing on behalf of a registered shareholder or entity your signature must include your legal capacity.

  **YOUR GUARANTOR (BANK/BROKER) WILL REQUIRE PROOF OF YOUR AUTHORITY TO ACT. CONSULT YOUR GUARANTOR FOR THEIR SPECIFIC REQUIREMENTS. YOU OR YOUR GUARANTOR MAY ACCESS THE SECURITIES TRANSFER ASSOCIATION (STA) RECOMMENDED REQUIREMENTS ON-LINE AT www.stai.org.**

- **BOX B-Certificate Detail:** List all certificate numbers and shares submitted in Box B. Any book-entry shares held by you will be automatically exchanged upon receipt of this properly completed Letter of Transmittal. If your certificate(s) are lost, please check the appropriate box below Box A, complete the Letter of Transmittal and return the Letter of Transmittal to Wells Fargo Shareowner Services. You will be contacted if a premium to obtain a bond of indemnity and/or additional documents are required to replace lost certificates. A one-time $50.00 fee will be deducted from your merger consideration payment for processing of Lost Certificates.

- **BOX C-New Registration:** Provide the new registration instructions (name and address) in Box C. Complete Box G to certify tax identification number for new registration of U.S. citizen, resident or entity.  Signature must be that of the new registration indicated.  See notice to non-resident aliens above.  All changes in registration require a Medallion Signature Guarantee. Joint registrations must include the form of tenancy. Custodial registrations must include the name of the Custodian (only one). Trust account registrations must include the names of all current acting trustees and the date of the trust agreement. If this transaction results in proceeds at or above $14,000,000.00 in value please contact Wells Fargo Shareowner Services at the number listed below.

- **BOX D-One Time Delivery:** Any address shown in Box D will be treated as a one-time only mailing instruction.

- **BOX E-Current Name and Address of Registered Shareholder:** If your permanent address should be changed on Wells Fargo Shareowner Services records, please make the necessary changes in Box E.

- **BOX F-Signature Guarantee:** Box F (*Medallion* Guarantee) only needs to be completed if the name on the check or bank account names are or will be different from the current registration shown in Box E. This guarantee is a form of signature verification which can be obtained through an eligible financial institution such as a commercial bank, trust company, securities broker/dealer, credit union or savings institution participating in a Medallion program approved by the Securities Transfer Association.

- **BOX G-Request for Taxpayer Identification Number and Certification - Substitute Form W-9:** Complete Box G for registration of U.S. citizen,resident or entity to certify tax identification number. Please provide the social security or employer identification number of the person or entity receiving payment, including signature and date for the above described shares. Completion of the Substitute Form W-9 certifies that receiver of the payment is not subject to backup withholding. Failure to complete the form will subject the recipient to the applicable federal income tax withholding from any cash payment made to them pursuant to the exchange.

- **Definition of U.S. Person:** For federal tax purposes, you are considered a U.S. person if you are (1) An individual who is a U.S. citizen or U.S. resident alien, (2) A partnership, corporation, company or association created or organized in the United States or under the laws of the United States, (3) An estate (other than a foreign estate), or (4) A domestic trust (as defined in regulation 301.7701-7).

- **BOX H – Wire Instructions:** To elect a bank wire transfer please complete Box H in its entirety. A medallion guarantee is required in Box F if all registered shareholders are not listed on the bank account provided in Box H.  Please contact your bank for questions regarding the appropriate bank routing number and account number to be used.

- **Deficient Presentments:** If you request a registration change that is not in proper form, the required documentation will be requested from you.

- **Returning Certificates:** Return this Letter of Transmittal with the certificate(s) to be exchanged *only* to Wells Fargo Shareowner Services at the address below. The method of delivery is at your option and your risk, but it is recommended that documents be delivered via a registered method, insured for 2% of the value of your shares.

| *By Mail to:* | *By Overnight Courier or Hand-Delivery to:* |
|---|---|
| Wells Fargo Shareowner Services | Wells Fargo Shareowner Services |
| Attention: P.A.S.S. Team | Attention:  P.A.S.S. Team |
| P.O. Box 64854 | 161 North Concord Exchange |
| St. Paul, MN 55164-0854 | South St. Paul, MN 55075 |

For additional information please contact our Shareowner Relations Department at (toll free) 1-866-927-3919 (local) (651)554-3954

or via email at acquisitionteam@wellsfargo.com

<u>**Exhibit D to the Agreement and Plan of Merger**</u>

# OPTION CANCELLATION ACKNOWLEDGMENT

**For Delivery of Company Options of
KOR ELECTRONICS**

Pursuant to the Agreement and Plan of Merger dated as of December 22, 2011 by and among Mercury Computer Systems ("<u>Parent</u>"), King Merger Inc. ("<u>Merger Sub</u>"), KOR Electronics (the "<u>Company</u>") and Shareholder Representative Services LLC, solely in its capacity as the "<u>Securityholders' Representative</u>".  Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to them in the Agreement and Plan of Merger (referred to below as the "<u>Merger Agreement</u>").

**DELIVERY OF THIS OPTION CANCELLATION ACKNOWLEDGMENT TO AN ADDRESS OTHER THAN AS SET FORTH ON THE LAST PAGE HEREOF WILL NOT CONSTITUTE A VALID DELIVERY**

<u>*THE INSTRUCTIONS ACCOMPANYING THIS OPTION CANCELLATION ACKNOWLEDGMENT SHOULD BE READ CAREFULLY BEFORE THIS OPTION CANCELLATION ACKNOWLEDGMENT IS COMPLETED.*</u>

### NOTE:  SIGNATURES MUST BE PROVIDED BELOW

**All holders of Company Options must complete Boxes A and B and sign on page 2. Please also read the "General Instructions" on page 5.**

| BOX A – Signature of Option Holder(s) | BOX B –  Company Option(s) Held by Registered Holder (Attach additional listing as necessary) | | |
|---|---|---|---|
| (Must be signed by all holders of Company Options) Note: by signing this Option Cancellation Acknowledgment and accepting payment for your Options, you are agreeing to the representations, warranties and covenants attached to this Option Cancellation Acknowledgment. | Date of Option | Exercise Price per Share | Number of Shares For Which Each Option Is Exercisable |
| | | | |
| **Signature** | | | |
| | | | |
| **Print Name Here** | | | |
| | | | |
| **Telephone Number** | **Total Company Options Surrendered:** | | |

| BOX C – Alternative Payment Instructions | BOX D – One Time Delivery Instructions |
|---|---|
| To be completed *ONLY* if the check is to be issued in the name(s) of (or wire transfer made to account of) someone other than the Option holder(s) in Box A. ISSUE TO: | To be completed *ONLY* if the check is to be delivered to an address other than that listed in Box E. MAIL TO: |
| | |
| **Name** | **Name** |
| **Street Address** | **Street Address** |
| **City, State and Zip Code** | **City, State and Zip Code** |

**Please remember to complete Box G if you were an employee of the Company at the time the Company Options were granted**

| BOX E – Name and Address of Option Holder(s) |
|---|
| Please confirm that your address below is correct or mark any corrections |

☐ indicates permanent address change

| BOX G – Request for Taxpayer Identification Number and Certification – Substitute Form W-9 |
|---|

Certification: Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (as defined in the instructions below)

**Social Security Number**

☐☐☐ - ☐☐ - ☐☐☐☐

**Employer Identification Number**

☐☐ / ☐☐☐☐☐☐☐

Notification of Backup Withholding

____ I have been notified by the Internal Revenue Service (IRS) that I am currently subject to backup withholding as a result of a failure to report all interest and dividends on my tax return. I understand that marking this box will result in backup withholding on any disbursements made to this account. You must also cross out item 2 above. "The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding."

Required: Check appropriate box for federal tax classification:

☐ Individual/sole proprietor   ☐ C Corporation   ☐ S Corporation   ☐ Partnership Trust/estate

☐ Limited liability company.  Enter tax classification (C=C corporation, S=S corporation, P=partnership):

Signature: _____   Date: _____

**NOTICE TO NON-RESIDENT ALIEN INDIVIDUALS OR FOREIGN PERSONS (e.g. foreign corporation, partnership or trusts):** *DO NOT COMPLETE THE ABOVE SUBSTITUTE FORM W-9.* **COMPLETE THE ENCLOSED FORM W-8BEN, OR OBTAIN ONE AT www.irs.gov OR CALL 877-262-8260 FOR COPY OF FORM W-8BEN. COMPLETE AND RETURN THE FORM W-8BEN CERTIFICATION OF FOREIGN STATUS. FAILURE TO DO SO WILL SUBJECT YOU TO FEDERAL BACKUP WITHHOLDING AT THE CURRENT APPLICABLE RATE.**

| BOX H – Optional Bank Wire Instructions |
|---|

**NOTE:** This wire request is optional. A wire fee of $50.00 per account will be deducted from the proceeds. If you do not complete the information below, a check for the proceeds will be delivered to you at the address as it appears on the front of this Option Cancellation Acknowledgment. If the name on the bank account does not include all registered holders, a medallion guarantee is required in Box F.  If you complete Box H and any of the information is incomplete, illegible or otherwise deficient, you will receive a check for your proceeds. In connection with the above referenced merger, please wire the entitled funds as follows:

| | |
|---|---|
| **ABA Routing Number** | |
| **Bank Name** | |
| **Bank Address** | |
| **Name on Bank  Account** | |
| **Bank Account Number** | |
| **For Further Credit To Name** | |
| **For Further Credit To Account Number** | |
| **Swift or IBAN (if applicable)** | |

**By completion of Box H, the Option holder(s) hereby agree(s) that the above wire instructions are true and correct and by endorsing this Option Cancellation Acknowledgment the person authorized to act on behalf of this account is directing Wells Fargo Bank, N.A. as Paying Agent to make payment of the merger consideration represented by this Option Cancellation Acknowledgment to the bank account listed above.**

Optionholder Representations, Warranties and Agreements

Note: by signing this Option Cancellation Acknowledgment and accepting payment for his or her Vested Options, the undersigned holder of Options (the "Optionholder) is agreeing to the representations, warranties and covenants set forth below.   Defined terms used below if not defined in this Option Cancellation Acknowledgment have the meaning given them in the Merger Agreement.

Beneficial Ownership.   The undersigned Optionholder represents and warrants that he/she is currently, and at the effective time of the Merger is, the sole record and beneficial owner of the Vested Options listed in Box B of this Option Cancellation Acknowledgment, or, if such Optionholder is a joint owner, has good title to such Vested Options, and currently has, and at the Effective Time of the Merger will have, the requisite power and authority to sell, assign and transfer such Vested Options free and clear of all liens, claims and encumbrances, and receive Option Payments for such Vested Options as contemplated by the Merger Agreement.

Securityholders' Representative.   The undersigned Optionholder hereby (A) appoints Shareholder Representative Services LLC as the Securityholders' Representative and attorney-in-fact and agent with the power and authority to act on his/her behalf and (B) approves the provisions contained in Section 12.04 of the Merger Agreement, including, among other things, authorizing Shareholder Representative Services to enter into an escrow agreement on his/her behalf with Parent and Wells Fargo Bank, N.A., as Escrow Agent, pursuant to which a portion of the Option Payments to which such Optionholder may become entitled will be deposited with the Escrow Agent to cover certain indemnification obligations as provided in Article IX of the Merger Agreement and to fund expenses of the Securityholders' Representative.

**Escrow and Indemnification.  The undersigned Optionholder agrees to be bound by the provisions of the Merger Agreement, including the escrow and indemnification provisions set forth therein pursuant to which, among other things, the undersigned Optionholder could be liable (i) up to the full amount of his/her pro rata interest in the Escrow Amount, pursuant to the indemnification provisions of the Merger Agreement, (ii) up to the full amount of his/her Option Payments for certain specified indemnification obligations, as set forth in the Merger Agreement, and (iii) for amounts in excess of such amount for breaches of any Ancillary Agreements (as defined in the Merger Agreement) to which he/she is a party.**

Closing Payment.   The undersigned Optionholder acknowledges that the Payment Agent will not deliver a closing payment to the Optionholder unless the Merger occurs and only after such Optionholder delivers to the Payment Agent this Option Cancellation Acknowledgment executed by such Optionholder, and the Form W-9 or W-8 and any other document required to be delivered in accordance with this Option Cancellation Acknowledgment or the Merger Agreement is delivered.   The undersigned Optionholder acknowledges that the Payment Agent may withhold certain amounts from its closing payment either that (i) such Optionholder owes the Company pursuant to the Merger Agreement or (ii) may be required to be withheld by applicable law.   In addition, the Paying Agent shall withhold amounts from the closing payment to such Optionholder if the Company delivers to the Paying Agent either (i) a court order prohibiting such payment or directing that such payment be made to the Company or (ii) a court judgment against such Optionholder in favor of the Company or any third party through whom the Company claims an interest, relating to any of the Specified Indemnity Matters and in an amount equal to or greater than the proposed amount of the payment to the Optionholder to be withheld.

Release by Optionholder.   The undersigned Optionholder agrees to release and forever discharge the Company, Parent, Merger Sub, the Securityholders' Representative and their respective Affiliates, stockholders, agents, directors, officers, assigns, predecessors and successors (collectively, the "Released Parties") from any and all legal, equitable or other claims, whether known or unknown, suspected or unsuspected, that such Optionholder or any Affiliate controlled by the undersigned Optionholder has any right to acquire (by purchase or otherwise) any Equity Interest in the Parent, Merger Sub or Surviving Corporation, or any subsidiary of the foregoing (a "Optionholder Claim"), including claims (a) based on breach of duty, tort, contract (express or implied), or relief or rights under any federal, state or local law, statute or regulation or pursuant to any organizational documents of the Company, (b) at law or in equity, or (c) based in any other way upon any act or omission on the part of the Released Parties and derivative rights that it had or now has, or that such Optionholder may hereafter have against any Released Party by reason of any event, transaction, conduct, occurrence, relationship or cause whatsoever occurring on or prior to the date of this option cancellation acknowledgment, in each case with respect to all of the foregoing, only to the extent it relates to an Optionholder Claim.   The foregoing Release shall not (i) relieve any of the Released Parties of their respective obligations or liabilities under the Merger Agreement, the transactions contemplated thereby, or the other documents executed in connection with the transactions contemplated thereby, (ii) relieve the Company of any indemnification obligations of the Company to the undersigned, if such person is a current or former director or officer of the Company pursuant to the Company's charter or bylaws, or (iii) be deemed to constitute a waiver of the availability of insurance to cover claims not covered by the release.

Optionholder acknowledges that he or she has read section 1542 of the Civil Code of the State of California, which states in full:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Optionholder waives any rights that he or she has or may have under section 1542 (or any similar provision of the laws of any other jurisdiction) to the full extent that he or she may lawfully waive such rights pertaining to this release of claims, and affirms that Optionholder is releasing all known and unknown claims that he has or may have against the Released Parties relating to the payment of, or failure to pay, the Optionholder Claims.

<u>Access to Information</u>.   The undersigned Optionholder acknowledges that he/she has received a copy of the Merger Agreement, and has had a full opportunity to review the Merger Agreement and ask the Company and its Representatives any questions the undersigned may have regarding the Merger Agreement or this Option Cancellation Acknowledgment.

# General Instructions

### *Please read this information carefully.*

- **BOX A-Signatures:** All Company Option holders must sign as indicated in Box A. If you are signing on behalf of an Option holder your signature must include your legal capacity.

- **BOX B-Option Detail:** List all option dates, exercise price and the number of shares into which the options submitted are exercisable in Box B.

- **BOX C-Alternative Payment Instructions:** Provide the new payment instructions (name and address) in Box C if your payment is to be made to anyone other than the holder of your Company Options. Joint registrations must include the form of tenancy.

- **BOX D-One Time Delivery:** Any address shown in Box D will be treated as a one-time only mailing instruction, and your address in Box E will be used for any future payments and communications.

- **BOX E-Current Name and Address of Company Option Holder:** Please confirm that the address here is the address that should be used for all future communications and payments (including distributions of funds held in the Escrow Account and Contingent Payments). If your permanent address should be changed on Wells Fargo Shareowner Services records, please make the necessary changes in Box E. If your permanent address should change in the future, please notify Wells Fargo Shareowner Services at the number listed below.

- **BOX G-Request for Taxpayer Identification Number and Certification - Substitute Form W-9:** Complete Box G for registration of U.S. citizen, resident or entity to certify tax identification number. Please provide the social security or employer identification number of the person or entity receiving payment, including signature and date for the above described shares. Completion of the Substitute Form W-9 certifies that receiver of the payment is not subject to backup withholding. Failure to complete the form will subject the recipient to the applicable federal income tax withholding from any cash payment made to them pursuant to the exchange.

  **Circular 230 Disclosure:** Internal Revenue Service regulations provide that, for the purpose of avoiding certain penalties under the Internal Revenue Code, taxpayers may rely only on opinions of counsel that meet specific requirements set forth in the regulations, including a requirement that such opinions contain extensive factual and legal discussion and analysis. Any tax advice that may be contained herein does not constitute an opinion that meets the requirements of the regulations. Any such tax advice therefore cannot be used, and was not intended or written to be used, for the purpose of avoiding any federal tax penalties that the Internal Revenue Service may attempt to impose.

- **Definition of "U.S. Person":** For federal tax purposes, you are considered a U.S. person if you are (1) An individual who is a U.S. citizen or U.S. resident alien, (2) A partnership, corporation, company or association created or organized in the United States or under the laws of the United States, (3) An estate (other than a foreign estate), or (4) A domestic trust (as defined in U.S. Treasury Regulations section 301.7701-7).

- **BOX H – Wire Instructions:** To elect a bank wire transfer please complete Box G in its entirety.  A bank wire transfer, rather than payment by check, will help to expedite your receipt of the funds. Please contact your bank for questions regarding the appropriate bank routing number and account number to be used.

- **Deficient Presentments:** If you request a registration change that is not in proper form, the required documentation will be requested from you and this will delay processing of any funds.

- **Returning Option Cancellation Acknowledgment:** Return this Option Cancellation Acknowledgment <u>*only*</u> to Wells Fargo Shareowner Services at the address below. The method of delivery is at your option and your risk, but it is recommended that documents be delivered via a registered method.

| *By Mail to:* | *By Overnight Courier or Hand-Delivery to:* |
|---|---|
| Wells Fargo Shareowner Services | Wells Fargo Shareowner Services |
| Attention: P.A.S.S. Team | Attention:  P.A.S.S. Team |
| P.O. Box 64854 | 161 North Concord Exchange |
| St. Paul, MN 55164-0854 | South St. Paul, MN 55075 |

For additional information please contact our Acquisition Team at 1-866-927-3919 or AcquisitionTeam@wellsfargo.com

**Exhibit E to the Agreement and Plan of Merger**

**NOTICE TO THE INTERNAL REVENUE SERVICE
PURSUANT TO THE REQUIREMENTS OF TREASURY
REGULATION SECTION 1.897-2(h)(2)**

This Notice is being provided by KOR Electronics, a California corporation (the "**Company**") pursuant to the requirements of Treas. Reg. § 1.897-2(h)(2).

The Company is located at 10855 Business Center Drive, Cypress, CA 90630.  The Company's federal employer identification number is 33-0198117.

The attached Statement of Non-U.S. Real Property Holding Corporation Status (the "**Statement**") pursuant to Treas. Reg. § 1.897-2(h) was not requested by a foreign interest holder. Such Statement was voluntarily provided by the Company in response to a request in accordance with Treas. Reg. § 1.1445-2(c)(3)(i) by Mercury Computer Systems, Inc., a Massachusetts corporation ("**Parent**"), the acquiror of the Company in the merger contemplated by that certain Agreement and Plan of Merger by and among Parent, the Company, King Merger Inc., a California corporation and a wholly-owned, direct subsidiary of Parent, and Shareholder Representative Services LLC, in its capacity as the Securityholders' Representative, dated as of December 22, 2011 (the "**Merger Agreement**").  Parent's principal offices are located at 201 Riverneck Road, Chelmsford, MA 01824.  Parent's federal employer identification number is 04-2741391.

The interests in question, shares of the Company's capital stock to be exchanged by the Company shareholders in the merger pursuant to the Merger Agreement, are not "United States real property interests" as defined in § 897(c)(1) of the Internal Revenue Code of 1986, as amended, and Treas. Reg. § 1.897-1(c).

Under penalties of perjury I declare that I have examined this Notice and the Statement attached hereto and to the best of my knowledge and belief they are true, correct and complete, and I further declare that I have authority to sign this document on behalf of the Company.

KOR ELECTRONICS

Dated:  December __, 2011            By:_____
                                                        Name: Kevin Carnino
                                                        Title: President and Chief Executive Officer

**STATEMENT OF NON-U.S. REAL PROPERTY HOLDING CORPORATION STATUS
PURSUANT TO TREASURY REGULATION SECTION 1.897-2(h) AND CERTIFICATION OF
NON-FOREIGN STATUS**

Pursuant to that certain Agreement and Plan of Merger, dated as of December 22, 2011 (the "**Merger Agreement**"), by and among, Mercury Computer Systems, Inc., a Massachusetts corporation ("**Parent**"), King Merger Inc., a California corporation and a wholly-owned, direct subsidiary of Parent ("**Merger Sub**"), KOR Electronics, a California corporation (the "**Company**"), and Shareholder Representative Services LLC, in its capacity as the Securityholders' Representative, Merger Sub will merge with and into the Company, with the Company continuing as the surviving corporation in the merger and a wholly-owned subsidiary of Parent.

Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), provides that a transferee of a "United States real property interest" (as that term is defined in § 897(c)(1) of the Code and Treas. Reg. § 1.897-1(c)) must withhold U.S. tax if the transferor is a foreign person. In order to confirm that Parent, as transferee, is not required to withhold tax under § 1445 of the Code from amounts paid to any shareholder in relation to the receipt of the Company's stock in the merger contemplated by the Merger Agreement, the undersigned, in his capacity as President and Chief Executive Officer of the Company, hereby certifies the following pursuant to Treas. Reg. § 1.1445-2(c)(3) and Treas. Reg. § 1.897-2(h):

1.      As of the date hereof, the Company is not a "United States real property holding corporation" (a "**USRPHC**") as defined in § 897(c)(2) of the Code and Treas. Reg. § 1.897-2(b), and the Company has not been a USRPHC for the five-year period ending on the date hereof.

2.      As of the date hereof, none of the outstanding capital stock of the Company constitutes a "United States real property interest" as defined in § 897(c)(1) of the Code and Treas. Reg. § 1.897-1(c).

3.      The Company's federal employer identification number is 33-0198117, and the Company's address is 10855 Business Center Drive, Cypress, CA 90630.

4.      The Company acknowledges that (1) the Company is issuing this Statement and making the certifications contained herein pursuant to Treas. Reg. § 1.1445-2(c)(3) and Treas. Reg. § 1.897-2(h), (2) the Company authorizes Parent to file this statement and the attached notice on its behalf with the Internal Revenue Service at any time after the closing of the merger described in the Merger Agreement, and (3) any false statement contained herein could be punished by fine, imprisonment, or both.

**[Remainder of Page Left Intentionally Blank]**

Under penalties of perjury I declare that I have examined this statement and the certifications contained herein and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of the Company.

KOR ELECTRONICS

Dated:  December __, 2011                     By:_____

Name: Kevin Carnino
Title: President and Chief Executive Officer

**[Signature Page to Statement of Non-U.S. Real Property Holding Corporation Status Pursuant to Treasury Regulation Section 1.897-2(h)**

A/74649472.4

December __, 2011

Mercury Computer Systems, Inc.
201 Riverneck Road
Chelmsford, MA  01824

Ladies and Gentlemen:

      We have acted as counsel to KOR Electronics, a California corporation (the "**Company**"), in connection with the Agreement and Plan of Merger, dated as of December __, 2011 (the "**Merger Agreement**"), by and among Mercury Computer Systems, Inc., a Massachusetts corporation ("**Parent**"), King Merger Inc., a California corporation and a wholly-owned subsidiary of Parent ("**Merger Sub**"), the Company, and Shareholder Representative Services, LLC, as the Securityholders' Representative.  This opinion is delivered to you pursuant to Section 7.13 of the Merger Agreement.  Except as otherwise defined herein, capitalized terms used in this opinion are defined in the Merger Agreement.

      In connection with this opinion, we have reviewed the documents listed on Exhibit A hereto and made such examinations of other documents and questions of law and fact as we considered appropriate or advisable for the purposes hereof.  As to various factual matters, we have relied upon, and assumed the accuracy, completeness, and genuineness of, a certificate of an officer of the Company (the "**Certificate**"), and certificates of public officials.  Except as otherwise set forth in this opinion, we have made no independent investigation of any of the facts stated in any such certificate or any such representation.

      Whenever a statement in this opinion is qualified by the expression "known to us," "to our knowledge" or any similar phrase or expression with respect to our knowledge of matters, it is intended to mean that our knowledge is based upon the current actual knowledge of the attorneys in this firm who have devoted substantive attention to the transactions contemplated by the Merger Agreement (but not including any constructive or imputed notice of any information).  We have not undertaken to canvass the other attorneys in any of our offices or to review all of our files, and we have not otherwise undertaken any independent investigations for the purpose of rendering this opinion.  Any limited inquiry undertaken by us during the course of our representation of the Company or the preparation of this opinion should not be regarded as such an investigation, and no inference as to our knowledge of any matters bearing on the accuracy of any such statement should be drawn from the fact of our representation of the Company.

      We do not express any opinion concerning any law other than the internal substantive laws of the State of California and the federal laws of the United States.  We have not conducted any special investigation of statutes, laws, ordinances, rules or regulations and our opinion is limited to such California and United States statutes, laws, rules and regulations as in our experience are typically applicable to the transactions of the type contemplated by the Merger Agreement.  Accordingly, and notwithstanding the parties' designation that the Merger Agreement is governed by the laws of the Commonwealth of Massachusetts, we express no opinion as to whether the laws of any particular jurisdiction apply, and no opinion to the extent that the laws of any jurisdiction other than those identified above are applicable to the Merger Agreement or the transactions contemplated thereby.  We express no opinion as to the ordinances, statutes, administrative decisions, orders, rules and regulations of any municipality, county or other political subdivision of any state (as opposed to the laws of the state itself).

      We have assumed (i) the genuineness of all signatures on original documents, (ii) the completeness and authenticity of all documents, certificates and records submitted to us as originals, (iii) the completeness and conformity to authentic originals of all documents submitted to us as copies, (iv) the

legal capacity of all natural persons who have signed the documents, certificates and records we have examined, (v) the due execution and delivery of all documents by any party other than the Company where due execution and delivery are a prerequisite to the effectiveness thereof, (vi) that the Company's board of directors is duly constituted, and (vii) that the Company's directors and shareholders have complied with all of their respective fiduciary duties in connection with the authorization and performance of the Merger Agreement and the transactions contemplated thereby.

In rendering the opinion set forth in Paragraph 1 below as to the good standing of the Company, we have relied exclusively on certificates of good standing from the California Secretary of State and the California Franchise Tax Board.

With respect to our determination of the shareholders of record eligible to vote for purposes of our opinion in Paragraph 2 regarding the receipt of the requisite vote of the Company's shareholders to approve the Merger Agreement, we have relied exclusively upon our review of the Company's Amended and Restated Articles of Incorporation and upon the representations made to us in the Certificate.  We have assumed the accuracy and completeness of supporting representations made to us in the Certificate.

Based upon and subject to the foregoing, we are of the opinion that:

1.      The Company is a corporation validly existing and in good standing under the laws of the State of California.

2.      The execution and delivery of the Merger Agreement, and the consummation by the Company of the transactions contemplated thereby (including the Merger), have been duly authorized by all necessary corporate action on the part of the Company and its shareholders, as applicable, and no further action is required on the part of the Company to authorize the Merger Agreement or the transactions contemplated thereby (including the Merger).  All corporate action on the part of the Company, its directors and shareholders necessary for the execution and filing with the Secretary of State of the State of California of the Agreement of Merger has been taken.  The Merger Agreement has been duly executed and delivered by the Company.

3.      The execution and delivery by the Company of the Merger Agreement, and the consummation by the Company of the transactions contemplated thereby, do not and will not as of the Closing conflict with or result in any violation of or default under any provision of the Company's Amended and Restated Articles of Incorporation or Bylaws.

4.      To our knowledge, no consent, waiver, approval, order or authorization of, or registration, declaration or filing with, or notice to any Governmental Authority is required as of the Closing by, or with respect to, the Company under California law in connection with the execution and delivery of the Merger Agreement or the consummation of the transactions contemplated thereby, except for (i) the filing of the Agreement of Merger with the Secretary of State of the State of California under the California General Corporation Law and (ii) those that have been made or obtained.

This opinion is rendered as of its date solely for your benefit in connection with the Merger Agreement and may not be delivered to or relied upon by any person other than you or for any other purpose, without our prior written consent.  Our opinion is expressly limited to the matters set forth above and we render no opinion, whether by implication or otherwise, as to any other matters relating to the Company.  We disclaim any obligation to advise you of facts, circumstances, events or developments which hereafter may be brought to our attention and which may alter, affect or modify the opinion expressed herein.

Sincerely,


**DLA Piper LLP (US)**

## <u>EXHIBIT A</u>

1.      Copy of the Amended and Restated Articles of Incorporation of the Company, as amended to date.

2.      Copy of the Bylaws of the Company, as amended to date, and as certified to be complete and true by an officer of the Company.

3.      The minute book of the Company, containing minutes of meetings of the Board of Directors and shareholders and written consents of the Board of Directors and shareholders through the date hereof.

4.      An executed copy of the Merger Agreement, including the exhibits and schedules thereto.

5.      An executed copy of the Agreement of Merger.

6.      The Certificate of the Chief Executive Officer or the Chief Financial Officer of the Company delivered to you in accordance with Section 7.03(a) of the Merger Agreement.

7.      The Secretary's Certificate delivered to you in accordance with Section 7.03(b) of the Merger Agreement.

8.      The certificates of public officials as to the good standing of the Company.

9.      The Information Statement delivered to the Shareholders in connection with the solicitation of their written consent approving the Merger and related matters.

NON-COMPETITION AGREEMENT

THIS NON-COMPETITION AGREEMENT (this "Agreement") is made and entered into effective as of December __, 2011, by and between Mercury Computer Systems, Inc., a Massachusetts corporation ("Parent"), and _____ (the "Seller").

WHEREAS, pursuant to the Agreement and Plan of Merger, dated as of December 22, 2011 (the "Merger Agreement"), by and among Parent, King Merger Inc., a California corporation and a wholly-owned subsidiary of Parent ("Merger Sub"), KOR Electronics, a California corporation (the "Company"), and Shareholder Representative Services LLC, in its capacity as the Securityholders' Representative, with the Company continuing as the surviving corporation and a wholly-owned subsidiary of Parent (the "Merger");

WHEREAS, the Seller will receive (i) cash payments from Parent pursuant to the Merger Agreement with respect to the Common Shares (as defined herein) and/or Options (as defined herein) owned by the Seller and (ii) restricted stock grants from Parent on the Closing Date (as defined herein); and

WHEREAS, as an inducement to Parent to consummate the Merger, it is a condition to the closing of the Merger that the Seller agree, and the Seller has agreed, to enter into this Agreement with Parent, which the parties agree is reasonable and necessary in order for Parent to protect its goodwill and business.

NOW THEREFORE, THE PARTIES HEREBY AGREE AS FOLLOWS:

1.      Construction and Effective Date.  Certain defined terms are set forth in Section 14, below.  This Agreement will take effect only if the transactions contemplated by the Merger Agreement are consummated and will be effective on the Closing Date.  This Agreement is binding upon and shall inure to the benefit of the respective successors and assigns of the parties hereto.

2.      Noncompetition and Nonsolicitation.  For the Non-Competition Period (as defined herein), the Seller agrees that neither it nor any Affiliate (as defined herein) shall engage directly or indirectly, as an owner, employee, consultant or otherwise, in any business activity that is competitive with the Company or its Subsidiaries (as defined herein) on the Closing Date; provided, that the Seller will not be deemed so engaged solely by reason of being the owner of less than 5% of the outstanding stock of any publicly-traded corporation that is competitive with the Company or a Subsidiary.  For purposes of this covenant, the phrase "competitive with the Company or its Subsidiaries" shall mean any business that designs or manufactures radar jammers, radar environment simulators, and intelligence, and surveillance, and reconnaissance subsystems or that provides software development, system engineering and technical assistance, or analysis tools for defense or intelligence industry applications that are competitive with any product or service being offered for sale by the Company or its Subsidiaries as of the Closing Date or that is in development by the Company or its Subsidiaries as of the Closing Date.  For the Non-Competition Period, the Seller agrees that it shall not, and shall not permit, cause or encourage any of its Affiliates to, directly or indirectly as an owner, employee, consultant or otherwise, recruit, offer employment, employ, engage as a consultant, lure or entice away, or in

any other manner persuade or attempt to persuade, any Person (as defined herein) who is an employee of the Company or its Subsidiaries or the Parent to leave the employ of the Company or its Subsidiaries or the Parent.  For purposes of this Agreement, "Non-Competition Period" means the period of eighteen (18) months from the Closing Date; provided, however, that in the event Seller's employment is terminated by the Company without cause (as determined by the Parent's Board of Directors), then this Agreement shall terminate and be of no further force and effect.

3.    Reasonableness.    The Seller acknowledges that the non-competition and non-solicitation covenants contained herein are being made in connection with the sale of the goodwill of the Company and the sale or termination of all of the Seller's Equity Interests (as defined herein) in the Company, and are a meaningful inducement for the Parent and Merger Sub to enter into this Agreement and pay the merger consideration, as provided in the Merger Agreement.    The Seller agrees that the covenants and restrictions in this Agreement are reasonable for protecting the Parent's and Company's businesses.  After having consulted with legal counsel, the Seller fully agrees and understands that this Agreement is not an unlawful restraint on trade or business and is within the scope of §16601 of the California Business & Professions Code in connection with the sale of all of the Seller's ownership interest in Parent pursuant to the Merger.  It is expressly understood and agreed that although Parent and the Seller consider the restrictions contained in this Agreement reasonable for the purpose of preserving the Parent's and Company's business, goodwill and other proprietary rights, if a final judicial determination is made by a court having jurisdiction that the time or territory or any other restriction contained in this Agreement is an unreasonable or otherwise unenforceable restriction against the Seller, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as the maximum time and territory and to any other extent as a court may judicially determine or indicate to be reasonable.

4.    Modifications; Termination.   No modification of this Agreement shall be valid unless made in writing and signed by the parties hereto.  This Agreement shall terminate and be of no force and effect upon Parent's material breach of the Merger Agreement or any agreement between the Seller and Parent that is not cured within 30 days after written notice to Parent of such breach.

5.    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any applicable law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, such term or other provision will be interpreted so as to best accomplish the intent of the parties within the limits of applicable law.

6.    Integrated Agreement.    This Agreement constitutes the full, complete and exclusive agreement between Parent and the Seller with respect to the subject matters herein.

7.    Governing Law.   This Agreement shall be construed in accordance with and governed by the laws of the State of California, without giving effect to the conflicts of law principles thereof.

8.     <u>Notices.</u>   All notices, requests, claims, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be delivered by hand or sent by confirmed facsimile (with the original to follow by first class mail, postage prepaid) or sent, postage prepaid, by registered or certified mail or internationally recognized overnight courier service and shall be deemed given when so delivered by hand or facsimile, or if mailed, five (5) days after mailing (two (2) Business Days (as defined herein) in the case of overnight courier service) at the following addresses (or at such other address for a party as shall be specified by like notice):

> (i)     if to Parent, to
>
> 201 Riverneck Road
> Chelmsford, MA 01824
> Telephone number: (978) 967-1788
> Facsimile number: (978) 256-0013
> Attention: Gerald M. Haines II
>
> With a copy, which shall not constitute notice, to:
>
> Bingham McCutchen LLP
> One Federal Street
> Boston, MA  02110-1726
> Telephone number: (617) 951-8852
> Facsimile number: (617) 428-6419
> Attention:  John R. Utzschneider
>
> (ii)     if to the Seller, to
>
> _____
> _____
> _____
> _____
> Attention:  _____
> Telecopy:  _____
>
> With a copy, which shall not constitute notice, to:
>
> _____
> _____
> _____
> Attention:  _____
> Telecopy:  _____

9.     <u>Counterparts.</u>   This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same instrument.

3

10.     <u>Specific Performance.</u>  Each party hereto acknowledges that it will be impossible to measure in money the damage to the other party if a party hereto fails to comply with any of the obligations imposed by this Agreement, that every such obligation is material and that, in the event of any such failure, the other party will not have an adequate remedy at law or damages. Accordingly, each party hereto agrees that injunctive relief or other equitable remedy, in addition to remedies at law or damages, is the appropriate remedy for any such failure and will not oppose the seeking of such relief on the basis that the other party has an adequate remedy at law.  Each party hereto agrees that it will not seek, and agrees to waive any requirement for, the securing or posting of a bond in connection with the other party's seeking or obtaining such equitable relief.

11.     <u>Venue.</u>  Each of the parties to this Agreement agrees that for any Action (as defined herein) among any of the parties relating to or arising in whole or in part under or in connection with this Agreement, such party shall bring such Action only in the federal and state courts located in the State of California.  Notwithstanding the previous sentence a party may commence any Action in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts.  Each party hereto further waives any claim and will not assert that venue should properly lie in any other location within the selected jurisdiction.  The parties also agree that service of process may be properly effected by delivering notice in accordance with Section 8 above, in addition to any other means of service permitted by applicable law.

12.     <u>Waiver of Jury Trial.</u>  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.

13.     <u>Attorneys' Fees.</u>  In the event either party commences litigation or arbitration for the judicial interpretation, enforcement, termination, cancellation, or rescission hereof, or for damages for the breach hereof, then, in addition to any or all other relief awarded in such proceeding, the prevailing party therein shall be entitled to a judgment against the other for an amount equal to the reasonable attorneys' fees and costs incurred.

14.     <u>Certain Definitions.</u>  As used in this Agreement, the following terms shall have the meanings set forth below:

"Action" means any claim, controversy, action, cause of action, suit, litigation, arbitration, investigation, opposition, interference, audit, assessment, hearing, complaint, demand or other legal proceeding (whether sounding in contract, tort or otherwise, whether civil or criminal and whether brought at law or in equity) that is commenced, brought, conducted, tried or heard by or before, or otherwise involving, any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such specified Person.  For purposes of the foregoing, (a) a Person shall be deemed to control a specified Person if such Person (or a Family Member of such Person) possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such specified Person or (b) if such other Person is at such time a direct or indirect beneficial holder of at least 10% of any class of the Equity Interests of such specified Person.

"Business Day" means any day other than a Saturday or a Sunday or a weekday on which banks in California are authorized or required to be closed.

"Closing Date" means the date on which the closing actually occurs.

"Common Shares" means the issued and outstanding shares of common stock, par value $0.0001 per share, (the "Common Stock") of the Company.

"Contractual Obligation" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, sublease, license, sublicense or other commitment, promise, undertaking, obligation, arrangement, instrument or understanding, whether written or oral, to which or by which such Person is a party or otherwise subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Equity Interests" means, with respect to any Person, (a) any capital stock, partnership or membership interest, unit of participation or other similar interest (however designated) in such Person and (b) any option, warrant, purchase right, conversion right, exchange right or other Contractual Obligation which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"Family Member" means, with respect to any individual, (a) such Person's spouse, (b) each parent, brother, sister or child of such Person or such Person's spouse, (c) the spouse of any Person described in clause (b) above, (d) each child of any Person described in clauses (a), (b) or (c) above, (e) each trust created for the benefit of one or more of the Persons described in clauses (a) through (d) above and (f) each custodian or guardian of any property of one or more of the Persons described in clauses (a) through (e) above in his or her capacity as such custodian or guardian.

"Governmental Authority" means any United States federal, state, local, municipal or any foreign government, or political subdivision thereof, regulatory, self-regulatory, or any multinational organization or authority, or any other authority, agency, bureau, board, court, department, tribunal, instrumentality or commission thereof entitled to exercise any

administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal, or any arbitrator or arbitral body.

"Options" means all of the issued and outstanding options to acquire Common Stock of the Company.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Subsidiary" means, with respect to any specified Person, any other Person of which such specified Person, directly or indirectly through one or more Subsidiaries, (a) owns at least 50% of the outstanding Equity Interests entitled to vote generally in the election of the board of directors or similar governing body of such other Person, or (b) has the power to generally direct the business and policies of that other Person, whether by contract or as a general partner, managing member, manager, joint venturer, agent or otherwise.

*(Remainder of page intentionally left blank - signature page follows)*

A/74649123.9

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

MERCURY COMPUTER SYSTEMS, INC.


By:_____
Name: Gerald M. Haines II
Title: Senior Vice President, Corporate Development


SELLER


By:_____

NON-COMPETITION AGREEMENT

THIS NON-COMPETITION AGREEMENT (this "Agreement") is made and entered into effective as of December __, 2011, by and between Mercury Computer Systems, Inc., a Massachusetts corporation ("Parent"), and _____ the "Seller").

WHEREAS, pursuant to the Agreement and Plan of Merger, dated as of December 22, 2011 (the "Merger Agreement"), by and among Parent, King Merger Inc., a California corporation and a wholly-owned subsidiary of Parent ("Merger Sub"), KOR Electronics, a California corporation (the "Company"), and Shareholder Representative Services LLC, in its capacity as the Securityholders' Representative, with the Company continuing as the surviving corporation and a wholly-owned subsidiary of Parent (the "Merger");

WHEREAS, the Seller will receive (i) cash payments from Parent pursuant to the Merger Agreement with respect to the Common Shares (as defined herein) and/or Options (as defined herein) owned by the Seller and (ii) restricted stock grants from Parent on the Closing Date (as defined herein); and

WHEREAS, as an inducement to Parent to consummate the Merger, it is a condition to the closing of the Merger that the Seller agree, and the Seller has agreed, to enter into this Agreement with Parent, which the parties agree is reasonable and necessary in order for Parent to protect its goodwill and business.

NOW THEREFORE, THE PARTIES HEREBY AGREE AS FOLLOWS:

1.     Construction and Effective Date.  Certain defined terms are set forth in Section 14, below.  This Agreement will take effect only if the transactions contemplated by the Merger Agreement are consummated and will be effective on the Closing Date.  This Agreement is binding upon and shall inure to the benefit of the respective successors and assigns of the parties hereto.

2.     Noncompetition and Nonsolicitation.  For the Non-Competition Period (as defined herein), the Seller agrees that neither it nor any Affiliate (as defined herein) shall engage directly or indirectly, as an owner, employee, consultant or otherwise, in any business activity that is competitive with the Company or its Subsidiaries (as defined herein) on the Closing Date; provided, that the Seller will not be deemed so engaged solely by reason of being the owner of less than 5% of the outstanding stock of any publicly-traded corporation that is competitive with the Company or a Subsidiary.  For purposes of this covenant, the phrase "competitive with the Company or its Subsidiaries" shall mean any business that designs or manufactures radar jammers, radar environment simulators, and intelligence, and surveillance, and reconnaissance subsystems or that provides software development, system engineering and technical assistance, or analysis tools for defense or intelligence industry applications that are competitive with any product or service being offered for sale by the Company or its Subsidiaries as of the Closing Date or that is in development by the Company or its Subsidiaries as of the Closing Date.  For the Non-Competition Period, the Seller agrees that it shall not, and shall not permit, cause or encourage any of its Affiliates to, directly or indirectly as an owner, employee, consultant or otherwise, recruit, offer employment, employ, engage as a consultant, lure or entice away, or in

any other manner persuade or attempt to persuade, any Person (as defined herein) who is an employee of the Company or its Subsidiaries or the Parent to leave the employ of the Company or its Subsidiaries or the Parent.  For purposes of this Agreement, "<u>Non-Competition Period</u>" means the period of eighteen (18) months from the Closing Date; provided, however, that in the event Seller's employment is terminated by the Company without cause (as determined by the Parent's Board of Directors), then this Agreement shall terminate and be of no further force and effect.

3.    <u>Reasonableness.</u>   The Seller acknowledges that the non-competition and non-solicitation covenants contained herein are being made in connection with the sale of the goodwill of the Company and the sale or termination of all of the Seller's Equity Interests (as defined herein) in the Company, and are a meaningful inducement for the Parent and Merger Sub to enter into this Agreement and pay the merger consideration, as provided in the Merger Agreement.   The Seller agrees that the covenants and restrictions in this Agreement are reasonable for protecting the Parent's and Company's businesses.  After having consulted with legal counsel, the Seller fully agrees and understands that this Agreement is not an unlawful restraint on trade or business and is within the scope of § 8-2-113(2)(a) of the Colorado Revised Statutes in connection with the sale of all of the Seller's ownership interest in Parent pursuant to the Merger.  It is expressly understood and agreed that although Parent and the Seller consider the restrictions contained in this Agreement reasonable for the purpose of preserving the Parent's and Company's business, goodwill and other proprietary rights, if a final judicial determination is made by a court having jurisdiction that the time or territory or any other restriction contained in this Agreement is an unreasonable or otherwise unenforceable restriction against the Seller, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as the maximum time and territory and to any other extent as a court may judicially determine or indicate to be reasonable.

4.    <u>Modifications; Termination.</u>   No modification of this Agreement shall be valid unless made in writing and signed by the parties hereto.  This Agreement shall terminate and be of no force and effect upon Parent's material breach of the Merger Agreement or any agreement between the Seller and Parent that is not cured within 30 days after written notice to Parent of such breach.

5.    <u>Severability.</u>  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any applicable law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, such term or other provision will be interpreted so as to best accomplish the intent of the parties within the limits of applicable law.

6.    <u>Integrated Agreement.</u>   This Agreement constitutes the full, complete and exclusive agreement between Parent and the Seller with respect to the subject matters herein.

7.    <u>Governing Law.</u>  This Agreement shall be construed in accordance with and governed by the laws of the State of Colorado, without giving effect to the conflicts of law principles thereof.

A/74649837.4

8.      <u>Notices.</u>   All notices, requests, claims, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be delivered by hand or sent by confirmed facsimile (with the original to follow by first class mail, postage prepaid) or sent, postage prepaid, by registered or certified mail or internationally recognized overnight courier service and shall be deemed given when so delivered by hand or facsimile, or if mailed, five (5) days after mailing (two (2) Business Days (as defined herein) in the case of overnight courier service) at the following addresses (or at such other address for a party as shall be specified by like notice):

(i)      if to Parent, to

201 Riverneck Road
Chelmsford, MA 01824
Telephone number: (978) 967-1788
Facsimile number: (978) 256-0013
Attention: Gerald M. Haines II

With a copy, which shall not constitute notice, to:

Bingham McCutchen LLP
One Federal Street
Boston, MA  02110-1726
Telephone number: (617) 951-8852
Facsimile number: (617) 428-6419
Attention:  John R. Utzschneider

(ii)      if to the Seller, to

_____
_____
_____
_____
Attention:  _____
Telecopy:  _____

With a copy, which shall not constitute notice, to:

_____
_____
_____
Attention:  _____
Telecopy:  _____

9.      <u>Counterparts.</u>   This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same instrument.

10.     Specific Performance.  Each party hereto acknowledges that it will be impossible to measure in money the damage to the other party if a party hereto fails to comply with any of the obligations imposed by this Agreement, that every such obligation is material and that, in the event of any such failure, the other party will not have an adequate remedy at law or damages. Accordingly, each party hereto agrees that injunctive relief or other equitable remedy, in addition to remedies at law or damages, is the appropriate remedy for any such failure and will not oppose the seeking of such relief on the basis that the other party has an adequate remedy at law.  Each party hereto agrees that it will not seek, and agrees to waive any requirement for, the securing or posting of a bond in connection with the other party's seeking or obtaining such equitable relief.

11.     Venue.  Each of the parties to this Agreement agrees that for any Action (as defined herein) among any of the parties relating to or arising in whole or in part under or in connection with this Agreement, such party shall bring such Action only in the federal and state courts located in the State of Colorado.  Notwithstanding the previous sentence a party may commence any Action in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts.  Each party hereto further waives any claim and will not assert that venue should properly lie in any other location within the selected jurisdiction.  The parties also agree that service of process may be properly effected by delivering notice in accordance with Section 8 above, in addition to any other means of service permitted by applicable law.

12.     Waiver of Jury Trial.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.

13.     Attorneys' Fees.  In the event either party commences litigation or arbitration for the judicial interpretation, enforcement, termination, cancellation, or rescission hereof, or for damages for the breach hereof, then, in addition to any or all other relief awarded in such proceeding, the prevailing party therein shall be entitled to a judgment against the other for an amount equal to the reasonable attorneys' fees and costs incurred.

14.     Certain Definitions.  As used in this Agreement, the following terms shall have the meanings set forth below:

A/74649837.4

"Action" means any claim, controversy, action, cause of action, suit, litigation, arbitration, investigation, opposition, interference, audit, assessment, hearing, complaint, demand or other legal proceeding (whether sounding in contract, tort or otherwise, whether civil or criminal and whether brought at law or in equity) that is commenced, brought, conducted, tried or heard by or before, or otherwise involving, any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such specified Person.  For purposes of the foregoing, (a) a Person shall be deemed to control a specified Person if such Person (or a Family Member of such Person) possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such specified Person or (b) if such other Person is at such time a direct or indirect beneficial holder of at least 10% of any class of the Equity Interests of such specified Person.

"Business Day" means any day other than a Saturday or a Sunday or a weekday on which banks in Colorado are authorized or required to be closed.

"Closing Date" means the date on which the closing actually occurs.

"Common Shares" means the issued and outstanding shares of common stock, par value $0.0001 per share, (the "Common Stock") of the Company.

"Contractual Obligation" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, sublease, license, sublicense or other commitment, promise, undertaking, obligation, arrangement, instrument or understanding, whether written or oral, to which or by which such Person is a party or otherwise subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Equity Interests" means, with respect to any Person, (a) any capital stock, partnership or membership interest, unit of participation or other similar interest (however designated) in such Person and (b) any option, warrant, purchase right, conversion right, exchange right or other Contractual Obligation which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"Family Member" means, with respect to any individual, (a) such Person's spouse, (b) each parent, brother, sister or child of such Person or such Person's spouse, (c) the spouse of any Person described in clause (b) above, (d) each child of any Person described in clauses (a), (b) or (c) above, (e) each trust created for the benefit of one or more of the Persons described in clauses (a) through (d) above and (f) each custodian or guardian of any property of one or more of the Persons described in clauses (a) through (e) above in his or her capacity as such custodian or guardian.

"Governmental Authority" means any United States federal, state, local, municipal or any foreign government, or political subdivision thereof, regulatory, self-regulatory, or any multinational organization or authority, or any other authority, agency, bureau, board, court, department, tribunal, instrumentality or commission thereof entitled to exercise any

administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal, or any arbitrator or arbitral body.

"Options" means all of the issued and outstanding options to acquire Common Stock of the Company.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Subsidiary" means, with respect to any specified Person, any other Person of which such specified Person, directly or indirectly through one or more Subsidiaries, (a) owns at least 50% of the outstanding Equity Interests entitled to vote generally in the election of the board of directors or similar governing body of such other Person, or (b) has the power to generally direct the business and policies of that other Person, whether by contract or as a general partner, managing member, manager, joint venturer, agent or otherwise.

*(Remainder of page intentionally left blank - signature page follows)*

6

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

MERCURY COMPUTER SYSTEMS, INC.


By:_____
Name: Gerald M. Haines II
Title: Senior Vice President, Corporate
Development


SELLER


By:_____

**Exhibit H to the Agreement and Plan of Merger**

Mercury Computer Systems, Inc.
201 Riverneck Road
Chelmsford, MA 01824
Attention: Gerald M. Haines II

December 22, 2011

**Re:  Principal Shareholders Agreement**

Gentlemen:

Reference is hereby made to that certain Agreement and Plan of Merger, dated as of December 22, 2011 (as amended, modified or supplemented from time to time, the "Merger Agreement") by and among Mercury Computer Systems, Inc., a Massachusetts corporation ("Parent"), King Merger Inc., a California corporation and a wholly-owned subsidiary of Parent ("Merger Sub"), KOR Electronics, a California corporation (the "Company"), and Shareholder Representative Services LLC, in its capacity as the Securityholders' Representative.  Defined terms used below if not defined in this Letter Agreement have the meaning given them in the Merger Agreement.

The undersigned (the "Shareholder") is a shareholder and/or option holder of the Company and will receive substantial payments as a shareholder or option holder pursuant to the Merger Agreement.  Pursuant to the terms of the Merger Agreement, the delivery of this letter agreement ("Letter Agreement") by the undersigned Shareholder is a condition to the closing of the transactions contemplated thereunder.  In order to induce the Parent to complete the Merger, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned Shareholder agrees as follows:

1.  Confidentiality.

    a.  The undersigned Shareholder acknowledges that the success of the Surviving Corporation after the Closing depends upon the continued preservation of the confidentiality of the Company's confidential information, some of which may be in the possession of such Shareholder, that the preservation of the confidentiality of such information is an essential premise of the bargain between the Company, Parent and Merger Sub, and that Parent and Merger Sub would be unwilling to enter into the Merger Agreement in the absence of this provision.  Accordingly, the undersigned Shareholder hereby agrees with Parent and the Company that such Shareholder, its Affiliates and its and its Affiliate's Representatives shall not, and that such Shareholder shall cause its Affiliates and such Representatives not to, at any time on or after the Closing Date, directly or indirectly, without the prior written consent of Parent and the Surviving Corporation, disclose or use, any information involving or relating to the Business, or the Company or the Surviving Corporation (other than in the case of a Shareholder that is a director, officer or employee of the Company or any Subsidiary, in the course of fulfilling his or her duties to the Surviving Corporation or such Subsidiary in such capacity); provided, that the information subject to this provision will not include any information generally available to, or known by, the public (other than as a result of disclosure in violation hereof); provided, further, that the provisions of this paragraph will not prohibit any retention of copies of records or disclosure (A) required by any applicable Legal Requirement so long as reasonable prior notice is given to Parent and the Surviving Corporation of such disclosure and a reasonable opportunity is afforded Parent and the Surviving Corporation to contest the same or (B) made in connection with the enforcement of any right or remedy relating to the Merger Agreement or the Contemplated Transactions.  The undersigned Shareholder agrees that it shall be responsible for any breach or violation of the provisions of this provision by any of its Affiliates or its or its Affiliates' Representatives.

      b.   Notwithstanding the foregoing, the undersigned Shareholder may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Contemplated Transactions and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure, all as contemplated to preclude characterization as a "confidential transaction" under Treasury Regulation Section 1.6011-4(b)(3)(iii).

2.   <u>Intellectual Property</u>.   If requested by the Surviving Corporation, the undersigned Shareholder shall make and record all necessary filings with the applicable Governmental Authorities so that the Surviving Corporation and/or its Subsidiaries will appear in their records as owner of all registrations and applications in the Owned Intellectual Property Rights.  No later than sixty (60) days after the Closing Date, the undersigned Shareholder shall deliver to Parent any records and files that may be in the possession or control of the undersigned Shareholder relating to the Owned Intellectual Property Rights and the prosecution and maintenance of any patents, trademarks or copyrights included in the Owned Intellectual Property Rights.

3.   <u>No Circular Recovery</u>.   The undersigned Shareholder hereby agrees that it will not make any claim for indemnification against Parent or the Surviving Corporation by reason of the fact that such Shareholder was a controlling person, director, employee or Representative of the Company or was serving as such for another Person at the request of the Company (whether such claim is for Losses of any kind or otherwise and whether such claim is pursuant to any Legal Requirement, Organizational Document, Contractual Obligation or otherwise) with respect to any claim brought by a Parent Indemnified Person against any Securityholder under the Merger Agreement or otherwise relating to the Merger Agreement, any Ancillary Agreement or any of the Contemplated Transactions.  With respect to any claim brought by a Parent Indemnified Person against any Securityholder under the Merger Agreement or otherwise relating to the Merger Agreement, any Ancillary Agreement or any of the Contemplated Transactions, the undersigned Shareholder expressly waives any right of subrogation, contribution, advancement, indemnification or other claim against the Company with respect to any amounts owed by such Shareholder pursuant to this provision or otherwise.

4.   <u>Release by Shareholder</u>.   The undersigned Shareholder agrees to release and forever discharge the Company, Parent, Merger Sub, the Securityholders' Representative and their respective Affiliates, stockholders, agents, directors, officers, assigns, predecessors and successors (collectively, the "<u>Released Parties</u>") from any and all legal, equitable or other claims, whether known or unknown, suspected or unsuspected, that such Shareholder or any Affiliate controlled by the undersigned Shareholder has any right to acquire (by purchase or otherwise) any Equity Interest in Parent, Merger Sub or Surviving Corporation, or any subsidiary of the foregoing, receive any bonus or similar amount from the Parent, Merger Sub or Surviving Corporation, or any subsidiary of any of the foregoing (except for bonuses or other rights granted to participants under the Company's Executive Retention and Severance Plan adopted on December 6, 2005 and amended and restated on September 30, 2008), or to acquire any asset of Parent, Merger Sub or the Surviving Corporation, or any subsidiary of the foregoing, (a "<u>Shareholder Claim</u>"), including claims (a) based on breach of duty, tort, contract (express or implied), or relief or rights under any federal, state or local law, statute or regulation or pursuant to any organizational documents of the company, (b) at law or in equity, or (c) based in any other way upon any act or omission on the part of the Released Parties and derivative rights that such Shareholder had or now has, or that such Shareholder may hereafter have against any Released Party by reason of any event, transaction, conduct, occurrence, relationship or cause whatsoever occurring on or prior to the date of this Letter of Transmittal, in each case with respect to all of the foregoing, only to the extent it relates to a Shareholder Claim.  The foregoing release shall not (i) relieve any of the Released Parties of their respective obligations or liabilities under the Merger Agreement, the transactions contemplated thereby, or the other documents executed in connection with the transactions contemplated thereby, (ii) relieve the Company of any indemnification obligations of the Company to the

undersigned, if such person is a current or former director or officer of the Company pursuant to the Company's charter or bylaws, or (iii) be deemed to constitute a waiver of the availability of insurance to cover claims not covered by the release.

The undersigned Shareholder acknowledges that it has read section 1542 of the Civil Code of the State of California, which states in full:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

The undersigned Shareholder waives any rights that it has or may have under section 1542 (or any similar provision of the laws of any other jurisdiction) to the full extent that it may lawfully waive such rights pertaining to this release of claims, and affirms that such Shareholder is releasing all known and unknown claims that it may have against the Released Parties for any Shareholder Claims.

5. <u>Notices</u>. All notices, requests, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt), (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested), (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (d) on the fifth Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 5</u>):

If to Parent, to:

> 201 Riverneck Road
> Chelmsford, MA 01824
> Telephone number: (978) 967-1788
> Facsimile number: (978) 256-0013
> Attention: Gerald M. Haines II
> Senior Vice President, Corporate Development

Copy (which shall not constitute notice) to:

> Bingham McCutchen LLP
> One Federal Street
> Boston, MA  02110-1726
> Telephone number: (617) 951-8852
> Facsimile number: (617) 428-6419
> Attention:  John R. Utzschneider

If to Shareholder, to the address or facsimile number set forth for Shareholder on the signature page hereof.

Copy (which shall not constitute notice) to:

> DLA Piper LLP (US)
> 2000 University Avenue
> East Palo Alto, CA 94301-2215

4

Telephone number: (650) 833-2243
Facsimile number: (650) 687-1200
Attention: Dennis C. Sullivan

6. <u>Governing Law</u>. This Letter Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts without giving effect to any choice or conflict of law provision or rule (whether of the Commonwealth of Massachusetts or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the Commonwealth of Massachusetts

7. <u>Jurisdiction</u>. Each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Letter Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Letter Agreement and the rights and obligations arising hereunder brought by the other party hereto or its successors or assigns shall be brought and determined exclusively in the United States District Court located in Commonwealth of Massachusetts, or if such action may not be brought in federal court, the state courts of Commonwealth of Massachusetts located in the City of Boston. Each of the parties hereto agrees that mailing of process or other papers in connection with any such action or proceeding in the manner provided in <u>Section 5</u> or in such other manner as may be permitted by applicable Laws, will be valid and sufficient service thereof. Each of the parties hereto hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Letter Agreement or any of the transactions contemplated by this Letter Agreement in any court or tribunal other than the aforesaid courts. Each of the parties hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Letter Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Letter Agreement and the rights and obligations arising hereunder (i) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with this <u>Section 7</u> (ii) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (iii) to the fullest extent permitted by the applicable Law, any claim that (x) the suit, action or proceeding in such court is brought in an inconvenient forum, (y) the venue of such suit, action or proceeding is improper, or (z) this Letter Agreement, or the subject matter hereof, may not be enforced in or by such courts.

8. <u>Jury Waiver</u>.   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS LETTER AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS LETTER AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS LETTER AGREEMENT. EACH PARTY TO THIS LETTER AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS LETTER AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.

9. <u>Counterparts</u>. This Letter Agreement may be signed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

A/74656118.5

5

**SHAREHOLDER:**

**By:** _____
**Name:**
**Title:**
**Address:** _____
_____

**ACKNOWLEDGED AND ACCEPTED:**

**MERCURY COMPUTER SYSTEMS, INC.**

**By:** _____

_____

**Name:**

**Title:**

**Annex I to the Agreement and Plan of Merger**

**List of Principal Shareholders**

| Name | Preferred Stock Shares | Common Stock Shares |
|------|------------------------|---------------------|
| Kevin Carnino | 0 | 1,127,200 |
| Louis Greenbaum | 0 | 561,465 |
| Christopher D. Lewis | 0 | 838,000 |
| New Enterprise Associates 11, Limited Partnership | 1,470,355 | 0 |
| New Enterprise Associates 10, Limited Partnership | 3,060,866 | 0 |
| New Enterprise Associates 9, Limited Partnership | 1,196,465 | 0 |
| NEA Ventures 2006, Limited Partnership | 4,036 | 0 |

## Net Working Capital Calculation Schedule

<u>Annex II to the Agreement and Plan of Merger</u>

| Currency: $000 | Dec10 | Jan11 | Feb11 | Mar11 | Apr11 | May11 | Jun11 | Jul11 | Aug11 | Sep11 | Oct11 | Nov11 | Net Working Capital Target |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Billed receivable | 4,779 | 3,874 | 3,883 | 4,515 | 4,272 | 3,941 | 4,290 | 4,555 | 3,173 | 3,520 | 2,598 | 3,078 | |
| Unbilled receivables | 4,243 | 3,758 | 4,698 | 4,604 | 4,226 | 3,273 | 2,699 | 2,497 | 3,408 | 3,801 | 5,152 | 6,608 | |
| Inventory, net | 39 | 76 | 76 | 56 | 56 | 64 | 61 | 61 | 100 | 100 | 55 | 55 | |
| Prepaid expenses and other assets | 170 | 241 | 228 | 193 | 254 | 229 | 362 | 211 | 223 | 238 | 195 | 194 | |
| AP and accrued liabilities | (2,490) | (2,143) | (2,445) | (2,529) | (2,966) | (2,557) | (2,699) | (3,013) | (2,817) | (2,755) | (2,757) | (2,962) | |
| Bonuses | - | - | - | - | - | - | - | - | - | - | - | - | |
| Program reserve | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | |
| Unearned revenue | (30) | (55) | (63) | (77) | (88) | (10) | (32) | (43) | (52) | (67) | (78) | (87) | |
| **Net Working Capital** | **6,511** | **5,551** | **6,177** | **6,562** | **5,554** | **4,740** | **4,481** | **4,068** | **3,835** | **4,637** | **4,965** | **6,686** | **5,314** |

Note: balances are shown here for the prior 12 month ends to show how the Net working Capital Target was determined.  However, as provided in Section 3.05 of the Merger Agreement the Net Working capital is to be calculated as of the close of business on the day preceding the Closing Date.

**ANNEX III to the Agreement and Plan of Merger**

## SECURITYHOLDERS SUBJECT TO NON-COMPETE

| NAME | COMPANY | LENGTH OF NON-COMPETITION PERIOD |
|---|---|---|
| Kevin Carnino | KOR Electronics | 18 months |
| Wayne Girard | KOR Electronics | 18 months |
| Brett Keating | KOR Electronics | 18 months |
| Matthew Hughes | Paragon Dynamics, Inc. | 18 months |
| Christopher Lewis | KOR Electronics | 1 year |

A/74650315.3

**Annex IV to the Agreement and Plan of Merger**

I.   Officers and Directors of Surviving Corporation.

      Directors                  Officers

      Kevin Carnino          Kevin Carnino - President and Chief Executive Officer

      Mark Aslett            Charles A. Speicher - Chief Financial Officer and Treasurer

      Gerald M. Haines II    Gerald M. Haines II - Secretary

II.   Officers and Directors of PDI.

      Directors                  Officers

      Kevin Carnino          Kevin Carnino - President and Chief Executive Officer

      Mark Aslett            Charles A. Speicher - Chief Financial Officer and Treasurer

      Gerald M. Haines II    Gerald M. Haines II - Secretary

                              Ted Batch - Chief Operating Officer

III. Resignations of Directors and Officers at KOR.

      KOR Directors

      Robert Kohler

      Richard Kramlick

      Peter Marino

      Roger Roberts

      Ken Israel

      James Cole

      Officers

      Thomas O'Hara

      Christopher Lewis (will resign as Secretary, but will not resign position as CTO)

IV. Resignations at PDI.

      Directors

      Thomas O'Hara

      Officers

      Thomas O'Hara